## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

IMPULSE COMMUNICATIONS, INC.,
    *Plaintiff,*

v.                                                                          C.A. NO. _____

UPLIFT GAMES, LLC,
TREETOP GAMES LLC, and                          **DEMAND FOR JURY TRIAL**
LIONFIELD INVESTMENTS LTD
    *Defendants.*

## COMPLAINT

Plaintiff, Impulse Communications, Inc. ("Plaintiff"), asserts claims against Defendants Uplift Games, LLC, Treetop Games LLC and Lionfield Investments Ltd (each a "Defendant" and, collectively, "Defendants")), for trademark infringement under 15 U.S.C. §1125(a), dilution of trademark by blurring and dilution of trademark by tarnishment under 15 U.S.C. §1125(c), common law trademark infringement, common law unfair competition, violation of Rhode Island's Trademark Anti-Dilution statute (R.I.G.L. §6-2-12), tortious interference with contractual relations and tortious interference with prospective business relations, and seeks a preliminary and permanent injunction, cancellation of Defendant's registered trademarks of the term "Adopt Me!", damages, attorney's fees and costs and such other relief as the Court deems just and proper.

## THE PARTIES

1.      Plaintiff is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located in East Greenwich, Rhode Island.

2.      Defendant Uplift Games, LLC ("Uplift"), is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business located at 823 Congress Avenue, Austin, Texas  78701.  Upon information and belief after reasonable

inquiry, Uplift's membership is comprised of two individual persons who are both citizens of Texas.

3.      Defendant Treetop Games LLC ("Treetop") is a limited liability company organized and existing under the laws of the State of Texas with its principal place of business located at 823 Congress Avenue, Austin, Texas  78701.  Upon information and belief after reasonable inquiry, Treetop's sole member is Uplift.

4.      Defendant Lionfield Investments Ltd. ("Lionfield") is a private limited company organized and existing under the laws of the United Kingdom with its registered office located at One London Square, Cross Lanes, Guildford, Surrey, United Kingdom  GU1 1UN.  Upon information and belief after reasonable inquiry, Lionfield's membership is comprised of Uplift and/or a single individual person who is a citizen of the United Kingdom.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over Plaintiff's federal Lanham Act claims pursuant to 15 U.S.C. §1125, and 28 U.S.C. §§1331 and 1338(a).  This Court has supplemental jurisdiction over the Rhode Island common law and state law claims pursuant to 28 U.S.C. §1367(a) because those claims are so closely related to the federal claims brought herein as to form part of the same case or controversy.

6.      In addition, upon information and belief after reasonable inquiry, none of the Defendants or the constituent members thereof are citizens of or incorporated in either Delaware or Rhode Island, where Plaintiff corporation is incorporated and has its principal place of business, respectively.  Because there is complete diversity of citizenship between the parties located in the United States, and one of the defendants, Lionfield, is a citizen or subject of a foreign state, and the damages Plaintiff seeks exceed $75,000, this Court also has diversity jurisdiction under 28

U.S.C. §1332(c) over the claims brought herein by Plaintiff.

7.    This Court has personal jurisdiction over Defendants because they have maintained sufficient minimum contacts with Rhode Island such that the exercise of personal jurisdiction over them would not offend traditional notions of fair play and substantial justice.  Defendants each initiated and maintained robust contact with Plaintiff in Rhode Island in an attempt to negotiate the purchase of Plaintiff's rights to the AdoptMe.com web domain, which is the primary location and use of the plaintiff's trademark rights that are the subject of this suit.  Furthermore, upon information and belief, all of the Defendants, either directly or indirectly through their parent/affiliate Uplift, have made Uplift's "Adopt Me!" interactive video game available to residents of Rhode Island through the Roblox online gaming platform and Rhode Island residents have played the Adopt Me! game.

8.    Defendants also offer Adopt Me! toys and other products in Rhode Island as follows: through a multiyear global master toy licensing agreement with Jazwares, Adopt Me! toys are sold at Target and Walmart retail stores in Rhode Island; in a partnership with McDonald's, Adopt Me! Happy Meals are sold to McDonald's customers in Rhode Island; through a licensing deal with HarperCollins, a series of Adopt Me! books is sold at booksellers throughout Rhode Island; through a licensing deal with Roblox, where Roblox licensed the rights of several popular Roblox games, including Adopt Me!, to Hasbro, a company headquartered in Rhode Island, Adopt Me! NERF guns are sold in retail stores (such as Target and Walmart) in Rhode Island.  Defendants enjoy economic benefits from all of the foregoing contacts with the Rhode Island market.

9.    In addition, since 2019, the head of support for Uplift has been a resident of Rhode Island.

10.    Venue properly lies in this district pursuant to 28 U.S.C. §1391(b) and (c).  All of

3

the Defendants are subject to personal jurisdiction in the State of Rhode Island at the time this action is commenced as a result of their contacts with the state.  A civil action wherein jurisdiction is not founded solely on diversity of citizenship may be brought in a judicial district where any defendant resides.   Uplift and Treetop are entities "with the capacity to sue and be sued in [their] common name under applicable law," and are therefore "deemed to reside… in any judicial district in which such defendant[s are] subject to the court's personal jurisdiction with respect to the civil action in question." 28 U.S.C §1391(c).  Thus, because this Court has specific personal jurisdiction over the defendant limited liability companies, venue in this Court is also proper as to such defendants.  Lionfield is "a defendant not resident in the United States" and may therefore be sued in any judicial district. 28 U.S.C §1391(c).

## FACTS

### I.    Plaintiff's Business

11.    Plaintiff owns and operates the AdoptMe.com website, featuring a virtual pets game entitled "Adopt Me".

12.    Plaintiff started the AdoptMe.com website in 1998. Plaintiff began featuring the Adopt Me virtual pets game on its website in 2000.

13.    Upon information and belief, Plaintiff was the first entity to ever use the mark "Adopt Me" in connection with an online, virtual pets game.

14.    Plaintiff's use of "Adopt Me" was and is distinctive in application to an online virtual pets game.  The term "Adopt Me" is suggestive, not generic or descriptive, when used in connection with an online virtual pets game.

15.    Plaintiff has also adopted a stylized Adopt Me logo that further distinguishes its use of the term "Adopt Me" in connection with its game and business.

4

16.    While Plaintiff never registered its "Adopt Me" trademark, Plaintiff has, since 2000, continuously used the mark in commerce and asserted common law ownership of it.

17.    Plaintiff has invested approximately $200,000 in the Adopt Me website, game, and brand since 2000.

18.    Through its website, Plaintiff makes its Adopt Me game available to players in all 50 states.

19.    While there is no charge to play the Adopt Me game, Plaintiff derives income from its website and game through third-party advertising directed at the users of its website and players of the Adopt Me game. The Adopt Me game attracts viewers to Plaintiff's website, creating a viewer/customer base for advertisements, and Plaintiff receives a payment for each view.

20.    Plaintiff's use of the "Adopt Me" trademark has not been limited to its website.

21.    In the mid-2000s, Plaintiff offered Adopt Me plush toys for sale at major national retailers such as Toys "R" Us.  The below photo shows Adopt Me plush toys for sale in the "Toys "R" Us store located in Times Square, New York City, during the mid-2000s:

5



22.     The Adopt Me plush toys helped expand and popularize Plaintiff's Adopt Me brand nationally and also drove customers to Plaintiff's website and the Adopt Me game. Customers purchasing an Adopt Me stuffed animal received a code in the toy's packaging enabling them to adopt that same pet in the Adopt Me game on AdoptMe.com.

23.     The Plaintiff's stuffed animals are presently still referenced on the web. See, e.g. https://www.entertainmentearth.com/product/adopt-me-beagle/ad116, https://www.entertainmentearth.com/product/adopt-me-horse/ad178                and https://www.entertainmentearth.com/product/adopt-me-hamster.

24.     For over twenty years, Plaintiff has sought to create a wholesome, safe, child- and

family-friendly experience on its website and in its Adopt Me game, in order to keep players and users coming back.

25.     Plaintiff's website and game do not feature any violence, sex, possibilities for scamming, or any other potentially objectionable content that may drive away players/users or expose Plaintiff to liability.

26.     To make its website and game safe for its young users, Plaintiff does not permit interaction or communication among players or users.  Plaintiff's Adopt Me game is not a multiplayer game; each player's experience is solitary.

27.     Millions of virtual pets have been adopted in Plaintiff's Adopt Me game since it was launched in 2000.

28.     As of 2011, the AdoptMe.com website was averaging about 5,000 visitors a day and had been averaging a similar number of visitors for the previous 10 years.

29.     During the same time, AdoptMe.com was the number one result for searches of the term "virtual pets" on Google.

30.     AdoptMe.com was also making approximately $1,600 a month from the AdSense advertisement network, and at one point made $5,000 a month.

31.     Over the years, Plaintiff built a large community of Adopt Me users who loved the Adopt Me game.

32.     A small sample of the high regard in which the Adopt Me game was held by members of the general public can be found at the following web sites and videos: https://pclosmag.com/html/Issues/201303/page17.html (2013 blog posting about AdoptMe.com by a user of the site); https://discover.hubpages.com/games-hobbies/Adopt-a-Virtual-Pet-Today (2016 posting about Adopt Me and other popular virtual pet sites); https://teddybear-

halo.neocities.org/internetchpt3 (blog posting about fond memories of playing AdoptMe.com as a child); https://www.swissarmylibrarian.net/2012/04/21/reference-question-of-the-week-41512/- (2012 posting discussing librarian's choice of AdoptMe.com as the best virtual pets site); https://www.pianostreet.com/smf/index.php?topic=25522.0 (2007 recommendation for AdoptMe.com); https://petshealthinfo.blogspot.com/2012/04/how-to-adopt-virtual-pet-online.html (2012 recommendation for AdoptMe.com); https://futurefive.co.nz/story/website-review-adopt-me (2011 review of AdoptMe.com); https://www.reddit.com/r/tipofmytongue/s/hfVdD5hILm (discussion of fond memories of AdoptMe.com in a post titled "Adopt Me: NOT ROBLOX"); https://www.youtube.com/watch?v=xl31cXLjhGQ&pp=ygUNIkFkb3B0bWUuY29tIg%3D%3D (Adopt Me user chats with their cat in 2009); https://www.youtube.com/playlist?list=PLudnIrf0Jadxb772z1GCzTuPHNUs91JY6 (AdoptMe.com user made 6 videos about using the site in 2015); https://www.youtube.com/watch?v=XVeSdad_wUE&pp=ygUNIkFkb3B0bWUuY29tIg%3D%3D (User video about playing with their snake on AdoptMe.com in 2015); https://www.youtube.com/watch?v=vaKVTW4ME-A&pp=ygUNIkFkb3B0bWUuY29tIg%3D%3D (UIser adopts a pet in 2009); https://www.youtube.com/watch?v=7Jm6u8yzT9Q&pp=ygUNIkFkb3B0bWUuY29tIg%3D%3D (User recommends AdoptMe.com as an alternative to WebKinz in 2009); and https://www.youtube.com/watch?v=jGMCiIRFaEk&pp=ygUNIkFkb3B0bWUuY29tIg%3D%3D (User chats with Adopt Me pet in 2011).

33.    Over the years, Plaintiff has received many emails from users of AdoptMe.com expressing their love for the Adopt Me game, for example: (from an email dated June 26, 2011)

8

"Hi I love adoptme.com a lot but its kind of sad you cant watch your pet do his or her job. It would be really fun if you could! All my friends at school who play this wish the same as me! PLEASE!"; (from an email dated February 20, 2012) "I liek [sic] your game very very much! Great job"; and (from an email dated October 9, 2020) "I used to play this game when I was younger and would really like to show my daughter the game. If you have any information on how or if it will be on an app store I would love to know. As well as help spread the word!".

34.    In 2020, Plaintiff replaced its twenty-year-old website version of the Adopt Me game with an Adopt Me iOS app that could be downloaded from Apple's App Store.  The AdoptMe.com website was changed to be a source of Adopt Me news and shows users where they may download the Adopt Me app.

35.    In 2021, while still maintaining the iOS app, Plaintiff launched a completely new version of the AdoptMe.com website and game, which were reprogrammed from scratch. This web version of the game had all new pets and its own economy where users could earn "AdoptCoins" for completing specific tasks and buy and sell pets and items in the Adopt Me marketplace.

36.    In January 2022, Plaintiff paid for a press release announcing the addition of six new Adopt Me pets:  https://www.einpresswire.com/article/561142689/adoptme-com-adds-6-new-virtual-pets.

37.    That same month, Plaintiff's owner wrote the Adopt Me theme song.  Plaintiff paid a musician to perform it and paid to make a music video, which was posted on the Adopt Me social media accounts. (It can be viewed at

https://youtu.be/LHgyXSMYBm4?si=BjljEmbOxczqfKi1.)

38.    In 2022, a metaverse concert hall was built on the AdoptMe.com site, and it

featured the Adopt Me theme song music video as the "concert."

39.    In 2022, an internal blockchain was added to the website to keep track of all transactions.  At the same time, users could mint NFTs (non-fungible tokens) of their pets. These NFTs could either be saved on the Adopt Me blockchain or transferred to the Solana blockchain (with Plaintiff paying for the "gas fee" on behalf of the user), where they could be sold for cryptocurrency outside of AdoptMe.com.

40.    In 2022, Plaintiff added a metaverse auction room to the AdoptMe.com website, enabling users to bid on Adopt Me pets and other items in the metaverse.

41.    In 2022, Plaintiff added the ability for users to chat with their pets to the Adopt Me game.

42.    In 2022, Plaintiff partnered with RescueGroups.org to have a "Rescue Pets" page in the Adopt Me game where users could adopt virtual versions of real pets housed in thousands of animal shelters throughout the USA.  Each of these pet profiles had a link to the applicable pet's real-world shelter and a message saying, "Please consider making a donation to the animal shelter that pet is currently living in, to help them get adopted by a loving family."  The links facilitated commerce on those shelter sites.

43.    In 2022 and 2023, Plaintiff paid for extensive social media marketing, with marketing consultants posting content on their following company-owned accounts.

44.    In 2022 and 2023, the Plaintiff also paid for workers to do online marketing for Adopt Me, including link-building campaigns for search engine optimization (SEO).

45.    In 2023, Plaintiff greatly expanded the metaverse section of the AdoptMe.com website to allow users to own parcels of virtual land and build houses and stores on them, and then later added an entire metaverse city to the website.

46.     In 2023, the website was again redesigned from scratch to its current format, in which the focus is on adopting AI-powered virtual pets.

47.     The Adopt Me game is currently available on both the website and as an app.

48.     The Adopt Me trademark and the goodwill associated with it have become valuable assets of the Plaintiff.

## II.     Defendant's Unlawful Activities

49.     Defendant Uplift develops and markets video games.

50.     Uplift operates the "Adopt Me!" virtual pets game on the Roblox online gaming platform. The official website for Adopt Me! is "playadopt.me."

51.     Uplift first launched Adopt Me! on Roblox in 2017 with the same title as Plaintiff's game: "Adopt Me".

52.     The below screenshot shows Plaintiff's website (and use of the Adopt Me mark) on July 13, 2017, the day Uplift first published its Adopt Me! game:



53.     On September 17, 2017, Uplift registered the playadopt.me domain for its game.

54.     The below screenshot shows Uplift's www.playadopt.me website (as of April 24, 2024) and use of the Adopt Me! mark in a way that is derivative of Plaintiff's use of the Adopt Me mark on its own website.



55.     Neither Uplift nor any other Defendant ever requested or received authorization from Plaintiff to use its Adopt Me trademark.

56.     Uplift's game was originally a children's game about adopting virtual humans.

57.     In 2019, Uplift changed its game to a children's game focused on virtual pets, just like Plaintiff's game.

58.     After that change, the popularity of Uplift's game rapidly increased. Adopt Me! is presently among the most popular games on the Roblox platform, attracting billions of visits a year.

59.     Uplift describes the aim of Adopt Me! as being to "adopt and raise, trade and collect legendary pets…" (https://www.roblox.com/games/920587237/Adopt-Me), and Uplift describes itself as "the premier pet adoption game on Roblox" (https://www.uplift.games/careers/senior-

gameplay-programmer).

60.    Both Plaintiff's and Defendants' games share the same consumer base and target demographic, which is children and young teenagers who like to play online games.

61.    In 2018, in an apparent attempt to differentiate its game from that of the Plaintiff, Uplift added an exclamation mark to the name of its game (i.e. "Adopt Me!").

62.    Despite this token name change, the main page of Uplift's playadopt.me website continued to refer to its game as "Adopt Me" without an exclamation point until at least May, 2021.

63.    Upon information and belief, Defendants' employees regularly omit the exclamation point when referring to the Uplift's game.  For example, when Uplift's employee Josh Ling contacted Plaintiff by email on May 12, 2020, seeking to buy Plaintiff's domain name on behalf of Uplift, the employee wrote "… I work on Adopt Me, the Roblox game…."

64.    In addition, Uplift's website continues, up to the present, to feature instances where the name of its game is listed as "Adopt Me" without an exclamation point, including in news releases (see https://www.uplift.games/news/toy-licensee-for-adopt-me (dated 05/19/2022) and https://www.uplift.games/news/developing-a-minigame (dated 03/4/2024)), in information about Uplift (see https://www.uplift.games/why-work-here (accessed 03/18/2024)) and its influencers (see https://www.playadopt.me/influencers (accessed 03/18/24)), and in job postings (see https://www.uplift.games/careers/senior-gameplay-programmer (dated 10/22/23)).

65.    Many users of Defendant's game (as well as parents and news outlets) still refer to Defendant's game as "Adopt Me" without the exclamation point.  Plaintiff can easily identify and submit thousands of pertinent examples.

66.    Adding an exclamation mark to Defendants' use of Adopt Me did not help

differentiate it from Plaintiff's Adopt Me, or decrease confusion of the two marks, as evidenced by the steady stream of consumers who still mistakenly contact Plaintiff to this day about Uplift's game.[1]

67.    Defendants have recently branched out into selling a line of "Adopt Me!" toys at Target and Walmart, and on Amazon.com and its website. Among these toys is a plush pet similar to those that Plaintiff sold under its Adopt Me mark.

68.    Defendants have recently licensed the "Adopt Me!" name to Hasbro's Nerf division to sell a "Nerf Roblox Adopt Me!: BEES!" gun, and offered "Adopt Me! Happy Meal Toys" at the McDonald's fast-food chain.

69.    Similar to Adopt Me being available on a website (AdoptMe.com) and through an iOS app, Adopt Me! is available on a website (roblox.com) and through an iOS app.

70.    Defendants have infringed upon and used Plaintiff's "Adopt Me" trademark without authorization from Plaintiff.  As of the date of the filing of this Complaint, Defendants continue to infringe upon and use Plaintiff's "Adopt Me" trademark without authorization from Plaintiff.

71.    Defendants have used Plaintiff's Adopt Me trademark in connection with services and products similar to those of the Plaintiff and thus created a likelihood of confusion.

72.    Defendants do business within states where Plaintiff also does business.

73.    There is a high likelihood that Defendants' continued use of the Adopt Me trademark will cause additional confusion in the marketplace as to the source of the goods and

---

[1] Defendants recognize that the presence or lack of an exclamation point does not suffice to differentiate trademarks. In Defendants' trademark opposition against Zhuhai Sandbox Network Technology LTD's application (Serial No. 79292309) to register "ADOPTME" as a trademark for an online game, Defendants asserted that that trademark was too similar to Adopt Me! and caused confusion in the marketplace. See Opposition No. 91268949, filed April 21, 2021.

services sold by the Plaintiff and by Defendants.

74.      The now-widespread name recognition and enormous popularity of Defendants' game have kept Plaintiff's user base and business from growing.

75.      While Plaintiff has attempted to cultivate investors and partners to help it expand its business and brand, they have rejected Plaintiff's business proposals citing the difficulty of competing with Adopt Me!.

76.      After investing large amounts of time and money over the past 4 years creating new versions of the Adopt Me game, Plaintiff has realized that, due to Defendants' trademark infringement, they are unable to compete with Defendant's game, which has over 100 million users.  As a result, Plaintiff currently maintains the AdoptMe.com website and game, but has been forced to put on hold any future business plans, investments, and expansions into new markets and product lines.

### III.    Defendants' Attempt to Purchase Plaintiff's AdoptMe.com Domain

77.      On May 12, 2020, Uplift, acting through its employee Josh Ling, initiated unsolicited contact with Plaintiff to express interest in purchasing the Adopt Me domain.

78.      This out-of-the-blue email was apparently precipitated by a notice Plaintiff published on its AdoptMe.com website one or two weeks prior to the arrival of Mr. Ling's email, in which Plaintiff notified users that the AdoptMe.com version of the Adopt Me game would be shutting down.

79.      In Plaintiff's responses to Uplift's email, Plaintiff never indicated that it was abandoning or intended to abandon the Adopt Me mark.

80.      In Plaintiff's responses to Uplift's email, Plaintiff actually asserted its almost twenty-year common law rights to the Adopt Me name.

81.     At the time of Uplift's email, the AdoptMe.com domain was not on the market for sale and Plaintiff had not been considering a sale.

82.     Without making any decision as to whether to sell the domain, Plaintiff decided to engage in negotiations with Uplift to see what Uplift would offer for the domain.

83.     Before making an offer on the domain, Uplift began to communicate with Plaintiff through Morrison Rothman LLP, attorneys for Uplift's subsidiaries/affiliates Treetop and Lionfield, Plaintiff and Defendants then negotiated over the AdoptMe.com domain and related trademark rights.

84.     During these negotiations, Plaintiff kept the website active and continued to make income from it.

85.     By August 2020, Plaintiff realized that Plaintiff and Defendants could not reach agreement on a sale of Plaintiff's AdoptMe.com domain, and the negotiations ended without resolution.

86.     Plaintiff immediately proceeded with pre-existing plans to invest significant amounts of money into its website, game and brand, which resulted in the launch of the Adopt Me iOS app in December 2020.

87.     On or about August 5, 2020, Plaintiff updated the AdoptMe.com website to include a public notice on its main page stating that "The AdoptMe.com website is no longer available, but we are working on creating an AdoptMe virtual pets app for iPhone, iPad and Android mobile devices to replace it. Check back here for more info.  Until then, please go to our new site at BoredHumans.com  …"      A    screenshot    of    the    notice    can    be    found    at https://web.archive.org/web/20200805160302/http://www.adoptme.com.

88.     In an August 20, 2020, email communication with an attorney from Morrison

Rothman LLP, on which Attorney Allison Rothman was copied, Plaintiff provided notice to the Defendants of Plaintiff's intention to continue using the Adopt Me mark in commerce, through the Adopt Me iOS app.

89.    In the August 20, 2020 email, Plaintiff's owner notified Defendants, "I am going to try to create a new version of AdoptMe in the form of a mobile app… I already am almost finished with a demo version, so I should have it relaunched soon."

90.    Plaintiff received no further communication from Defendants.

## IV.    Defendants' Subsequent Fraudulent Registration of Trademark

91.    Several months after negotiations between Plaintiff and Uplift broke off, on February 4, 2021, Uplift (acting through its subsidiaries/affiliates, Defendants Treetop and Lionfield) applied for a federally registered trademark of "Adopt Me!" for downloadable games software. This trademark (Registration Number 6626699) was registered on January 25, 2022.

92.    In addition, on March 9, 2022, Uplift (again acting through its subsidiaries/affiliates, Defendants Treetop and Lionfield) applied for a federally registered trademark of "Adopt Me!" for scores of physical items such as toys, books, stickers and backpacks. This trademark (Registration Number 7130097) was registered on August 8, 2023.

93.    Upon information and belief, Uplift used Treetop and Lionfield to hold ownership rights to the Adopt Me! trademark registration in an attempt to insulate itself from trademark infringement lawsuits.

94.    Upon information and belief, Treetop and Lionfield license the rights to use the Adopt Me! trademark to their parent/affiliate Uplift and to others.

95.    Defendants' federal registrations of the "Adopt Me!" trademark were fraudulently obtained, with Defendants certifying and maintaining Trademark Applications to the United States

Patent and Trademark Office ("USPTO") in spite of their knowledge of Plaintiff's twenty-year long and continuing use of the Adopt Me mark in commerce and their knowledge of the confusion between the Adopt Me and Adopt Me! marks.

96.     Plaintiff had no intent to abandon the Adopt Me trademark at the time Defendants filed their federal Trademark Applications or at any other time in question.

97.     The notice published by Plaintiff on AdoptMe.com in early May, 2020, gave no indication that the Adopt Me game was going to shut down permanently or that Plaintiff would not relaunch the game on another domain or platform.

98.     The notice gave no indication that the Adopt Me brand or business was shutting down or that Plaintiff was abandoning the use of the Adopt Me trademark.

99.     Even before the shutdown of the Adopt Me game on AdoptMe.com, Plaintiff had already planned to relaunch it as a mobile app by the end of 2020.

100.     Plaintiff needed to create a new version of the game for two reasons.  First, the original version was programmed in Flash and PHP, and Flash was scheduled to become obsolete on December 31, 2020.  Second, the Server and PHP programming were very old and causing errors.  While the server issues could have been fixed, the Flash problem was out of Plaintiff's control, and, as a result, Plaintiff had already begun planning to have a new version of the game in place by the end of 2020.

101.     Shutting down the Adopt Me game on AdoptMe.com did nothing to change the Plaintiff's plans to refresh and modernize the Adopt Me game, which happened on schedule when Plaintiff launched the Adopt Me iOS app in December, 2020, and then relaunched the Adopt Me web game shortly thereafter.

102.     The only reason Plaintiff shut down its game in May, 2020, seven months earlier

than it had already planned, was due to the consequences of Defendants' continued trademark violations. Otherwise, in December, 2020, there would have been an orderly transition from the old version of the Adopt Me game to the new one, with no downtime.

103. When the COVID-19 lockdown began in March 2020, Uplift's game skyrocketed in popularity, and Plaintiff began to receive multiple very angry and hostile emails daily from users of Uplift's game mistakenly believing Plaintiff was Uplift.

104. By accelerating the timing of the shutdown of AdoptMe.com, Plaintiff sought to avoid having to deal with the sudden influx of harmful Adopt Me! related emails and the risk of potential mistaken lawsuits from the millions of players of Uplift's game.

105. Even while the AdoptMe.com game was shut down, the Adopt Me brand was still in use.

106. Plaintiff never took down the AdoptMe.com website and it remained active on the web during the entirety of 2020 at a cost of $100/month.

107. Plaintiff also posted news updates about the Adopt Me game on the AdoptMe.com site as part of a placeholder strategy, since Plaintiff planned to use the AdoptMe.com website to promote the Adopt Me app once it was launched.

108. Even before the negotiations between Uplift and Plaintiff over the sale of Plaintiff's domain name ended in August, 2020, the news updates on AdoptMe.com informed the public that Plaintiff was working on a new version of the game that it was about to release.

109. A permanent shut down of the AdoptMe.com website would have caused Plaintiff to lose 20 years of valuable external links to AdoptMe.com (from search engines, directories, blog postings, etc.) relating to virtual pets, and these were critical for Plaintiff's planned relaunch of the site and launch of the Adopt Me iOS app.

110.   Referring Adopt Me users to one of Plaintiff's affiliated AI sites, BoredHumans.com, in the notice posted on AdoptMe.com while the Adopt Me game was down, was not an attempt to replace AdoptMe.com with BoredHumans.com.

111.   BoredHumans.com was newly launched in April 2020, and Plaintiff posted the BoredHumans.com link in an attempt at cross-marketing, because BoredHumans.com generated income from banner ads. Thousands of visitors per month who came to AdoptMe.com seeking to play the Adopt Me game while the game was down clicked on the BoredHumans.com link seeking other games, and thereby generated income which Plaintiff could use to help pay for the relaunch of the Adopt Me game and launch of the Adopt Me app.

112.   In connection with each of the Defendants' federal trademark registration applications for Adopt Me!, Defendants, acting through their Attorney of Record, Allison Rothman, Esq., of Morrison Rothman LLP, the same attorneys Defendants used as an intermediary in negotiations with Plaintiff, declared that "To the best of the signatory's knowledge and belief, no other persons, except, if applicable, concurrent users, have the right to use the mark in commerce, either in the identical form or in such near resemblance as to be likely, when used on or in connection with the goods/services of such other persons, to cause confusion or mistake, or to deceive."

113.   At the time of such declaration, and in direct contradiction thereof, Defendants and their attorneys actually already had knowledge of Plaintiff's prior use of the Adopt Me common law trademark as well as Plaintiff's intent to continue using the Adopt Me trademark for the indefinite future.

114.   In email correspondence six months prior to the Defendants' filing of their initial federal Trademark Application for Adopt Me!, Plaintiff had given Defendants and their counsel

notice of Plaintiff's trademark rights and of Plaintiff's intent to continue using Plaintiff's Adopt Me mark.

115.    At the time of such declaration, and in direct contradiction thereof, Defendants and their attorneys also already had knowledge of the confusion in the marketplace caused by the similarity between Plaintiff's mark and the mark that Defendants were seeking to register.

116.    In his May 12, 2020, email to Plaintiff, Uplift employee Mr. Ling showed awareness of the confusion when he stated "My name is Josh and I work on Adopt Me, the Roblox game you've been unfortunately made aware of. Firstly I'd like to apologise for any confusion our players had relating to thinking you were in any way related to Adopt Me. I had no idea until today there was this confusion, though it makes sense."

117.    Prior to filing Defendants' federal trademark applications for Adopt Me!, Defendants and their attorneys had an obligation to conduct reasonable investigation and due diligence to ensure that the use of Adopt Me! did not infringe on others' rights.

118.    Since both Uplift and its attorneys were involved in the unsuccessful negotiations with Plaintiff just six months prior to the filing of Defendants' initial Adopt Me! trademark application on February 4, 2021, and all of the Defendants and their attorneys were thus aware of Plaintiffs use of Adopt Me, they had a duty to confirm whether Plaintiff was still using the trademark.

119.    Defendants and their attorneys could have easily confirmed Plaintiff's continued use of Adopt Me.  By August 5, 2020, while the parties were still negotiating, Plaintiff's AdoptMe.com website was already advertising the upcoming release of the new version of the Adopt Me game, and by December, 2020, the website and the Adopt Me iOS app (linked from AdoptMe.com) were fully active.

## V.    Confusion Between Marks and Damage to Plaintiff's Mark

120.    For over 20 years, Plaintiff has strived to build a reputation for its website, game and brand as being wholesome, safe and child- and family-friendly.

121.    Before Defendant Uplift started their Adopt Me! game in 2017, Plaintiff was the only "Adopt Me" virtual pet game and was frequently linked to and talked about online as a fun and safe website for children to go to.

122.    To avoid potential harm to children (and legal risks to Plaintiff), Plaintiff's Adopt Me game has never allowed user interaction.

123.    On the other hand, Adopt Me! and the Roblox platform upon which it is available allow interaction, and Adopt Me! has millions of users under the age of 13 interacting online.

124.    This has resulted in negative consequences for Adopt Me! and Roblox and, increasingly, because of public confusion, for Plaintiff and the Adopt Me brand.

125.    As Uplift's game became increasingly popular, Plaintiff received increasing numbers of misdirected communications from users of Adopt Me! evincing confusion between Plaintiff's and Defendants' use of the "Adopt Me" mark.  At the same time, traffic to AdoptMe.com increased from the usual 600 visitors per day to 15,000 per day, without a commensurate increase in activity on the Adopt Me game, indicating that, as in the case of the mistakenly directed emails, visitors were mistakenly looking for Defendants' website.

126.    Plaintiff has received many complaints from users of the Adopt Me! game who have been scammed (e.g. "I was scammed a day ago and I reported to the game and my pets have not been returned yet. On roblox my name is [redacted];" and "My daughter is always playing AdoptMe and this time she was tricked. A user with the name [redacted] and some numbers including [redacted] scammed my daughter out of her ultra rare Shibu Inu… Please fix this

problem, I don't want grown people scamming my 8-year-old."); who have been hacked (e.g. "I got hacked and lost my frost dragon im going to cry") and who have technical issues (e.g. "My child has lost her pets and I have made a ticket but have not heard anything from them. Can you please help me. She is very upset."). Plaintiff can easily identify and produce over 500 such emails.

127.    In addition, members of the public have posted videos and posts confusing Adopt Me and Adopt Me! on public platforms such as YouTube (e.g. Video entitled "my adopt me plush. adoptme.com.plushies" at https://www.youtube.com/watch?_app=desktop&v=5_NR3CXVnSY, about one of the plush toys produced or licensed by Defendants); Instagram (e.g. https://www.instagram.com/adoptme_play/_?igsh=Z3d2aXBwMmljb2gy, where a user posts screenshots from Uplift's game but references the Plaintiff's website at www.adoptme.com); Facebook           (e.g.           https://www.facebook.com/people/Adopt-Me-Page/100078986753565/?mibextid=LQQJ4d where posting and comments are about the Adopt Me! game, but reference Plaintiff's website URL by mistake); and Reddit (e.g. https://www.reddit.com/r/AdoptMeRBX/comments/ok3dim/guys_i_got_hacked_and_they_took_all_of_my_pets/?share_id=sQcR0WuEbR8eMCAO44Hqd where a user asks "Wait rlly so you go to like adoptme.com?" in a discussion about hacked pet problems on Adopt Me!).  Plaintiff can easily identify and produce dozens of similar postings.

128.    Because of this public confusion, users of Plaintiff's Adopt Me game are often forced to include disclaimers in their videos and web postings, to clarify that they are talking about Plaintiff's       game       and       not       Defendants'       game.       (See,       e.g., https://www.reddit.com/r/tipofmytongue/comments/18jggi7/tomt_website_early_2000s_adopt_me_not_roblox/;     https://apps.apple.com/us/app/adopt-me-adopt-virtual-pets/id1528053329?see-all=reviews (a review of the Adopt Me app stating: "The original AdoptMe!!! Many people will

associate AdoptMe with that Roblox game, but this is where it was at for me! I spent many hours on AdoptMe.com in elementary school and I even wrote a literary magazine entry about it in the second grade! While that was some 13 years ago now, I hope this AdoptMe will be a part of my life as the website once was. Disclaimer: This is not the Roblox AdoptMe team's game if you are looking for that. However, you should still 100% give this classic game a try!"); and https://www.reddit.com/r/tipofmytongue/comments/12ob4ar/tomtvideogame_cant_remember_this_old_online_pet/ (AdoptMe.com user's response to a 2023 Reddit posting titled "[TOMT][videogame] Can't remember this old online pet video game" stating "Adopt Me? (Not the Roblox Game. Here [https://pclosmag.com/html/Issues/201303/page17.html] is a website that describes it for reference.) There were lots of dog and cat breeds on there, and there was a parrot too...").

129.    Defendants' use of Plaintiff's trademark has made Plaintiff's game much more difficult to find online.  Prior to the launch of Defendants' game in 2017, there was only one "Adopt Me" virtual pets game, and Plaintiff's website was the #1 search result in Google and all other major search engines for the term "Adopt Me". Since 2020, for the same search, AdoptMe.com is nowhere to be found in the results.

130.    The inability of users to find Plaintiff's website among online search results online has caused a significant decrease in traffic to Plaintiff's website.  New users searching for a virtual pets adoption game are not made aware of the existence of Plaintiff's game, and inconsistent users of the AdoptMe.com game, who do not remember the exact game or website name and need to perform an internet search for it, are not able to find it again. (See, e.g., https://www.reddit.com/r/tipofmytongue/s/lA35EIQHsB (former game user posting search for Adopt Me game under title "Can't remember this old online pet video game" is referred to Adopt

Me in a comment as the correct solution.)

131.     The public confusion between Adopt Me and Adopt Me! has the effect of implicating Adopt Me with bad behavior (such as scamming, pedophilia, sex, gambling, and illegal child labor) associated with Adopt Me! and the Roblox platform on which it is offered, and thereby damaging Plaintiff's brand and reputation.

132.     For example, Plaintiff, at its AdoptMe.com website, received a message from an Adopt Me! user on April 24, 2021, stating that "One of your adopt me, staff movers was caught abusing a roblox exploit inside of my Subway game. The adopt me employee was confronted, and immediately banned me from the server to re-book any permissions that I had to be able to open a ticket via discord. I am using this website to submit a support ticket… There's also video evidence in screenshot evidence proving that this was in adopt me staff member."

133.     Another example evinces that some of the public using Adopt Me! mistakenly hold the Plaintiff responsible for money they have lost on Defendant's game.  On April 25, 2020, Plaintiff, at its adoptme.com website received an email from an Adopt Me! user stating: "So, today I was playing adopt me.and well..I got scammed for my 800 dollars. This person said 'give me 800 dollars for my mega ride dog' and so,I paid him/her and then they left the game and scammed me,please help from [redacted],I would hope you would take it into consideration to give me my money back."

134.     A Google search of the term "adopt me scam" performed on March 18, 2024 brought back results including "5 NEW Adopt Me Scams That You Need To AVOID!: Adopt me scams are getting worse, i show how to avoid these and educate you on how to be safe when playing adopt me and avoid these scams …" ; "I Became An Adopt Me Scammer For 24 HOURS!"; "Best Ways To Scam In Adopt Me."

135.    There is even an entire section on the Adopt Me! Wikipedia page about the Defendants' scammer problem (see https://en.wikipedia.org/wiki/Adopt_Me!#Scams).

136.    In 2022, it was determined that Defendants' Adopt Me! game was illegally facilitating gambling by selling "loot boxes" in the Netherlands and Belgium, and the game was temporarily shut down in those countries. (See https://www.pcgamesn.com/roblox/adopt-me-shut-down-loot-box) Other governments of other countries, including the United States, also see loot boxes as a form of gambling and are also considering banning and regulating them.

137.    A Google search of the term "adopt me pedophile" performed March 18, 2024 returned results including "Kanwal: Convicted pedophile [redacted] after using Roblox currency for online abuse" (describing that when a girl asks [redacted] for an "adopt me pet" from Roblox, [redacted] asks her to take a video "so I can watch you take your clothes off"); "I caught a pedo on adopt me"; and "Adopt me! SUCKS!!!!!!!!!!!!!!!!!!!!!!!!! : r/RobloxAdoptme" (stating "It's also filled with too many children. I am a female and I got into a Discord call with a PEDOPHILE who was DATING SEVEN-YEAR-OLDS!!!!!!!!").

138.    A Google search of the term "Adopt Me rape" performed on March 18, 2024, returned results including "Are Predators Approaching Children on Roblox? What Parents Need to Know; Child predators … Sex rooms … Gang Rape? … Most popular games on Roblox at the moment: Adopt Me!..."; "New Roblox Video (adopt Me) She Tried To Rape Me. 12K views. 4 years ago … more. Ke'Anni Johnson. 68. Subscribe." and "Roblox responds to the hack that allowed a child's avatar to …; July 18, 2018 – This allowed two male avatars to gang rape a young girl's avatar on a playground in one of the Roblox games. The company has now issued an …"

139.    There are dozens of articles and forum postings about objectionable activity on the Roblox platform generally.  For example: "Paedophile groomed 150 children to engage in sexual

activity using online game Roblox" ( https://www.walesonline.co.uk/news/wales-news/paedophile-groomed-150-children-engage-16258877); "11-Year-Old Girl Allegedly Kidnapped By Man She Communicated With On Roblox" (https://news.yahoo.com/11-old-girl-allegedly-kidnapped-215725284.html.); https://www.pcmag.com/news/parents-file-another-class-action-lawsuit-against-roblox (describing lawsuits filed by parents alleging Roblox exposes children to "harmful content" and citing examples of incidents of children groomed by pedophiles, children engaging in illegal gambling, links for pornography sites sent to children, children playing with nude avatars, avatars engaging in intercourse and playing with sex toys).

140.    Roblox has been the subject of multiple lawsuits, including a 2021 suit brought by music publishers seeking damages of $200 million (https://www.gamedaily.biz/roblox-sued-for-200-million-by-national-music-publishers-association/), a 2022 suit blaming it for the suicide of a 15-year-old girl (https://www.kktv.com/2022/10/22/mother-warns-parents-online-game-that-led-death-her-15-year-old-daughter/), and a 2024 suit accusing Roblox of unlawfully profiting from children's labor because all of the content it sells is user-generated, and the majority of its users are children (https://www.kron4.com/news/bay-area/lawsuit-roblox-exploits-child-labor-creates-addictive-gaming-experiences/).

141.    Many of the articles and postings about bad behavior (scamming, pedophilia, sex, gambling, illegal child labor, etc.) on the Roblox platform cite "Adopt Me" as an example of a popular game on Roblox, even if not explicitly implicating the Defendants' Adopt Me! game. These articles and postings almost always have a very negative tone.

142.    Every time Adopt Me is confused with Adopt Me! in these negative contexts and every time Adopt Me! and the Roblox platform are mentioned negatively in this manner damages Plaintiff's Adopt Me brand and reputation and increases Plaintiff's potential legal exposure to

lawsuits filed by confused plaintiffs attempting to sue Plaintiff instead of Defendants for damages attributable to Defendants.

143.    Plaintiff's serious concern about potential legal exposure to lawsuits brought against it by confused claimants actually seeking to sue one of the Defendants is justified by two instances in which Plaintiff became involved in lawsuits when litigants mistakenly either named Plaintiff as a defendant or served Plaintiff with a subpoena.  Even though the mistakes in those two cases were quite obvious, Plaintiff was still forced to expend much time and effort to extricate itself from the lawsuits.  Because of the nearly identical nature of the names and games of the parties in this suit, the time, effort and expense required to extricate Plaintiff from lawsuits in which it is mistaken for one of the Defendants would be much greater.  Plaintiff would likely have to go to court to prove that it was being wrongly accused.

144.    Furthermore, Defendants' infringement of Plaintiff's Adopt Me trademark and the confusion that it has caused in the marketplace negatively impact Plaintiff's business, scaring potential users and investors away from Plaintiff's Adopt Me website and game.

145.    The negative impact on Plaintiff's finances caused by Defendants' infringing actions and the resulting confusion between the two marks, coupled with the expense of the investments Plaintiff made to try to update and advertise the Adopt Me game, deprived Plaintiff of the funds necessary for a complex litigation against the wealthy defendants.

146.    However, over the past few years, the negative associations with Plaintiff's Adopt Me brand resulting from Defendants' trademark violations have grown from being related to run-of-the-mill scams to more severe issues such as pedophilia, rape, pornography, music copyright violations, underage gambling, and child labor.

147.    Even though Plaintiff does not wish to be associated with any of these toxic

issues, it has become associated with them anyway due to Defendants' continued trademark violations.

148.    It has come to a point in 2024 where Plaintiff could be forced to shut down its Adopt Me business if Defendants do not stop infringing upon Plaintiff's trademark.  The current state of affairs has become intolerable to Plaintiff and forces it to act.

149.    The various lawsuits against Roblox and countless articles about alleged illegal activity on Roblox and Adopt Me! do ever more damage to the reputations of Plaintiff and its owner and create increasingly significant legal risk for Plaintiff by association.

150.    Plaintiff and its owner have done everything possible since Plaintiff started in 1995 to avoid legal problems, and, except for the two instances of mistake described above, have never been involved in a lawsuit.

151.    Because of the disreputable and criminal acts that have become associated with Defendants and the Roblox platform upon which Adopt Me! game is offered, potential criminal actions against the Defendants are now possible, and as a result of the confusion caused by Defendants, criminal actions against Plaintiff or its owner are also now possible.  Any such criminal actions, even if based on mistake, would involve arrest, publicity, and the potential for personal injury by overzealous law enforcement, and would cause irreparable damage to the reputations of Plaintiff and its owner.

152.    The disreputable and criminal acts recently associated with Defendants and Roblox, especially those involving children, also now create the risk that victims or others affected by these acts could seek revenge and seek to injure or kill those they believe to be associated with the Adopt Me! game, even if that association is mistaken.

153.    Defendants continued trademark violations no longer simply relate to Plaintiff's

business; they now also carry the risk of personal harm to and wrongful imprisonment of Plaintiff's owner.

154.    As a result, Plaintiff is compelled to file this lawsuit to stop Defendant's illegal use of the Adopt Me trademark.

### COUNT I – TRADEMARK INFRINGEMENT UNDER 15 U.S.C. 1125(a)

155.    Plaintiff re-alleges and incorporates paragraphs 1 through 154 as set forth above.

156.    Plaintiff is the owner and senior user of the unregistered trademark Adopt Me.

157.    Plaintiff has used the Adopt Me mark in commerce for over twenty years.

158.    The Adopt Me mark is inherently distinctive or has acquired distinctiveness, and is entitled to trademark protection.

159.    Plaintiff has used the Adopt Me trademark in interstate commerce.

160.    Defendants have used Plaintiff's Adopt Me trademark in Uplift's Adopt Me! game and related goods and services in a manner that is likely to cause confusion or mistake as to the affiliation of Defendants with Plaintiff and as to the origin of Defendants' game, goods, services and commercial activities.

161.    Defendants' infringement of Plaintiff's unregistered trademark has caused millions of dollars in damages to Plaintiff entitling Plaintiff to an award of damages, including actual, consequential and punitive damages, disgorgement of Defendants' profits, a royalty for use of the Plaintiff's mark, a declaratory judgment declaring Defendants' mark invalid, cancellation of Defendants' registered Adopt Me! trademarks, and attorney's fees and costs.

162.    Defendants' infringing activities have caused and, unless enjoined by this Court, will continue to cause, irreparable injury and other damages to Plaintiff, its business, its reputation and goodwill because Plaintiff has no adequate remedy at law.

Plaintiff asks this Honorable Court to find in Plaintiff's favor on this Count and award it damages, including actual, consequential and punitive damages, disgorgement of profits and a royalty for use of Plaintiff's mark, equitable relief, a declaratory judgment that Defendants' mark is invalid, cancellation of the federal registration of Defendants' mark, costs, attorneys' fees, interest, and all other relief this Court deems proper.

## COUNT II – DILUTION OF TRADEMARK BY BLURRING (15 U.S.C. 1125(c))

163.   Plaintiff re-alleges and incorporates paragraphs 1 through 162 as set forth above.

164.   Plaintiff has used the Adopt Me trademark continuously for over twenty years.

165.   Plaintiff's mark is inherently distinctive or has acquired distinctiveness through repeated use in commerce.

166.   Plaintiff's Adopt Me mark is widely recognized by the general consuming public of the United States as a designation of source of Plaintiff's goods or services.

167.   Plaintiff has advertised and used the Adopt Me mark to a nationwide extent as a result of its use of the mark on its website, through internet advertising and social media marketing, and through the sale of physical products bearing the mark through nationwide retailers.

168.   Seventeen years after Plaintiff first used the Adopt Me mark and after the mark had become distinctive, Defendant Uplift commenced using of the mark in commerce when it released the Adopt Me! game on the Roblox online gaming platform.

169.   Uplift, initially individually and then with and through its subsidiaries/affiliates Treetop and Lionfield, has continued to offer Adopt Me! in commerce through the present.

170.   Adopt Me! and Adopt Me are extremely similar. Except for the addition of an exclamation point, Adopt Me! is identical to Adopt Me, and the two games are online and app based virtual pet adoption games marketed to children.

171.    The similarity between Adopt Me! and Adopt Me has caused confusion in the marketplace.

172.    The similarity between Adopt Me! and Plaintiff's Adopt Me gives rise to a false association between the Defendants and the Plaintiff that blurs and impairs the distinctiveness of Plaintiff's mark.

173.    Upon information and belief, Defendants willfully intended to create such a false association with Plaintiff's mark.

174.    Defendants' dilution of Plaintiff's unregistered trademark by blurring has caused Plaintiff millions of dollars in damages entitling Plaintiff to an award of damages, including actual, consequential, and punitive damages, disgorgement of Defendants' profits, a royalty for use of the Plaintiff's mark, a declaratory judgment declaring Defendants' mark invalid, cancellation of Defendants' registered Adopt Me! trademarks, and attorney's fees and costs.

175.    Defendants' dilution of Plaintiff's unregistered trademark by blurring has caused and, unless enjoined by this Court, will continue to cause, irreparable injury and other damages to Plaintiff, its business, its reputation and goodwill because Plaintiff has no adequate remedy at law.

Plaintiff asks this Honorable Court to find in Plaintiff's favor on this Count and award it damages, including actual, consequential and punitive damages, disgorgement of profits and a royalty for use of Plaintiff's mark, equitable relief, a declaratory judgment that Defendants' mark is invalid, cancellation of the federal registration of Defendants' mark, costs, attorneys' fees, interest, and all other relief this Court deems proper.

### COUNT III – DILUTION OF TRADEMARK BY TARNISHMENT (15 U.S.C. 1125(c)

176.    Plaintiff re-alleges and incorporates paragraphs 1 through 175 as set forth above.

177.    Plaintiff has used the Adopt Me trademark continuously for over twenty years.

178.    Plaintiff's mark is inherently distinctive or has acquired distinctiveness through repeated use in commerce.

179.    Plaintiff's Adopt Me mark is widely recognized by the general consuming public of the United States as a designation of source of Plaintiff's goods or services.

180.    Plaintiff has advertised and used the Adopt Me mark to a nationwide extent as a result of its use of the mark on its website, through internet advertising and social media marketing, and through the sale of physical products bearing the mark through nationwide retailers.

181.    Seventeen years after Plaintiff first used the Adopt Me mark and after the mark had become distinctive, Defendant Uplift commenced using of the mark in commerce when it released the Adopt Me! game on the Roblox online gaming platform.

182.    Uplift, initially individually and then with and through its subsidiaries/affiliates Treetop and Lionfield, has continued to offer Adopt Me! in commerce through the present.

183.    Adopt Me! and Adopt Me are extremely similar. Except for the addition of an exclamation point, Adopt Me! is identical to Adopt Me, and the parties' games designated with these marks are both online and app based virtual pet adoption games marketed to children.

184.    The similarity between Adopt Me! and Adopt Me has caused confusion in the marketplace.

185.    The similarity between Adopt Me! and Plaintiff's Adopt Me gives rise to a false association between the Defendants and the Plaintiff that tarnishes and harms the reputation of Plaintiff's mark.

186.    Upon information and belief, Defendants willfully intended to create such a false association with Plaintiff's mark.

187.    Defendants' dilution of Plaintiff's unregistered trademark by tarnishment has

caused Plaintiff millions of dollars in damages entitling Plaintiff to an award of damages, including actual, consequential and punitive damages, disgorgement of Defendants' profits, a royalty for use of the Plaintiff's mark, a declaratory judgment declaring Defendants' mark invalid, cancellation of Defendants' registered Adopt Me! trademarks, and attorney's fees and costs.

188.     Defendants' dilution of Plaintiff's unregistered trademark by tarnishment has caused and, unless enjoined by this Court, will continue to cause, irreparable injury and other damages to Plaintiff, its business, its reputation and goodwill because Plaintiff has no adequate remedy at law.

Plaintiff asks this Honorable Court to find in Plaintiff's favor on this Count and award it damages, including actual, consequential and punitive damages, disgorgement of profits and a royalty for use of Plaintiff's mark, equitable relief, a declaratory judgment that Defendants' mark is invalid, cancellation of the federal registration of Defendants' mark, costs, attorneys' fees, interest, and all other relief this Court deems proper.

## COUNT IV – VIOLATION OF THE ANTICYBERSQUATTING CONSUMER PROTECTION ACT (15 U.S.C. 1125(d)

189.     Plaintiff re-alleges and incorporates paragraphs 1 through 188 as set forth above.

190.     Plaintiff has used the Adopt Me trademark continuously for over twenty years.

191.     For over twenty years, Plaintiff has asserted common law trademark rights to Adopt Me in the context of a virtual pets game.

192.     Plaintiff's mark is inherently distinctive or has acquired distinctiveness through repeated use in commerce.

193.     Plaintiff's Adopt Me mark is famous and widely recognized by the general consuming public of the United States as a designation of source of Plaintiff's goods or services.

194.     Plaintiff has advertised and used the Adopt Me mark to a nationwide extent as a

result of its use of the mark on its website, through internet advertising and social media marketing, and through the sale of physical products bearing the mark through nationwide retailers.

195.   On September 17, 2017, seventeen years after Plaintiff first used the Adopt Me mark and after the mark had become distinctive and famous, Defendant Uplift registered or licensed the domain name playadopt.me.

196.   On October 28, 2019, nineteen years after Plaintiff first used the Adopt Me mark and after the mark had become distinctive and famous, Defendant Uplift registered or licensed the domain name playadoptme.com.

197.   Uplift's playadopt.me and playadoptme.com domain names incorporate Plaintiff's Adopt Me trademark in connection with a virtual pets game and are confusingly similar to Plaintiff's Adopt Me mark and Plaintiff's AdoptMe.com domain name.

198.   Employing a "domain hack" in the case of playadopt.me, Uplift combined the main part of the domain name "adopt" with the top level domain extension ".me" to spell out Plaintiff's Adopt Me mark.

199.   In the case of playadoptme.com, Uplift simply added "play," the verb describing what one does with a virtual pets game, with Plaintiff's AdoptMe.com website, which features the Adopt Me virtual pets game and which incorporates Plaintiff's Adopt Me mark.

200.   Uplift's playadopt.me and playadoptme.com domain names have caused consumer confusion about the distinctiveness of the Defendants' Adopt Me! game and mark and Plaintiff's Adopt Me game and mark.

201.   The confusion caused by the playadopt.me and playadoptme.com domains has harmed the good will that Plaintiff has cultivated for its Adopt Me mark and the adoptme.com website, because the Adopt Me! game offered on Defendants' websites in associated with bad

behavior such as scamming, pedophilia, gambling and the like.

202.    Either Uplift or one of the other Defendants has continued to own/license, maintain and use the playadopt.me and playadoptme.com domains through the present.

203.    In registering/licensing and using the playadopt.me and playadoptme.com domains, the Defendants had and have the bad faith intent to profit from the Plaintiff's Adopt Me mark.

204.    Defendants have no trademark rights in the playadopt.me and playadoptme.com domain names.

205.    Defendants' use of the term Adopt Me in the aforesaid domain names infringes upon Plaintiff's Adopt Me trademark.

206.    Plaintiff had trademark rights in the term Adopt Me in the context of a virtual pets game, and used its mark in commerce, for at least seventeen years prior to Defendants' registration of their domain names and use thereof in offering any goods and services.

207.    Neither playadopt.me nor playadoptme.com incorporates the name of any of the defendants.

208.    Defendants intended to divert users from Plaintiff's own adoptme.com website and Plaintiff's Adopt Me game to the playadopt.me and playadoptme.com websites for commercial gain and profit.

209.    Defendants were aware of Plaintiff's AdoptMe.com domain and of Plaintiff's Adopt Me game before they registered or licensed the playadopt.me and playadoptme.com domains.

210.    Defendants chose to register/license the long, confusing and relatively inferior playadopt.me and playadoptme.com domains because they knew that the Adopt Me trademark and the short, simple and obvious AdoptMe.com domain were already being used in commerce by

Plaintiff.

211.    Defendants proceeded with the registration/licensing of playadopt.me and playadoptme.com in spite of their knowledge of Plaintiff's prior use of the Adopt Me mark and the AdoptMe.com domain because they wished to incorporate the Adopt Me mark into their domain names.

212.    None of the Defendants, at the time of registering playadopt.me or playadoptme.com or thereafter, believed or had reasonable grounds to believe that their use of Adopt Me in their domain names was a fair use of trademark or otherwise lawful.

213.    Defendants' bad faith registration/licensing of the playadopt.me and playadoptme.com domains has caused Plaintiff millions of dollars in damages entitling Plaintiff to an award of damages, including actual, consequential and punitive damages, disgorgement of Defendants' profits, a royalty for use of the Plaintiff's mark, and attorney's fees and costs.

214.    Defendants' bad faith maintenance of the playadopt.me and playadoptme.com domains has caused and, unless enjoined by this Court, will continue to cause, irreparable injury and other damages to Plaintiff, its business, its reputation and goodwill because Plaintiff has no adequate remedy at law.

215.    Plaintiff asks this Honorable Court to find in Plaintiff's favor on this Count and award it damages, including actual, consequential and punitive damages, disgorgement of profits and a royalty for use of Plaintiff's mark, equitable relief, forfeiture or cancellation of the playadopt.me and playadoptme.com domains or transfer of these domain names to the Plaintiff, costs, attorneys' fees, interest, and all other relief this Court deems proper.

### COUNT V – COMMON LAW TRADEMARK INFRINGEMENT

216.    Plaintiff re-alleges and incorporates paragraphs 1 through 215 as set forth above.

217.    Plaintiff is the owner and senior user of the common law trademark Adopt Me.

218.    Plaintiff has used the Adopt Me mark in commerce continuously for over twenty years, and had used the mark for at least 17 years before it was used by Defendant.

219.    The Plaintiff's Adopt Me mark is inherently distinctive or has acquired distinctiveness through continuous use in commerce.

220.    Defendants have used Plaintiff's Adopt Me trademark in its Adopt Me! game and related goods and services without authorization from Plaintiff, and in a manner that is likely to cause confusion or mistake as to the affiliation of Defendants with Plaintiff and as to the origin of Defendants' game, goods, services and commercial activities.

221.    Defendants' infringement of Plaintiff's common law trademark has caused Plaintiff millions of dollars in damages entitling Plaintiff to an award of damages, including actual, consequential and punitive damages, disgorgement of Defendants' profits, a royalty for use of the Plaintiff's mark, a declaratory judgment declaring Defendants' mark invalid, cancellation of Defendants' registered Adopt Me! trademarks, and attorney's fees and costs.

222.    Defendants' infringing activities have caused and, unless enjoined by this Court, will continue to cause, irreparable injury and other damages to Plaintiff, its business, its reputation and goodwill because Plaintiff has no adequate remedy at law.

Plaintiff asks this Honorable Court to find in Plaintiff's favor on this Count and award it damages, including actual, consequential and punitive damages, disgorgement of profits and a royalty for use of Plaintiff's mark, equitable relief, a declaratory judgment that Defendants' mark is invalid, cancellation of the federal registration of Defendants' mark, costs, attorneys' fees, interest, and all other relief this Court deems proper.

## **COUNT VI – COMMON LAW UNFAIR COMPETITION**

223.    Plaintiff re-alleges and incorporates paragraphs 1 through 222 as set forth above.

224.    Plaintiff is the owner and senior user of the unregistered trademark Adopt Me.

225.    Plaintiff has used the Adopt Me Mark in commerce for over twenty years.

226.    The Adopt Me mark is inherently distinctive or has acquired distinctiveness and is entitled to trademark protection.

227.    Plaintiff has used the Adopt Me trademark in interstate commerce.

228.    Defendants have used Plaintiff's Adopt Me trademark in their Adopt Me! game and related goods and services in a manner that is likely to cause confusion or mistake as to the affiliation of Defendants with Plaintiff and as to the origin of Defendants' game, goods, services and commercial activities.

229.    Defendants activities constitute unfair competition under Rhode Island common law and have caused Plaintiff millions of dollars in damages entitling Plaintiff to an award of damages, including actual, consequential and punitive damages, disgorgement of Defendants' profits, a royalty for use of the Plaintiff's mark, a declaratory judgment declaring Defendants' mark invalid, cancellation of Defendants' registered Adopt Me! trademarks, and attorney's fees and costs.

230.    Defendants' activities have caused and, unless enjoined by this Court, will continue to cause, irreparable injury and other damages to Plaintiff, its business, its reputation and goodwill because Plaintiff has no adequate remedy at law.

Plaintiff asks this Honorable Court to find in Plaintiff's favor on this Count and award it damages, including actual, consequential and punitive damages, disgorgement of profits and a royalty for use of Plaintiff's mark, equitable relief, a declaratory judgment that Defendants' mark is invalid, cancellation of the federal registration of Defendants' mark, costs, attorneys' fees,

interest, and all other relief this Court deems proper.

## COUNT VII – VIOLATION OF THE RHODE ISLAND TRADEMARK ANTI-DILUTION STATUTE (R.I.G.L. §6-2-12)

231.    Plaintiff re-alleges and incorporates paragraphs 1 through 230 as set forth above.

232.    Plaintiff has used the Adopt Me continuously for over twenty years.

233.    Plaintiff's mark is inherently distinctive or has acquired distinctiveness through repeated use in commerce.

234.    Upon information and belief, Plaintiff's Adopt Me mark is widely recognized by the general consuming public of the United States as a designation of source of Plaintiff's goods or services.

235.    Plaintiff has advertised and used the Adopt Me mark to a nationwide extent as a result of its use of the mark on its website, through internet advertising and social media marketing, and through the sale of physical products bearing the mark through nationwide retailers.

236.    Seventeen years after Plaintiff first used the Adopt Me mark and after the mark had become distinctive, Defendant Uplift commenced using the mark in commerce when it released the Adopt Me! game on the Roblox online gaming platform.

237.    Uplift, initially individually and then with and through its subsidiaries/affiliates Treetop and Lionfield, has continued to offer Adopt Me! in commerce through the present.

238.    Adopt Me! is not a validly registered trademark, the registrations therefore having been fraudulently obtained.

239.    Adopt Me! and Adopt Me are extremely similar. Except for the addition of an exclamation point, Adopt Me! is identical to Adopt Me, and the parties' games designated with these marks are both online and app based virtual pet adoption games marketed to children.

240.    The similarity between Adopt Me! and Adopt Me has caused confusion in the

marketplace.

241. The similarity between Adopt Me! and Plaintiff's Adopt Me gives rise to a false association between the Defendants and the Plaintiff that injures the reputation of Plaintiff's mark and dilutes the distinctive quality of Plaintiff's mark.

242. Defendants' dilution of Plaintiff's unregistered trademark has caused and, unless enjoined by this Court, will continue to cause, irreparable injury and other damages to Plaintiff, its business, its reputation and goodwill because Plaintiff has no adequate remedy at law.

Plaintiff asks this Honorable Court to find in Plaintiff's favor on this Count and award it equitable relief, costs, attorneys' fees, interest, and all other relief this Court deems proper.

## COUNT VIII – TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

243. Plaintiff re-alleges and incorporates paragraphs 1 through 242 as set forth above.

244. Plaintiff is the owner and senior user of the common law trademark Adopt Me.

245. Plaintiff earns income from the Adopt Me mark by selling advertising on the AdoptMe.com website.

246. Plaintiff has entered into contracts with advertisers pursuant to which the advertisers pay Plaintiff for advertising space on the AdoptMe.com website.

247. Plaintiff earns income from the advertisers under these contracts for every player of Plaintiff's Adopt Me game that views Plaintiff's website.

248. Defendants had and continue to have knowledge that Plaintiff has contracts with advertisers to advertise on Plaintiff's website and that these contracts are dependent upon the strength of the Adopt Me game and brand bringing viewers to Plaintiff's website.

249. Defendants intentionally interfered with Plaintiff's advertising contracts by copying and infringing upon Plaintiff's Adopt Me trademark, causing confusion between Adopt

Me! and Adopt Me and diluting the Adopt Me trademark by tarnishing its reputation.

250.    Defendants' infringement of Plaintiff's Adopt Me trademark has impeded and driven down the viewership of Plaintiff's website upon which Plaintiff's contractual payment rights depend.

251.    Defendants' actions have decreased the amount of income that Plaintiff earns under its contracts with advertisers.

252.    Defendants' actions have caused damages to Plaintiff entitling Plaintiff to an award of damages, including actual and consequential damages, and attorney's fees and costs.

Plaintiff asks this Honorable Court to find in Plaintiff's favor on this Count and award it actual and consequential damages, costs, attorneys' fees, interest, and all other relief this Court deems proper.

## COUNT IX – TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS

253.    Plaintiff re-alleges and incorporates paragraphs 1 through 252 as set forth above.

254.    Plaintiff is the owner and senior user of the common law trademark Adopt Me.

255.    Plaintiff earns income from the Adopt Me mark by selling advertising on the AdoptMe.com website.

256.    Plaintiff has entered into contracts with advertisers pursuant to which the advertisers pay Plaintiff for advertising space on the AdoptMe.com website.

257.    Plaintiff earns income from the advertisers under these contracts for every player of Plaintiff's Adopt Me game that views Plaintiff's website.

258.    Plaintiff has sought to enter into similar contracts with additional advertisers.

259.    Plaintiff has also sought to enter into business relations with investors who could invest in Plaintiff and the Adopt Me brand and help them grow their presence in the marketplace.

260.    Defendants had and continue to have knowledge that Plaintiff had relations with prospective advertisers on Plaintiff's website and prospective investors in Plaintiff's business.

261.    Defendants intentionally interfered with Plaintiff's prospective business relations with advertisers and investors by copying and infringing upon Plaintiff's Adopt Me trademark, causing confusion between Adopt Me! and Adopt Me and diluting the Adopt Me trademark by tarnishing its reputation.

262.    Defendants' infringement of Plaintiff's Adopt Me trademark has impeded and driven down the viewership of Plaintiff's website that Plaintiff's prospective advertisers and investors desire and caused them to refrain from entering into business relations with Plaintiff.

263.    But for Defendants' actions, these advertisers and investors would have entered into business relations with Plaintiff.

264.    Defendants' actions have caused damages to Plaintiff entitling Plaintiff to an award of damages, including actual and consequential damages, and attorney's fees and costs.

Plaintiff asks this Honorable Court to find in Plaintiff's favor on this Count and award it actual and consequential damages, costs, attorneys' fees, interest, and all other relief this Court deems proper.

## COUNT X – PETITION FOR CANCELLATION OF TRADEMARKS

265.    Plaintiff re-alleges and incorporates paragraphs 1 through 264 as set forth above.

266.    On February 4, 2020, Defendants Treetop and Lionfield submitted to the US Patent and Trademark Office ("USPTO") a Trademark Application (Serial No. 90509103) for the mark Adopt Me! applicable to goods and services in International Classes 9 and 41.  The application was signed and submitted by counsel for Treetop and Lionfield, Attorney Allison Rothman of the firm Morrison Rothman LLP.  The Trademark Adopt Me! for International Classes 9 and 41 was

registered by the USPTO on January 25, 2022 (Registration No. 6626699).

267.    On March 9, 2022, Defendants Treetop and Lionfield submitted to the USPTO a Trademark Application (Serial No. 97303544) for the mark Adopt Me! applicable to goods and services in International Classes 16, 18, 21, 25, 26 and 28.   The application was signed and submitted by counsel for Treetop and Lionfield, Attorney Sean Ulrich of the firm Morrison Rothman LLP.  The Trademark Adopt Me! for International Classes 16, 18, 21, 25, 26 and 28 was registered by the USPTO on August 8, 2023 (Registration No. 7130097).

268.    On August 11, 2023, Defendants Treetop and Lionfield submitted to the USPTO a Trademark Application (Serial No. 98128774) for the mark Adopt Me! applicable to goods and services in International Classes 3, 11, 15, 20, 24, 27, 29, 30 and 32.  The application was signed and submitted by counsel for Treetop and Lionfield, Attorney Julia Skyhar of the firm Morrison Cooper LLP.  This Application is currently pending before the USPTO.

269.    Defendants committed fraud on the PTO in connection with each of the aforementioned Trademark Applications in order to bring about each of the aforementioned registrations.

270.    In connection with each of the aforementioned Trademark Applications, Defendants made false statements with the intent to deceive the USPTO and induce the PTO to register the mark Adopt Me! for the applicable International Classes of goods and services.

271.    Through their attorneys, Defendants falsely represented to the PTO that "To the best of the signatory's knowledge and belief, no other persons, except, if applicable, concurrent users, have the right to use the mark in commerce, either in the identical form or in such near resemblance as to be likely, when used on or in connection with the goods/services of such other persons, to cause confusion or mistake, or to deceive."

272.    On the respective dates that Defendants made these representations, they and their attorneys knew that the representations were false.

273.    Defendants had knowledge of Plaintiff's pre-existing use of the Adopt Me mark, as evidenced by their contacting Plaintiff to attempt to buy Plaintiff's domain.

274.    As a result of Plaintiff's email notice to Defendants' counsel at Morrison Rothman LLP on August 20, 2020, as well as the notice posted on the AdoptMe.com website since August 4, 2020, Defendants also had knowledge that Plaintiff intended to continue using the Adopt Me mark.

275.    In addition, Defendants knew of the confusion in the marketplace that existed between Plaintiff's Adopt Me mark and the Defendants' almost identical Adopt Me! mark, as evidenced by Uplift employee Josh Ling's email of May 12, 2020.

276.    The Defendants' false representations in the aforementioned Trademark Applications were material.  None of the Trademark Applications would have been accepted by the USPTO if not for the false representation made by the Defendants.

277.    The false representations made by the Defendants were made with the intent to induce the PTO to issue a Trademark registration in response to each of the Defendants' Trademark Applications.

278.    Defendants wanted to obtain the Trademark registrations from the USPTO because, as a game with 100 million users and many opportunities for potential licensing deals, it was important for Defendants to try to have control over the mark that their entire business was based upon.

279.    Potential licensees of Defendants' rights, such as Hasbro and McDonald's, would want and expect any licensing agreements for those rights to be based on registered trademarks.

The Defendants wished to obtain the Trademark registrations from the USPTO without having first arrived at some sort of agreement over the Plaintiff's conflicting mark, so that the Defendants could quickly enter into lucrative agreements with such potential licensees.

280.    Because all three Trademark Applications for Adopt Me! that Defendants filed with the USPTO were based on an intentional material misrepresentation, the two trademark registrations Defendants fraudulently obtained as a result thereof, as well as the Defendants' currently pending Trademark application, should all be cancelled.

Plaintiff asks this Honorable Court to grant Plaintiff's petition and cancel USPTO Trademark registration Nos. 6626699 and 7130097 and Trademark Application Serial No. 98128774.

**WHEREFORE**, Plaintiff prays that this Honorable Court grant the following relief:

1.    Entry of judgment against Defendants on all claims;

2.    An award of damages, including actual, consequential, and punitive damages, disgorgement of Defendants' profits, and a royalty for use of Plaintiff's mark, against Defendants and in favor of Plaintiff in an amount to be determined at trial, with prejudgment interest;

3.    Entry of preliminary and permanent injunctions restraining the Defendants, their employees, agents, officers, directors, attorneys, successors, affiliates, subsidiaries, and assigns, and all those acting in concert and participation with Defendants, from directly or indirectly using the infringing trademark in connection with their business;

4.    A declaratory judgment declaring Defendants' Adopt Me! mark invalid;

46

5.     Cancellation of Defendants' federal registrations of the Adopt Me! trademark;

6.     Forfeiture, cancellation, or transfer to Plaintiff of Defendants' playadopt.me and

playadoptme.com domains; and

7.     Such other relief as the Court deems just and proper.

**Demand For Jury Trial**

Plaintiff demands a trial by jury on all issued so triable.


Dated:  April 26 , 2024                                IMPULSE COMMUNICATIONS, INC.,
                                                       By & through its attorneys,


                                                       /s/    Chip Muller
                                                       Chip Muller, Esq. (#7686)
                                                       Joseph Hoefferle, Jr., Esq. (#8421)
                                                       Muller Law, LLC
                                                       47 Wood Avenue
                                                       Barrington RI  02806
                                                       (401) 256-5171
                                                       chip@mullerlaw.com
                                                       joe@mullerlaw.com

47