**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| Impulse Communications, Inc., <br><br>             Plaintiff, <br><br><br> Uplift Games LLC, Treetop Games LLC, and Lionfield Investments Ltd., <br><br>             Defendants. | C.A. No. 1:24-cv-00166-JJM-LDA |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS UPLIFT GAMES LLC AND TREETOP GAMES LLC'S MOTION TO STRIKE PURSUANT TO FED. R. CIV. P. 12(f) AND TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)**

Defendants Uplift Games LLC ("Uplift") and Treetop Games LLC ("Treetop") (collectively "Defendants") submit this memorandum in support of their motion to strike certain allegations of Plaintiff Impulse Communications, Inc.'s ("Plaintiff" or "Impulse") Complaint for inclusion of immaterial, impertinent and/or scandalous matter pursuant to Fed. R. Civ. P. 12(f) and to dismiss Counts II, III, IV, VI, VIII, and IX of the Complaint for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).

**I.       INTRODUCTION**

Plaintiff has filed a ten-count Complaint against Defendants and another party yet to be served, Lionfield Investments Ltd. ("Lionfield").[1] The claims include trademark infringement, dilution, unfair competition, tortious interference, violation of the Anti-Cybersquatting Consumer Protection Act ("ACPA"), and cancellation of trademark registrations and pending applications

---

[1]       Defendants Treetop and Uplift make no representations on behalf of Lionfield, which reserves all rights in this proceeding.

jointly owned by Treetop and Lionfield. Plaintiff alleges that it is the senior user of the unregistered trademark ADOPT ME and the crux of Plaintiff's claims relate to use and registration of the trademark ADOPT ME! in connection with Defendants' popular online game, which is hosted on an unrelated, third party platform known as Roblox.

However, the Complaint is crowded with claims that lack any basis in fact or are speculative at best. Plaintiff also includes statements in the Complaint that are irrelevant and scandalous in nature. Defendants bring this motion in an effort to streamline the case and do away with claims where relief "could not be granted under any facts Plaintiff could prove consistent with its allegations." *Kyricopoulos v. Rollins,* 89 F.3d 823 (1st Cir. 1996).

## II.    BACKGROUND

### A.    Defendants Uplift and Treetop

With over 50 million monthly players[2] in 2020,  36.5 billion visits[3], and a peak of 1.92 million concurrent users (a record for Roblox)[4], Defendants' Adopt Me! game is one of the most popular and frequently played games on the Roblox platform. Adopt Me! was developed by two young adults, now aged 26 and 27. One of the creators, known online by the Roblox user name "NewFissy," grew up in the Dallas-Fort Worth Area and began developing games at a young age, later attending a Texas university, with a major in Computer Science. The other, known online by the Roblox user name "Bethink," grew up in London, England and later achieved a Bachelor of Arts with honors. The two met online and decided to work together on the creation of their own game, with "NewFissy" primarily responsible for the coding and "Bethink" primarily responsible for game design, look and feel. In its original form, the game was uploaded to Roblox, an

---

2       *See* https://www.gamesindustry.biz/adopt-me-interview
3       *See* https://www.roblox.com/games/920587237/SUMMER-Adopt-Me
4       *See* https://gamerant.com/sims-roblox-game-adopt-me-mmo-pets/

unaffiliated, third party gaming platform that hosts games created by independent developers and studios (much the same way YouTube hosts videos created by independent developers and studios) on July 14, 2017.  The creators used the name ADOPT ME! because the game itself is a roleplay game where players assume parental responsibilities for virtual characters such as feeding, bathing, medical care, etc.  Upon realizing the early success of the Adopt Me! game, "Bethink" and "NewFissy" decided to formalize a corporate structure around the game.  Accordingly, Treetop was incorporated in the state of Texas on March 14, 2018. Its principal place of business is in Dallas, Texas.

In the early years, "Bethink" and "NewFissy" were able to run the Adopt Me! game independently, but over time, they needed to hire additional developers. Uplift was incorporated in Delaware on November 3, 2020 to serve as the creators' joint studio and currently is a team of approximately 60 employees and independent contractors. The team includes game creators and developers, experts in consumer products, and operations staff in North America and the United Kingdom. Adopt Me!'s young founders continue to run and develop the game, while they have entrusted the daily operations of Uplift's business to parents and other family members.  Despite its soaring popularity, the Adopt Me! game continues to operate as an independent family-owned business. This business culture is apparent in the operation of the business, as Uplift Games is an award winning, celebrated and well respected studio in industry and has won and been nominated

for a number of awards including: Games Industry Best Places to Work (US) 2023[5], Nickelodeon Kids Choice Award Nomination 2023[6], and Barclays Bank Entrepreneur Games Award 2022[7].

Adopt Me! allows players to explore a magical, family-friendly, virtual world where they can build houses and collect and trade  hundreds of pets and Uplift has entered into licensing agreements with various partners for a variety of goods and services. Although the Adopt Me! game is accessed through Roblox, Defendants do not offer Roblox's in-game currency, known as "Robux" for sale.[8]  Roblox's Community Standards, Safety and Civility, Safety Features, and Terms of Use govern the platform and are publicly available on the Roblox website.[9] Per the Community Standards, "All chat on Roblox is filtered to prevent inappropriate content[10]" by Roblox and Defendants are not responsible for monitoring Roblox's chat function.

## B.    Plaintiff Impulse Communications

Impulse was founded and is owned by Eric Borgos.[11]  Central to its business is the acquisition and sale of Internet domain names for profit. The company's website has a page listing

---

[5]    *See* https://www.gamesindustry.biz/ea-wins-big-at-the-us-gamesindustrybiz-best-places-to-work-awards-2023

[6]    *See* https://www.nick.com/kids-choice-awards/articles/rwskx2/every-kids-choice-awards-2023-winner

[7]    *See* https://www.barclays.co.uk/business-banking/sectors/entrepreneurs/awards/hall-of-fame/?#online

[8]    *See* Declaration of Nicholas Shawyer in support of Defendant's claim that they do not sell Robux currency. Shawyer Decl. ¶3.

[9]    *See* Roblox Community Standards available at https://en.help.roblox.com/hc/en-us/articles/203313410-Roblox-Community-Standards; Safety and Civility Policy available at https://en.help.roblox.com/hc/en-us/articles/4407444339348-Safety-Civility-at-Roblox; Terms of Use available at https://en.help.roblox.com/hc/en-us/articles/115004647846-Roblox-Terms-of-Use, and Safety Features available at Safety Features: Chat, Privacy & Filtering – Roblox Support.

[10]    *See* https://en.help.roblox.com/hc/en-us/articles/203313120-Safety-Features-Chat-Privacy-Filtering#:~:text=All%20chat%20on%20Roblox%20is,experiences%20based%20on%20their%20age.

[11]    *See* https://impulsecorp.com/about (last visited June 12, 2024).

over 200 domains available for purchase, many of which are lewd or sexually suggestive in nature.[12] According to an Impulse SEC filing on March 27, 2001, about 50% of its revenue is from sexually oriented adult entertainment websites, with the other 50% from traditional websites.[13]

On July 28, 2015, Borgos self-published a book entitled *How to Make Money Online: Work From Home and Get Rich On The Internet*.[14] One of 28 Amazon reviewers observed that "[Borgos] sounds like a virtual hoarder. He's got hundreds of domains that he has registered that aren't particularly doing anything."[15] In fact, the company website boasts that "[by] 2013, Impulse Communications [had] sold the majority of its 5000 unused domains."[16] The Impulse website includes a summary of its financials. The summary shows that in 2011, Impulse had a net income of $1,544,782 "mainly from selling a portfolio of 4000 domains". In 2013, net income was $1,351,652 "mainly from selling a portfolio of 4600 domains." More recently, however, Impulse self-reports that it has suffered losses ranging from $-48,347 in 2018 to $-65,665 in 2020 (the last years reflected on the website financial summary).[17]

The domain name ADOPTME.COM is owned by Plaintiff. According to the Complaint, Plaintiff began featuring a game on the website associated with this domain in 2000 and sold ADOPT ME-branded plush toys at Toys "R" Us during the "mid-2000s".[18] The Complaint states

---

[12]    *See* https://impulsecorp.com/domain-sales (listing domains including BIGORGIES.COM, DIRTYPORNOS.COM, and LOUDORGASMS.COM, among others) (last visited June 12, 2024).

[13]    *See* https://www.sec.gov/Archives/edgar/data/1140101/000110801701500115/impulsecommunications.htm

[14]    *See* https://www.amazon.com/How-Make-Money-Online-Internet-ebook/dp/B010VLB6L4?ref_=ast_author_mpb (last visited June 12, 2024).

[15]    *Id.*

[16]    *See* https://impulsecorp.com/about (last visited June 12, 2024).

[17]    *Id.*

[18]    Compl. ¶ 12; 21.

that in 2011, the domain "was averaging about 5,000 visitors a day" and "had been averaging a similar number of visitors for the previous 10 years."[19]  Information regarding web traffic and revenue after this time period is notably absent from the Complaint.

### C.    Procedural History and Facts Relevant to the Instant Dispute

Uplift currently owns and uses the domains PLAYADOPT.ME and PLAYADOPTME.COM, which were registered on September 17, 2017 and October 28, 2019, respectively. Given that Adopt Me! users and prospective users engage with the game on Roblox, the websites hosted at Uplift's domain names are not central to its business. Rather, they are used to provide information about and links to the game on social media and elsewhere.

On May 12, 2020, unbeknownst to Defendants, Josh Ling, a former contractor working on Adopt Me!, contacted Borgos by email after learning he was affiliated with a domain ADOPTME.COM that was shutting down. In this correspondence, he suggested that if Borgos had "no use of the adoptme.com domain any more, we may be interested in purchasing it as a redirect to our official website." Borgos responded the next day and encouraged Ling to make an offer, stating "Yes, make me an offer for AdoptMe.com. I don't have an official asking price." Nearly two weeks later, Borgos followed up, telling Ling he would "soon [ ] be trying to sell AdoptMe.com through a domain broker."[20] Nearly one month later, on June 20, 2020, Borgos again emailed Ling, saying "please make me an offer" as he would prefer to sell the ADOPTME.COM domain to the owners of the Adopt Me! game rather than a third party since he thought they were the "best fit for it."[21]

---

[19]    Compl. ¶ 28.
[20]    *See* email correspondence between Josh Ling and Eric Borgos. Shawyer Decl. ¶3-5 Ex. 1.
[21]    *Id.*

The matter was then referred to outside counsel, who attempted to negotiate the purchase of the ADOPTME.COM domain on Defendant's behalf.[22]

Before Ling contacted Borgos, Plaintiff had posted the following on ADOPTME.COM:

*We are very sorry, but after almost 20 years online, Adoptme.com is shutting down.*

Noting that its website was no longer active, it redirected users to the URL BoredHumans.com mainly because "the programming [from the early 2000s] was so old that it stopped working."[23]

Believing it was clear Plaintiff had abandoned any rights it may have had in ADOPT ME and with the advice of counsel, on February 4, 2021 Treetop (together with Lionfield) filed an application at the U.S. Patent and Trademark Office to register ADOPT ME! for use in connection with downloadable game software and other goods/services. The application was granted and the mark registered without any office action citing a likelihood of confusion with Plaintiff or any opposition by Plaintiff during the public opposition period.[24]

After August 2020, Defendants heard nothing from Plaintiff until they were served in the instant lawsuit, which was filed April 26, 2024, nearly 4 years later.

III.    **STANDARD OF REVIEW**

A.    **Motion to Strike**

Fed. R. Civ. P. 12(f) provides that the Court may strike from a pleading "any redundant, immaterial, impertinent, or scandalous matter."  Paragraphs that are "irrelevant to plaintiff's case"

---

[22]    Defendants have withheld information regarding this portion of the communications, as they are subject to Fed. R. Civ. P. 408.

[23]    *See* https://web.archive.org/web/20200506021652/http://www.adoptme.com/

[24]    *See* U.S. Trademark Reg. Nos. 6626699 for ADOPT ME! (registered January 25, 2022).

or crowd a complaint with "superfluous" matter can and should be stricken. *See Sheffield v. City of Boston,* 319 F.R.D. 52, 55-56 (D. Mass 2016). Although courts possess "broad discretion to strike comments that are not 'substantive elements of the cause of action,'" courts exercise such discretion judiciously, exercising such discretion only in limited circumstances. *Id.* at 54.

### B.    Motion to Dismiss

In order to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), Plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A plaintiff states a plausible claim when the content of its allegations "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While a plaintiff need not show a likelihood of success on the merits, to survive a motion to dismiss, allegations must demonstrate "more than a sheer possibility that a defendant has acted unlawfully"[25] and "be enough to raise a right to relief above the speculative level."[26] "[S]peculation, unaccompanied by any factual predicate, is not sufficient to confer plausibility." *Morales-Cruz v. Univ. of P.R.*, 676 F.3d 220, 225 (1st Cir. 2012).

While the Court must accept all well-pleaded facts alleged in the complaint as true for purposes of evaluating a motion to dismiss,[27] "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. To the contrary, the allegations must "possess[] enough heft to sho[w] that the pleader is entitled to relief." *Twombly*, 550 U.S. at 559.

### IV.    ARGUMENT

---

[25]    *Garcia-Catalan v. United States*, 734 F.3d 100, 102-03 (1st Cir.2013) (citing *Ashcroft v. Iqbal*, 556 U.S. at 678.

[26]    *Twombly*, 550 U.S. at 555.

[27]    *See Rodriguez-Reyes v. Molina-Rodriguez*, 711 F.3d 49, 53 (1st Cir. 2013).

A.   **Paragraphs, 131, 137-141, 143, 146, 151-153, and a Portion of Paragraph 201 of the Complaint Contain Inflammatory Allegations That Plaintiff Acknowledges Do Not Implicate Defendants and Should be Stricken.**

The Complaint is rife with salacious allegations against third party Roblox Corporation and other entities that Plaintiff does not allege are tied to Defendants' conduct in any way. As Plaintiff itself acknowledges in paragraph 141 of the Complaint, reports of bad behavior on the Roblox platform such as pedophilia, sex, gambling, and illegal child labor, do not "explicitly implicat[e] the Defendants' Adopt Me! game".  The most natural inference is that these immaterial and scandalous allegations were included in the Complaint in an effort to unfairly impute allegations against Roblox to Defendants, inflame the reader, and disparage the reputation of Defendants and their Adopt Me! game. As outlined below, the allegations in question should be stricken pursuant to Fed. R. Civ. P. 12(f) for inclusion of "immaterial, impertinent, or scandalous matter."

Paragraph 137 references the use of "Roblox currency" to facilitate predators' abuse of children on the Roblox platform. Defendants do not sell Roblox currency, known as "Robux," nor does Plaintiff allege that they do. ShawyerDecl. ¶ 3. This paragraph also references predators' attempts to entice children with promises of Adopt Me! pets on Snapchat (Kanwal's article) and a third party Discord channel (Adopt Me Sucks! Article). Defendants do not control these third party websites/channels and have no responsibility for the content and actions of individuals on these websites/channels. While Defendants find the purported conduct to be abhorrent and condemn any such actions in the strongest possible way, Defendants cannot be and are not liable for the conduct of criminals simply because the criminals mention Defendant's game.  Put simply, these accusations relate to alleged activities of anonymous third parties utilizing third party platforms outside of the control of Defendants and do not relate to Defendants themselves.  This fact is

instantly clear by performing even a small level of diligence against Plaintiff's allegations. Plaintiff's inclusion of these facts as somehow the acts of Defendants should be stricken from the record with prejudice.

Paragraph 138 lists several articles that are allegedly returned when performing a Google search using the term "Adopt Me rape," but there are no links provided and the abhorrent conduct in the articles are not specific to the Adopt Me! game.  For example, the Complaint cites an article describing how two male avatars allegedly gang raped a young girl's avatar on a playground "*in one of the Roblox games*." The full text of the article referenced does not include a single reference to Adopt Me!.[28] Similarly, this paragraph cites an article entitled "Are Predators Approaching Children on Roblox? What Parents Need to Know" and goes on to quote the article as including reports of "child predators," "sex rooms," and "gang rape." Again, there is no link to the article in question and upon reviewing the article, the only reference to Adopt Me! is made where the author lists the "[m]ost popular games on Roblox at the moment."[29]  Plaintiff again includes facts that have no bearing on Defendants' business or actions and attempts to allege that articles referencing the independent hosting platform Roblox, on which 40 million games operate[30], is somehow synonymous with or attributable to Defendants actions.  Such attempts are flawed on their face and the corresponding allegations should be stricken from the record with prejudice.

Paragraph 139 alleges there are "dozens of articles and forum postings about objectionable activity on the Roblox platform generally" and notes there have been lawsuits filed by parents

---

[28]    *See* https://techcrunch.com/2018/07/18/roblox-responds-to-the-hack-that-allowed-a-childs-avatar-to-be-raped-in-its-game/.

[29]    *See* https://www.mysocialife.com/roblox-child-predators/.

[30]    See https://www.thegamer.com/how-many-games-are-on-roblox/#:~:text=It%20would%20be%20impossible%20to,counted%20one%20game%20every%20second.

alleging that "***Roblox exposes children to 'harmful content'***".  The allegations cite morally reprehensible and scandalous conduct such as pedophiles sending children links to pornographic websites, prompting children to play with nude avatars, and having avatars engage in sexual intercourse and play with sex toys. Here, too, the articles cited[31] do not reference Adopt Me! anywhere and Defendants have not been named in any lawsuits related to these allegations. Accordingly, the allegations should be stricken from the record with prejudice.

Paragraph 140 includes a list of lawsuits filed against Roblox even though Defendants have not been named in any such lawsuits and, as Plaintiff acknowledges in paragraph 141, Defendants are not directly implicated in any such lawsuits.  Such lawsuits do not advance any factual claims or evidence as to Defendants' business or actions.  Quite simply, the referenced material is superfluous to any potential claim Plaintiff may have and should be stricken from the record with prejudice.

In paragraph 131, Plaintiff alleges that "public confusion between Adopt Me and Adopt Me! has the effect of implicating Adopt Me with bad behavior (such as pedophilia, sex, gambling, and illegal child labor) associated with Adopt Me! and the Roblox platform on which it is offered," but, as noted above and acknowledged in Plaintiff's own allegations, these accusations relate to alleged activities of third party criminals and third party businesses, such as Roblox and Discord. Plaintiff attempts to bootstrap the misplaced allegations discussed above as a basis for its legal claims without once offering a factual claim that is attributable to Defendant.  Such gamesmanship

---

[31]    "Paedophile groomed 150 children to engage in sexual activity using online game Roblox" available at https://www.walesonline.co.uk/news/wales-news/paedophile-groomed-150-children-engage-16258877; "11-Year-Old Girl Allegedly Kidnapped By Man She Communicated With On Roblox" available at https://www.yahoo.com/news/11-old-girl-allegedly-kidnapped-215725284.html; "Parents File Another Class-Action Lawsuit Against Roblox" available at https://www.pcmag.com/news/parents-file-another-class-action-lawsuit-against-roblox.

is not only legally and factually flawed, it is devoid of the basis required to plead a claim against Defendants. Accordingly, the corresponding allegations should be stricken from the record with prejudice.

Paragraph 146 alleges "the negative associations with Plaintiff's Adopt Me brand resulting from Defendants' trademark violations have grown from being related to run- of-the-mill scams to more severe issues such as pedophilia, rape, pornography, music copyright violations, underage gambling, and child labor." The allegations cite morally reprehensible and scandalous conduct which infer lawsuits against Roblox and do not reference Adopt Me! anywhere and Defendants have not been named in any lawsuits related to these allegations. Similar to paragraph 131 discussed above, Plaintiff attempts to rely on these misplaced allegations as a basis to support its legal claims against Defendant. Such attempts are legally flawed and do not constitute a basis to plead a claim against Defendants and should be stricken from the record with prejudice.

Paragraphs 151-153 include hyperbolic allegations that the claims against Roblox could lead to individuals associated with Plaintiff being "arrest[ed]," "injure[d]," or "kill[ed]". In paragraph 143, Plaintiff attempts to substantiate this fear by noting that it has previously been "involved in lawsuits when litigants mistakenly either named Plaintiff as a defendant or served Plaintiff with a subpoena". Plaintiff's involvement in prior lawsuits has no bearing on the instant dispute and the extrapolation to hypothetical arrests, injuries and even murder are unwarranted. As shown throughout, Plaintiff has attempted to create the facts it needs to make the claims set forth in this paragraph by alleging that third party conduct on third party websites and platforms are attributable to Defendants. Plaintiff attempts to leverage this effort once again by asserting the hyperbolic conclusion that Defendants are culpable for placing Plaintiff at risk of incarceration,

injury, or death.  Such claims are not only baseless, they are beyond the pale and should be stricken from the record with prejudice.

A portion of paragraph 201 alleges that "the Adopt Me! game offered on Defendants' websites in [*sic*] associated with bad behavior such as pedophilia, gambling and the like." The allegations cite morally reprehensible and scandalous conduct related to third party lawsuits and actions set forth in detail above.  Plaintiff should be restricted from asserting baseless allegations of pedophilia, gambling and the like in this paragraph and such terms should be stricken from the record with prejudice wherever they appear in the Complaint.

The facts alleged in paragraphs 131, 137-141, 143, 146, 151-153, and a portion of paragraph 201 of the Complaint bear no relation to Defendants' game, their business, their conduct, or to the instant dispute.  Accordingly, Defendants respectfully request that they be stricken with prejudice.

**B.**     **Plaintiff's Mark Is Not Famous and Its Dilution Claims Should be Dismissed.**

Counts II and III of the Complaint purport to state claims for federal trademark dilution by blurring (Count II) and tarnishment (Count III).  However, as discussed below, Plaintiff has not alleged facts sufficient to show, if taken as true, that its ADOPT ME trademark ("Plaintiff's Mark") is "famous." Since fame is a prerequisite for a dilution claim, these counts should be dismissed.

Under 15 U.S.C. 1125(c), "the owner of a ***famous mark*** that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury." ***A mark is considered "famous" if it is widely recognized by the general***

***consuming public of the United States*** as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A) (emphasis added).  In determining whether a mark possesses the requisite degree of recognition, the court may consider all relevant factors, including the following:

> (i)     *The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.*
>
> (ii)    *The amount, volume, and geographic extent of sales of goods or services offered under  the mark.*
>
> (iii)   *The extent of actual recognition of the mark.*
>
> (iv)   *Whether the mark was registered.*

*Id*.

Here, Plaintiff's allegations as to the recognition of Plaintiff's Mark by the general public are conclusory at best.  Plaintiff does not own or allege that it owns a registration for this mark. To the contrary, Treetop and Lionfield own a registration for the ADOPT ME! trademark (the "ADOPT ME! Mark") and Plaintiff did not oppose that registration with ***full prior knowledge*** of the Defendants' use of the mark.  Although Plaintiff claims to have used its mark "continuously for over 20 years" (Compl. ¶164), the Complaint is devoid of any facts purporting to show that the mark is actually recognized by a large part of the consuming public. Plaintiff alleges that it has "advertised and used the Adopt Me mark to a nationwide extent" (Compl. ¶ 180) but "[n]ational renown" is the standard. *See Boston Granite Exchange v. Greater Boston Granite LLC*, Case No: 11–cv–11898–JLT, 2012 WL 3776449, at *5 (D. Mass. Aug. 29, 2012) (dismissing dilution claims where allegations only led to an inference that plaintiff had established a strong presence in its own industry); *see also Luv N' Care, Ltd. v. Regent Baby Products Corp.*, 841 F. Supp.2d 753, 757 (S.D.N.Y. 2012) (dismissing plaintiff's claim for dilution of unregistered marks used on its baby products and noting the requirement that a mark be "widely recognized by the by the general

consuming public of the United States" was intended to reject dilution causes of action based on niche fame.)

The threshold for fame on a dilution claim is "exceptionally high" and the availability of the claim is reserved for brands that have "accumulated the cultural heft to transform them from mere trademarks – even strong ones – to a household name that is instantly recognizable among the general public of the United States." *10, Inc. v. Beauty Elite Group, Inc.,* 110 U.S.P.Q.2d 1116, 1125, 2013 WL 6834804 (S.D. Fla. 2013). Plaintiff has not alleged facts that could plausibly put Plaintiff's Mark among the likes of "giants of branding" entitled to such protection. *Id.* (citing 3 McCarthy on Trademarks and Unfair Competition § 24:107 (5th ed.), which lists marks such as NIKE, PEPSI and STARBUCKS as examples of marks found to be "famous" for purposes of a dilution claim); *Luv N' Care*, 841 F. Supp. 2d at 758 (dilution causes of action should be limited to "truly famous marks" like BUDWEISER beer and others).

Moreover, Plaintiff appears to acknowledge that the ADOPT ME! Mark is actually the more well-known mark through its many references to receiving complaints intended for Adopt Me! and numerous other allegations. *See, e.g.* Compl. ¶123 (noting Adopt Me! has "millions of users" whereas Plaintiff's Adopt Me game averaged "about 5,000 visitors a day" at its peak around 2011); Compl. ¶ 125 ("traffic to AdoptMe.com increased from the usual 600 visitors per day to 15,000 per day, without a commensurate increase in activity on the Adopt Me game, indicating that, as in the case of the mistakenly directed emails, visitors were mistakenly looking for Defendants' website"); Compl. ¶ 129 (noting that since 2020, AdoptMe.com is nowhere to be found in the Google search results for "Adopt Me").

By alleging these facts, Plaintiff has undercut any argument that its mark is famous and negated a required element of a dilution claim by its own admissions. Thus, the dilution counts should be dismissed.

### C.  Defendants are Not Cybersquatters So Plaintiff's ACPA Claim Should be Dismissed.

To establish a claim under the ACPA, a plaintiff must show that: (1) it has a valid trademark entitled to protection; (2) its mark is distinctive or famous; (3) defendant's domain name is identical or confusingly similar to, or in the case of famous marks, dilutive of, the owner's mark; and (4) defendant used, registered, or trafficked in the domain name (5) with a bad faith intent to profit. Lanham Trade-Mark Act § 43, 15 U.S.C.A. § 1125(d).

The ACPA is a law distinct from the laws governing trademark infringement and is meant to address the holding and sale of a domain. *See N. Light Tech., Inc. v. N. Lights Club*, 97 F. Supp. 2d 96, 115 (D. Mass. 2000) (quoting H.R. Rep. No. 106-412, at 5), *aff'd*, 236 F.3d 57 (1st Cir. 2001) ("Congress passed the ACPA 'primarily in an effort to stop cybersquatters who register numerous domain names containing American trademarks or tradenames **only to hold them ransom in exchange for money**.'") (emphasis added).

Defendants are not holding, nor did they ever offer, a domain for ransom or sale. In fact, the Complaint alleges the opposite is true through numerous references Plaintiff makes to correspondence it received from a person affiliated with Defendants offering to ***purchase*** the ADOPTME.COM domain.[32] Operating a business under a similar name to that of another domain registrant or owning and using a domain similar to that of another registrant is not, in and of itself, an ACPA violation.

---

[32]    *See* Compl. ¶¶ 63, 77, and 273.

With respect to the elements of an ACPA claim, even assuming for purposes of this motion that Plaintiff holds valid trademark rights in ADOPT ME - a premise that is tenuous at best - Plaintiff makes only a conclusory allegation in the Complaint that "Plaintiff's mark is inherently distinctive or has acquired distinctiveness through repeated use in commerce." Complaint ¶ 192. As noted in section IV.B *supra*, it is Defendants' Adopt Me! game that has achieved widespread recognition. In addition, the allegations are clear that Defendants did not "use[], register[], or traffic[] in the domain name . . with a bad faith intent to profit." To the contrary, after years of using the domains PLAYADOPT.ME and PLAYADOPTME.COM, Defendants sought to lawfully procure Plaintiff's ADOPTME.COM domain name directly from Plaintiff when it appeared that Plaintiff no longer had use for it. *See* 15 USCA § 1125(B)(ii) ("Bad faith intent . . . shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful.")

As described in section II.B *supra,* Plaintiff may purchase and hold domain names for long periods of non-use waiting for the right buyer or user to come along, but Defendants do not. Given the absence of any allegations tending to show that Defendants wrongfully procured domain names in the hopes of diverting Plaintiff's business to them or purchased domain names solely to hold them for ransom, the ACPA claim should be dismissed.

### D.     Plaintiff Has Not Alleged With Any Particularity That Defendants Were Aware of, or Intentionally Interfered With, Any Contract or Prospective Business of Plaintiff, So Its Tortious Interference Claims Should be Dismissed.

Plaintiff's claims for tortious interference with contract (Count VIII) and prospective business relations (Count IX) do not cite the legal authority under which they seek relief. The Complaint does not detail whether Plaintiff's claims are based on statute or common law.

Accordingly, Plaintiff should be required to amend its complaint to describe the bases of its claims with greater specificity.

Even if Plaintiff's claims are construed as claims arising under common law, to prevail on a claim alleging tortious interference with contract, a plaintiff must show "(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) his[, her, or its] intentional interference [with the contract]; and (4) damages resulting therefrom." *UST Corp. v. General Road Trucking Corp.*, 783 A.2d 931, 937 (R.I. 2001) (cleaned up).

The elements of a claim for tortious interference with prospective business opportunities are similar and require: "(1) the existence of a business relationship or expectancy; (2) knowledge by the interferer of the relationship or expectancy; (3) an intentional act of interference; (4) proof that the interference caused the harm sustained; and (5) damages to the plaintiff." *North American Catholic Ed. Programming Foundation, Inc. v. Cardinale*, 567 F.3d 8, 14 (1st Cir. 2009). ), citing *Mesolella v. Providence*, 508 A.2d 661, 669-70 (R.I. 1986).

The allegations in the Complaint do not contain facts that, even if taken as true, would establish that the elements of these claims are met. Notably, both claims require that Defendants had ***knowledge*** of the Plaintiff's contract or business relationship and that Defendants ***intentionally interfered*** with such contracts or relationships. Plaintiff's bald allegation that Defendants "had and continue to have knowledge that Plaintiff had relations with prospective advertisers on Plaintiff's website and prospective investors in Plaintiff's business" (Compl. ¶ 260) fails to point to any concrete facts tending to show this is true.  And Plaintiff's tortious interference with contract claim is premised on unspecified advertising contracts between Plaintiff and third parties, which Defendants could not have known by their very nature. *See* Compl. ¶ 246.

Moreover, tortious interference requires an overt act that has not been pleaded here. Rhode Island courts have interpreted such acts to include the active solicitation of employees subject to non-compete clauses, the act of a salesman holding himself out as representative of his employer but diverting sales made to a different company owned by the salesman, and soliciting and presenting an offer for a residential property after another offer had been accepted.[33]

The Complaint contains no credible facts which, taken as true, would show that Defendants had knowledge of or interfered in any way with Plaintiff's contracts or prospective business partners in the manner such "interference" has been construed. It is unclear such contracts and relationships even exist, as the Complaint only references web traffic and ad revenue from over a decade ago.  *See* Compl. ¶ 28-30. Moreover, Plaintiff fails to quantify or specify the alleged damage it has suffered.  Given the very specific knowledge and intentional interference requirements associated with these claims and the paucity of Plaintiff's allegations in support of these claims, they should be dismissed.

### E.    **Defendants Have Not Engaged in Unfair Competition Because They Do Not Divert Business from Plaintiff and Plaintiff's Mark is Not So Distinctive that Consumers Associate the ADOPT ME! Mark with Plaintiff.**

Rhode Island courts have held that "[u]nfair competition occurs when the device or means employed would be likely to confuse and mislead the public generally to purchase the product or patronize the shop of one person when the actual intention was to purchase the product or patronize the shop of another." *Nat'l Lumber & Bldg. Materials Co. v. Langevin*, 798 A.2d 429, 433 (R.I. 2002).

---

[33]    *McFarland v. Brier*, 769 A.2d 605, 609 (R.I. 2001); Baris v. Steinlage, No. C.A. 99-1302, 2003 WL 23195568, at *16 (R.I. Super. Dec. 12, 2003); *Loffredo v. Shapiro*, 274 A.3d 782, 787 (R.I. 2022).

With regards to source identifiers, the Rhode Island Supreme Court has held that "[e]very man has in common the right to use a descriptive term in the advertising of his services or goods, unless another offering the same services or marketing the same product has, ***by prior and continuous use thereof***, given to a particular descriptive term a ***secondary meaning*** which in the public mind identifies the user with the particular services or goods." *Charles J. Donnelly, Inc. v. Donnelly Bros., Inc*., 96 R.I. 255, 261, 191 A.2d 143, 146 (1963). Plaintiff has not alleged sufficient facts, taken as true, to establish that its mark is strong enough to have acquired secondary meaning. To the contrary, as described in section IV.B *supra*, the facts alleged tend to show that when the relevant consuming public thinks of ADOPT ME!, they associate the term with Defendants and their Adopt Me! game rather than the Plaintiff. In addition, the Complaint contains only conclusory allegations that Plaintiff's Mark has been used "continuously for over 20 years." Although Plaintiff devotes significant space in its pleading describing web traffic and revenue from the early 2000s, similar information from 2011 and on is notably absent from the Complaint. Accordingly, the claim for unfair competition is not plausible and should be dismissed.

## V.    <u>CONCLUSION</u>

For the reasons set forth above, Defendants respectfully request that paragraphs 131, 137-141, 143, 146, 151-153, and portions of 201, referring to pedophilia and gambling, of the Complaint be stricken for improper inclusion of immaterial, impertinent and/or scandalous matter and that Counts II, III, IV, VI, VIII, and IX of the Complaint be dismissed, with prejudice, for failure to state a claim.

Dated: June 27, 2024

Respectfully submitted,

DEFENDANTS UPLIFT GAMES LLC AND
TREETOP GAMES LLC
By their attorneys,

/s/ Jeffrey K. Techentin
R. Bart Totten [No. 5095]
Jeffrey K. Techentin [No. 6651]
ADLER POLLOCK AND SHEEHAN, P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903

Michael D. Adams
(*pro hac vice* application pending)
Emily A. Nash
(*pro hac vice* application pending)
MAYER BROWN LLP
71 S. Wacker Dr.
Chicago, IL 60606

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 27, 2024, a true copy of the within was filed electronically via the Court's CM/ECF System.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system and the filing is available for viewing and downloading from the Court's CM/ECF System.

<u>/s/ Jeffrey K. Techentin</u>