## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| IMPULSE COMMUNICATIONS, INC., <br><br>      Plaintiff, <br><br> v. <br><br> UPLIFT GAMES LLC, TREETOP GAMES, LLC, and LIONFIELD INVESTMENTS, LTD., <br><br><br>      Defendants. | C.A. No. 1:24-cv-00166-JJM-LDA |

### PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS OPPOSITION TO DEFENDANTS UPLIFT GAMES, LLC, AND TREETOP GAMES, LLC'S, MOTION TO STRIKE PURSUANT TO FED. R. CIV. P. 12(f) AND TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)

Plaintiff, Impulse Communications, Inc. ("Impulse"), hereby files this Memorandum in support of its Opposition to the Motion to Strike and to Dismiss ("Motion") filed by Defendants Uplift Games, LLC ("Uplift"), and Treetop Games, LLC ("Treetop") (collectively with Uplift, "Defendants") (Dkt. 14).

As a preliminary matter, Impulse voluntarily withdraws its claims of Dilution by Blurring under 15 U.S.C. 1125(c) (Count II); Dilution by Tarnishment under 15 U.S.C. 1125(c) (Count III); Tortious Interference with Contractual Relations (Count VIII); and Tortious Interference with Prospective Business Relations (Count IX), while reserving the right, in the future, to seek to amend the Complaint to reassert such claims should evidence coming to light through discovery warrant doing so. As a result, the only remaining claims that are the subject of the

1

portion of Defendants' Motion seeking to dismiss Impulse's claims under Fed. R. Civ. P. 12(b)(6) are Count IV (Violation of the Anti-cybersquatting Consumer Protection Act) and Count VI (Common Law Unfair Competition).

The allegations in the Complaint that Defendants seek to strike are not immaterial, impertinent or scandalous, but rather are relevant to and necessary to state Impulse's claims. Furthermore, the Complaint plausibly states claims upon which relief can be granted in cases of Counts IV and VI. Therefore, Defendants' Motion to Strike and to Dismiss should be denied.

## I.     **<u>KEY FACTS</u>**

Impulse owns and operates the AdoptMe.com website, featuring a virtual pets game entitled "Adopt Me". Complaint (April 26, 2024) ("CMP") ¶ 11. Impulse started the AdoptMe.com website in 1998 and began featuring the Adopt Me virtual pets game on its website in 2000. CMP ¶ 12. To the best of Impulse's knowledge, it was the first entity to ever use the mark "Adopt Me" in connection with an online, virtual pets game. CMP ¶ 13. While Impulse never registered its "Adopt Me" trademark, it has, since 2000, continuously used the mark in commerce and asserted common law ownership of it. CMP ¶ 16.

Ways in which Impulse has continuously used its mark in commerce include: making its Adopt Me game available online to players in all 50 states, deriving income from its adoptme.com web address and third party advertising thereon; offering, at national retailers during the mid-2000s, animal plush toys that cross-promoted Impulse's game and website. CMP ¶¶ 18-21. More recently, in 2020, Plaintiff supplemented its twenty-year-old website version of the Adopt Me game with an Adopt Me iOS app that was available for download from Apple's App Store. CMP ¶34. In 2021, while still maintaining the iOS app, Impulse relaunched AdoptMe.com with a completely new version of the AdoptMe.com website and game, which were reprogrammed from

scratch.  CMP ¶35. In connection with these changes, Impulse made multiple investments to market its product under the Adopt Me mark.  In order to advertise its new iOS App and its relaunched website, Impulse paid for press releases, extensive social media marketing, and on-line marketing including link-building campaigns for search engine optimization. CMP ¶¶ 36, 43-4. It also invested in improving the in-game experience for Adopt Me users by investing in an Adopt Me theme song that was featured in a virtual concert hall on its website and on YouTube and by investing in upgrades to the game that permitted users to mint NFTs (non-fungible tokens) of their pets, to chat with their pets to the Adopt Me game, and to own parcels of virtual land and build houses and stores on them as part of an entire metaverse city.  CMP ¶¶ 37-41,45.

Impulse has invested approximately $200,000 in the Adopt Me website, game, and brand since 2000. CMP ¶ 17.  Impulse's efforts to market its website and game have been successful. Millions of virtual pets have been adopted in Plaintiff's Adopt Me game since it was launched in 2000. CMP ¶ 27.  For large periods of time, Impulse's website averaged about 5,000 visitors a day (i.e. over a million visitors a year), and Impulse was earning thousands of dollars a month from advertising on the site.  CMP ¶ 28. During the 2000s and early 2010s, AdoptMe.com was the number one result for searches of the term "virtual pets" on Google. CMP ¶ 29.

In 2017, 19 years after Impulse first started using Adopt Me, Defendant Uplift first launched its "Adopt Me" game on the Roblox gaming platform as a virtual humans adoption game for children with the same title as Plaintiff's game. CMP ¶¶ 51,56.  In September 2017, it also registered its official website playadopt.me, which clearly mimics Impulse's adoptme.com website. CMP ¶ 53.  In 2019, Uplift changed its game to focus on virtual pets, just like Plaintiff's game. CMP ¶ 57.   Defendants' game is available on both the web and via an iOS app just like Impulse's Adopt Me game under the name Adopt Me. CMP ¶ 69. Defendants marketed their game

to the same consumer base and target demographic to which Impulse markets it's Adopt Me game, which is children and young teenagers who like to play online games. CMP ¶ 60.  Neither Uplift nor any other Defendant ever requested or received authorization from Plaintiff to use its Adopt Me trademark in connection with any version of its game. CMP ¶ 55.  Defendants applied for a federally-registered trademark of "Adopt Me!" for downloadable games software. This trademark (Registration Number 6626699) was registered on January 25, 2022. CMP ¶ 91.

As a result of their essentially identical marks, and their respective online, virtual pets games that are aimed at children, there is not just a likelihood of, but there is well documented confusion in the marketplace regarding the two Adopt Me games and their owners.  Despite officially adding an exclamation mark to the name of their game, Defendants' playadopt.me website continues (as of the date of this filing) in various ways to refer to the Adopt Me! game as "Adopt Me" without an exclamation mark, and much of the general public also does not use the exclamation mark.  CMP ¶¶ 61, 62-65. Multiple members of the public persistently confuse the two marks, for example contacting and blaming Impulse for their experiences with Defendants' game. CMP ¶¶ 66, 126-8.

Public confusion about Impulse and Defendants and their respective games has diverted online traffic from Impulse's website and game.  CMP ¶74.  It has also interfered with Impulse's ability to cultivate investors and partners to help it expand its business and brand.  CMP ¶ 74. Defendants' use of Plaintiff's trademark for its game has also made Plaintiff's game much more difficult to find online. Prior to the launch of Defendants' game in 2017, there was only one "Adopt Me" virtual pets game, and Plaintiff's website was the #1 search result in Google and all other major search engines for terms such as "Adopt Me," "AdoptMe" and "Adopt Me pets."  CMP ¶ 129.  Since 2020, for the same searches, AdoptMe.com is nowhere to be found in the results. CMP

¶ 129.  The inability of users to find Plaintiff's website among online search results has caused a significant decrease in traffic to Plaintiff's website as new users and inconsistent users are unable to find Impulse's website by doing an internet search.  CMP ¶ 130.

Because of the public confusion caused by the Defendants' infringement of Impulse's Adopt Me mark, both the Defendants' decision to allow in-game communication between players and in-game purchases,[1] and their decision to use the Roblox gaming platform as the venue in which they offer Adopt Me! to the public, have also damaged Impulse's reputation and public goodwill towards Impulse's Adopt Me mark. Incidents taking place in the Adopt Me! game as a result of in-game communications and purchases have caused the public to directly associate Defendants' Adopt Me! game with bad behavior such as scamming (CMP ¶¶ 126, 133-135), hacking (CMP ¶ 132), illegal gambling (CMP ¶ 136), and pedophilia (CMP ¶ 137).  Even when Adopt Me! is not directly implicated in bad or illegal behavior, as one of the biggest games on Roblox, it is often mentioned in articles about this type of behavior occurring on the Roblox platform generally, reinforcing the public perception that this behavior goes on in Adopt Me!. CMP ¶ 141.  For over twenty years, Plaintiff has sought to create a wholesome, safe, child- and family-friendly experience on its website and in its Adopt Me game. CMP ¶ 120.  Plaintiff's website and game do not feature any violence, sex, possibilities for scamming, or any other potentially objectionable content that may drive away players/users or expose Plaintiff to liability. CMP ¶¶ 24-5, 122.   As a result of the confusion between Adopt Me! and Adopt Me, Adopt Me has become tainted by the bad acts associated with Adopt Me! and Roblox that are directly antithetical to the wholesome reputation that it built over 20 years and which the public associated with Adopt Me. CMP ¶¶ 131-2, 142, 147.

---

[1] Both of these are optional choices for Roblox game developers such as Defendants.

## II.    <u>LEGAL STANDARD FOR MOTION TO STRIKE</u>

Under the Federal Rules of Civil Procedure, a court may strike from any pleading "any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f); *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 182 F.R.D. 386, 398 (D.R.I. 1998).  "Immaterial matters are those having no important relationship to the parties' claims or defenses. Impertinent matters are essentially the same; they are not relevant to the issues in question." *McKay v. Fay Servicing, LLC*, No. 1:23-cv-00361, 2024 U.S. Dist. LEXIS 141630, at *8 (D. Me. Aug. 9, 2024)(citation omitted).

Scandalous matter constitutes statements that "improperly cast[] a derogatory light on someone." *Alvarado-Morales v. Digital Equip. Corp.*, 669 F. Supp. 1173, 1186 (D.P.R. 1987). As to scandalous matter, "it is not enough that the matter offends the sensibilities of the objecting party if the challenged allegations describe acts or events that are relevant to the action." *Autila v. Mass. Bay Transp. Auth.*, 342 F.R.D. 23, 31-32 (D. Mass. 2022). Allegations will not be stricken simply because they "sound scandalous." *Islam v. Option One Mortg. Corp.*, 432 F. Supp. 2d 181, 199 n. 17 (D. Mass. 2006). Even allegations amounting to "character assassination with prior bad acts" and "guilt by association" should not be stricken as long as there is some relevancy to the allegations. *See*, *e.g.*,  *Barden v. Murphy-Brown, LLC*, No. 7:20-CV-85, 2021 U.S. Dist. LEXIS 47809, at *25 (E.D.N.C. Mar. 15, 2021) and *J.M. v. Karla Major*, No. 6:18-cv-00739, 2022 U.S. Dist. LEXIS 251708, at *9 (D. Or. Apr. 13, 2022).

A court has discretion to strike matters from pleadings under Fed. R. Civ. P. 12(f). *Autila*, 342 F.R.D. at 31 (citing *Alvarado-Morales v. Digital Equip. Corp.*, 843 F.2d 613, 618 (1st Cir. 1988)).  "[W]hile ruling on a motion to strike is committed to the district court's sound judgment, 'such motions are narrow in scope, disfavored in practice, and not calculated readily to invoke

the court's discretion.'" *McKay*, 2024 U.S. Dist. LEXIS 141630, at *8 (quoting *Manning v. Bos. Med. Ctr. Corp.*, 725 F.3d 34, 59 (1st Cir. 2013)). In general, a motion to strike should be denied unless it is clear that the challenged matter "can have no possible bearing on the subject matter of the litigation" *Hall v. President & Trs. of Bates Coll.*, No. 2:22-cv-00090, 2022 U.S. Dist. LEXIS 220164, at *46 (D. Me. Dec. 7, 2022), or if the court "is in doubt as to whether the challenged matter may raise an issue of fact or law" *Ross-Simons*, 182 F.R.D. at 398.  The moving party has the burden of proof on a motion to strike. *Barden*, 2021 U.S. Dist. LEXIS 47809, at *21.

## III.    <u>ARGUMENT (MOTION TO STRIKE)</u>

### A.    Paragraphs 131, 137-141, 143, 146, 151-153 and 201 contain allegations relevant to Plaintiff's claims against Defendants and should not be stricken.

This Honorable Court should deny Defendants' motion to strike paragraphs 131, 137-141, 143, 146, 151-153 and a portion of paragraph 201 from the Complaint.  While Defendants claim that these allegations are salacious, inflammatory, immaterial and not tied to Defendants in any way and that they are only included in the Complaint to disparage the reputation of Defendants and their game, this is not the case. All of the cited paragraphs contain allegations which are necessary and relevant to state Impulse's claims and therefore should not be stricken.

#### 1.    Relevance to Damages Claim

Impulse's claim of Trademark Infringement under the Lanham Act (Count I) requires a showing of damages resulting from the alleged infringer's acts. 15 USC §1125(a) (infringer "shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act").  Damages available under 15 USC §1125(a) include more than those resulting from the diversion of customers and lost business caused by infringement. An alleged

7

infringement of a mark can inflict commercial injury in the form of "damage to goodwill, or loss of control over reputation on the trademark holder." *Beacon Mut. Ins. Co. v. OneBeacon Ins. Grp.*, 376 F.3d 8, 15 (1st Cir. 2004). Courts have found that a mark's reputation can be damaged where, because of consumer confusion, the public may attribute the defects present in the infringer's product with the mark owner's product. *See*, *e.g.*, *Kusan, Inc. v. Fairway Siding Corp.*, Civil Action No. 87-0212-F, 1988 U.S. Dist. LEXIS 10223, at *34 (D. Mass. Feb. 3, 1988) (preliminary injunction entered where plaintiff established that infringing use of mark causing consumer confusion could cause irreparable harm to plaintiff's reputation, since consumers may attribute the defects present in building product purchased from infringer to plaintiff and its building products).

Therefore, in addition to other monetary damages, Impulse is claiming damages resulting from harm to its reputation as a wholesome, safe website and game for children, and to the goodwill among the public that its Adopt Me mark has accumulated over twenty years in the market, caused by Defendants' adopting a nearly identical infringing mark in relation to a game with problematic and potentially dangerous features that they have decided to make available on the problematic and potentially dangerous Roblox a platform.

Impulse advances two parallel theories about the harm to its reputation and good-will caused by Defendant's infringement of its mark. According to the first of these theories, Defendants have caused damage to Impulse's reputation and the good-will associated with its mark as a result of bad acts, such as scamming (CMP ¶¶ 126, 133-135), hacking (CMP ¶ 132), illegal gambling (CMP ¶ 136), and pedophilia (CMP ¶ 137), that have occurred on or in direct connection with Defendant's Adopt Me!, which the public confuses with the Adopt Me mark.

According to the second damages theory advanced by Impulse, due to consumer

confusion caused by Defendants' infringement of the Adopt Me mark, the reputation of Impulse and its mark have become tainted and damaged by Adopt Me!'s association with the problematic and potentially dangerous gaming platform Roblox. There are several features on Roblox, such as the ability to use in-game virtual money, and to communicate and trade items with strangers, that can make it a dangerous place for children.

### WHY PLAINTIFF'S ALLEGATIONS ARE WELL-PLED AND BELONG IN ITS COMPLAINT

Paragraphs 131 and 201 of the Complaint simply and concisely state Impulse's theory of how its Adopt Me mark is damaged by the bad acts associated with Adopt Me! and with Roblox. They are therefore not redundant or immaterial. *McKay*, 2024 U.S. Dist. LEXIS 141630 at *8. While the bad acts listed in these paragraphs are not pleasant subjects, they are presented in a matter-of-fact, not salacious or inflammatory, manner. Though the subjects listed may offend some sensibilities, they are clearly relevant to Impulse's claims and therefore should not be stricken. *Autila*, 342 F.R.D. 31-31.

Paragraph 137 includes examples of on-line posts where Adopt Me! has been associated with pedophilia, including an instance where Roblox's in-game currency was used by a pedophile in an attempt to abuse a girl who wanted an Adopt Me! pet. This paragraph serves as evidence of how members of the public have come to associate Adopt Me! with pedophilia both directly, because the instances involved the Adopt Me! game, and indirectly, because of the game's association with Roblox, whose in-game currency played a role in the incidence of attempted abuse. That the Robux currency used in the cited incident of attempted abuse is not sold by Defendants is not of great importance. Regardless of where the currency can be purchased, its use in this incident highlights Adopt Me!'s problematic association with Roblox and the risks associated with the in-game purchase and communications features that both Adopt

Me! and Roblox have and which Impulse's Adopt Me, because of child safety concerns, does not have. CMP ¶ 26. Even though the allegations contained in paragraph 137 sound scandalous, they should not be stricken because they are relevant to Impulse's claims. *Islam*, 432 F.Supp. 2d 199 Fn. 17.

Paragraphs 138, 139, and 140 provide just a handful of many available examples of articles in the press and posts on public forums recounting the types of objectionable conduct that the public has come to identify with Roblox and, through association, with Adopt Me! and, because of confusion caused by the Defendants, with Adopt Me. Paragraph 138 provides examples showing instances where the multiplayer nature of games on Roblox enabled instances of in-game rape. Paragraph 139 provides examples of objectionable acts associated with Roblox in general.  Paragraph 140 provides examples of lawsuits that have been filed against Roblox, evidencing that the perception that Roblox is dangerous for children is not just based on rumor and on-line chatter. All of these paragraphs provide an evidentiary foundation for Impulse's claim that Roblox has earned a bad reputation in the public mind, which relates to its theory of damages to its reputation resulting from Adopt Me!'s association with the problematic and potentially dangerous Roblox gaming platform.  Being relevant to Impulse's claims, these allegations are not immaterial or impertinent, and therefore should not be stricken. *McKay*, 2024 U.S. Dist. LEXIS 141630 at *8.

Paragraph 141[2] is an allegation that most of the negative articles reporting bad acts on

---

[2] In their motion, the Defendants mischaracterize and misquote the Complaint to make it seem as if the paragraphs that they are moving to strike are only related to bad acts on Roblox not on the Adopt Me! game. For example, referencing paragraph 141 of the Complaint, they assert that "Since Plaintiff itself acknowledges that these allegations do not implicate Defendants, the allegations should be stricken." This is not the case. What Impulse actually wrote in paragraph 141 of the Complaint was that there are certain articles and postings online that, while they do not <u>explicitly</u> implicate the Defendants game, instead do so <u>implicitly</u>, by giving Adopt Me! as an example of a Roblox site where this bad behavior might be happening. The cited allegation in paragraph 141 was simply acknowledging a difference between the two theories of damages that Impulse is asserting.

Roblox mention the Adopt Me! game as one of the most popular games on Roblox, reinforcing in the public's mind the association between Adopt Me! and the bad acts occurring on or in connection with Roblox. This paragraph sets forth a necessary link between the bad acts occurring on Roblox, on the one hand, and Adopt Me!, on the other, which, due to confusion in the marketplace, is frequently mis-identified by the public as Adopt Me.  Similar to paragraphs 131 and 201, paragraph 141 simply states a part of Impulse's theory of damages in a matter-of-fact, not salacious or inflammatory way. Because it is relevant to Impulse's claim, it should not be stricken.

Finally, paragraphs 143, 151, 152 and 153 include allegations about how public confusion about Adopt Me and Adopt Me!, coupled with Adopt Me!'s association with the unsavory acts occurring both on Adopt Me! and on Roblox could result in financial damage to Impulse and its owner as a result of lawsuits mistakenly being filed against them instead of Defendants, or actual physical danger to Impulse's owner. These allegations are not idle speculation. To date, over five hundred Adopt Me! victims have mistakenly contacted Impulse about illegal activity in Defendants' game, erroneously blaming Impulse. CMP ¶ 126. Aside from those players attributing negative associations to Plaintiff's game, some of the emails had threatening tones, and many asked for monetary compensation. CMP ¶ 133. In May 2020, Impulse had to temporarily remove the Adopt Me game from its AdoptMe.com website to avoid potential lawsuits or other forms of escalation (such as physical harm) arising from complaints against Adopt Me! that it had nothing to do with.  Impulse has already incurred actual damages as a result of the marketplace confusion caused by Defendants' infringement of its mark and is at risk of incurring other types of damages as set forth in paragraphs 143, 151, 152 and 153. These paragraphs are therefore relevant to Impulse's damages claims and not immaterial or

impertinent, and should not be stricken.

In connection with most of the paragraphs to which they object, Defendants assert that the illegal acts that take place in their game and on Roblox are out of their control, that Defendants are not responsible for these acts, and that they cannot be found liable for them, and so references to them should be stricken from the Complaint.[3]  However, this misses the point of these allegations, which, it should be noted are all public and well-known.  It does not matter that Defendants did not commit these bad acts themselves or that they are not liable for them. What matters is that Defendants have chosen to create a game environment that allows these illegal acts, and have chosen to associate their game with the Roblox gaming platform where these illegal acts take place, and as a result are tarnished by these bad acts in the minds of the public. This tarnishment by association is then extended to Impulse and Adopt Me due to confusion over the parties' marks caused by the Defendants' trademark infringement.  Courts have found that even allegations amounting to "guilt by association" and allegations about bad acts for which a plaintiff may not have been found liable should not be stricken from a complaint as long as there is some relevancy to the allegations. *See*, *e.g.*, *Barden v. Murphy-Brown, LLC*, No. 7:20-CV-85-BR, 2021 U.S. Dist. LEXIS 47809, at *25 (E.D.N.C. Mar. 15, 2021) (motion to strike allegations of defendant food producer's associations with China, made in the midst of heightened

---

[3] Impulse notes that Defendants' arguments for striking the cited paragraphs of the Complaint actually support Impulse's point. Defendants do not deny that the cited bad acts happen on Roblox and that it has become associated with the platform in the minds of many in the public. Their efforts to have these paragraphs stricken indicate that they fear being associated with the bad acts that happen on or in connection with Roblox. They claim that simply including a sampling of these bad acts disparages the reputation of Defendants and their game. Yet, this is essentially what Impulse is claiming has happened to it: because of the choices that Defendants have made, both in infringing the Adopt Me mark and in associating with Roblox, Defendants have caused Adopt Me to become unwillingly associated with Roblox and its bad acts in the public's mind, with the result that its reputation has been damaged.

xenophobia due to Covid-19 pandemic, denied because associations could conceivably bear on plaintiff's claims) and *J.M. v. Karla Major*, No. 6:18-cv-00739-YY, 2022 U.S. Dist. LEXIS 251708, at *9 (D. Or. Apr. 13, 2022) (motion to strike allegations relating to previously settled lawsuit that alleged serious child abuse at a group home denied because allegations, though upsetting, were relevant to issues of knowledge and notice.)

The allegations set forth in paragraphs 131, 137-141, 143, 146, 151-153 and 201 of the Complaint are clearly relevant to the claims that Impulse has brought against the Defendants in the present lawsuit. It cannot be said that the challenged allegations "can have no possible bearing on the subject matter of [this] litigation," and, so, Defendants' Motion to Strike these allegations should be denied. *Hall*, 2022 U.S. Dist. LEXIS 220164, at *46.

### 2. Relevance to Claim of Violation of RI Trademark Anti-Dilution Statute (Count VII)

The allegations that Defendants are moving this Court to strike from the Complaint are also relevant to Impulse's claim that Defendants violated Rhode Island's Trademark Anti-Dilution Statute. R.I. Gen. Laws § 6-2-12.  Among the elements Impulse must prove to prevail on this claim is a dilution of its trademark, in other words, a "likelihood of injury to business reputation … of … a mark valid at common law…." R.I. Gen. Laws § 6-2-12.

"A trademark may be tarnished when it is linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context, with the result that the public will associate the lack of quality or lack of prestige in the defendant's goods with the plaintiff's unrelated goods. A trademark may be diluted by tarnishment if the mark loses its ability to serve as a 'wholesome identifier' of plaintiff's product." *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 110 (2d Cir. 2009). The possibility of injury to a plaintiff's business reputation is significant when there is a similarity of names, products and services provided by the parties and

13

similar channels of trade in which the parties conduct their business. *AABACUS PROCESSING Corp. v. ABACUS Comput. Servs.*, C.A. NO. 831919, 1983 R.I. Super. LEXIS 2, at *9 (Super. Ct. June 10, 1983).

As set forth in more detail in Section III (A)(1) with regard to Impulse's claim for damages under 15 USC §1125(a), Impulse has asserted the allegations that Defendants seek to have stricken from the Complaint because they are relevant to its claim that Defendants harmed Impulse's reputation and the good will associated with the Adopt Me mark. Defendants caused market confusion that increased the likelihood of damage to Impulse's Adopt Me mark by using the almost identical Adopt Me! in the marketing of its very similar virtual pets game to the same juvenile market that Impulse's Adopt Me game occupied. As a result of this confusion, Impulse's mark has been tarnished by the bad acts directly associated with Adopt Me! and also with the unsavory Roblox gaming platform that the Adopt Me! game is played on.

In sum, the allegations set forth in paragraphs 131, 137-141, 143, 146, 151-153 and 201 of the Complaint are clearly relevant to the claims that Impulse has brought against the Defendants in the present lawsuit. They are necessary for Impulse to bring its claims under 15 USC §1125(a) and under the Rhode Island Trademark Anti-Dilution Statute. Because it cannot be said that the challenged allegations "can have no possible bearing on the subject matter of [this] litigation," Defendants' Motion to Strike these allegations should be denied. *Hall*, 2022 U.S. Dist. LEXIS 220164, at *46.

## IV.    LEGAL STANDARD FOR MOTION TO DISMISS

In this Motion to Dismiss, the burden is on the Defendants to prove that there is insufficient "factual matter" in Counts IV and VI of Plaintiff's Complaint to "state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell*

*Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Mayale-Eke v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 754 F. Supp. 2d 372, 375 (D.R.I. 2010), *accepted by*, 754 F. Supp. 2d 372, 373 (D.R.I. 2010)) (denying Defendants' motion to dismiss). The "plausibility inquiry properly takes into account whether discovery can reasonably be expected to fill any holes in the pleader's case." *García-Catalán v. United States*, 734 F.3d 100, 104 (1st Cir. 2013) (reversing district court's granting of motion to dismiss).

This Court must "construe[] the complaint in the light most favorable to the plaintiff, taking all well-pleaded allegations as true and giving the plaintiff the benefit of all reasonable inferences." *Wyss v. Gen. Dynamics Corp.*, 24 F. Supp. 2d 202, 203 (D.R.I. 1998) (denying defendants' motion to dismiss) (citing *Negron-Gaztambide v. Hernandez-Torres*, 35 F.3d 25, 27 (1st Cir. 1994), *cert. denied*, 513 U.S. 1149 (1995)). *Twombly* did not change what this Court calls the "liberal standard for notice pleading" embodied in the Federal Rules of Civil Procedure. *Barkan v. Dunkin' Donuts, Inc*., 520 F. Supp. 2d 333, 339 (D.R.I. 2007). Rule 8 still requires plaintiffs to allege only "a short and plain statement of the claim showing, that the pleader is entitled to relief . . . ." Fed. R. Civ. P. Rule 8; *accord Barkan*, 520 F. Supp. 2d at 339.

## V.    ARGUMENT (MOTION TO DISMISS)

### A.    COUNT IV: PLAINTIFF HAS STATED A PLAUSIBLE CLAIM THAT DEFENDANTS HAVE VIOLATED THE ANTICYBERSQUATTING CONSUMER PROTECTION ACT

Impulse has stated a plausible claim that Defendants have violated the Anti-cybersquatting Consumer Protection Act ("ACPA"), and therefore the Court should deny Defendants' Motion to dismiss this claim.

The ACPA protects the owner of a distinctive trademark from another's bad faith intent to profit from the trademark owner's mark by registering or using a domain name that is identical or confusingly similar to the trademark owner's mark without regard to the goods or services of the parties. *YETI Coolers, LLC v. Individuals*, No. 21-cv-62008, 2021 U.S. Dist. LEXIS 247615, at *11 (S.D. Fla. Dec. 28, 2021). To state a claim under the ACPA, a plaintiff must allege the following elements: (1) the plaintiff owns a mark; (2) the defendant registers, traffics in or uses a domain name that (i) in cases in which the plaintiff's mark was distinctive at the time of the defendant's registration of the domain name, the domain name is identical or confusingly similar to the plaintiff's mark; … and (3) the defendant has a bad faith intent to profit from plaintiff's mark. *N. Light Tech., Inc. v. N. Lights Club*, 97 F. Supp. 2d 96, 115 (D. Mass. 2000).

In their motion, Defendants assert two arguments for why they claim that Impulse has failed to state a plausible claim under the ACPA. First, Defendants claim that the Adopt Me mark is not eligible for trademark protection either because it is not inherently distinctive or because it has not acquired distinctiveness through repeated use in commerce. They further argue that Impulse's claim fails because Impulse has failed to allege that Defendants wrongfully procured the domain names in question in order to hold them for ransom or divert business from Impulse. Defendants are wrong on both counts.

Impulse has plainly alleged that its Adopt Me mark was inherently distinctive or had become distinctive by the time that Defendants registered the domain names playadopt.me and playadoptme.com, which incorporate and are confusingly similar to the Adopt Me mark. CMP ¶192.  It has also alleged facts sufficient to support this allegation.

To determine whether a mark is distinctive, courts often employ a taxonomy that classifies marks along a continuum of five categories of increasing distinctiveness: generic

marks, descriptive marks, suggestive marks, arbitrary marks, and fanciful marks. *Borinquen Biscuit Corp. v. M.V. Trading Corp.*, 443 F.3d 112, 116-17 (1st Cir. 2006). Generic marks can never be ranked as distinctive, while suggestive, arbitrary, and fanciful marks are considered inherently distinctive. *Id.*

A descriptive mark is one that portrays a characteristic of the article or service to which it refers; it denotes what goods or services are provided in such a way that the consumer does not have to exercise powers of perception or imagination. *R.R. Salvage of Conn., Inc. v. R.R. Salvage, Inc.*, 561 F. Supp. 1014, 1020 (D.R.I. 1983). Examples of descriptive marks include: "VISION CENTER" in reference to a place where one purchases eyeglasses, "EVERREADY" with reference to batteries or light bulbs, or "HOTRAY" in reference to electric food warmers. *Id.*

A mark is suggestive, and therefore considered inherently distinctive, if it requires "imagination, thought and perception to reach a conclusion as to the nature of [services]." *Commerce Bank & Tr. Co. v. TD Banknorth, Inc.*, 554 F. Supp. 2d 77, 84 (D. Mass. 2008). Examples of suggestive marks include: "ULTRASUEDE" when used to describing suede-like fabrics, "NATIVE TAN" when referring to a suntan lotion, and "BEETLE" when used in describing a plastic fishing lure. *R.R. Salvage*, 561 F. Supp. 1020.

Impulse's Adopt Me mark is clearly a suggestive mark, and therefore inherently distinctive and eligible for protection under ACPA. Imagination, thought and perception on the part of the consumer are required for the consumer to see the term "Adopt Me" and jump to the conclusion that the term describes not just a game, and not just a game relating to a pet, but to a game relating to a virtual pet. The word "Adopt" typically refers to taking legal responsibility for a child or pet in real life. When seen in the context of a game, it requires the consumer to further

17

imagine that the adoption is virtual and involves virtual pets. The use of "Me" implies a first-person perspective, which can be ambiguous. Consumers would need to interpret that "Me" represents virtual pets within the game, rather than the consumer or other real-life entities. Taken together, the phrase "Adopt Me" suggests a scenario where someone or something is requesting to be adopted. Without additional context, the phrase "Adopt Me" could be seen as a plea from a person, organization, or even an item, such as a pending piece of legislation. The imaginative leap needed is to understand that in this specific scenario, it is a virtual pet in a game asking to be adopted.  In the context of Impulse's game, the consumer is not the one being adopted; instead, the consumer must imagine and visualize that she will be adopting and caring for virtual pets, rather than real pets. This indirect suggestion requires a degree of imagination and mental leap from the consumer, making "Adopt Me" a suggestive mark.

That Adopt Me is suggestive and inherently distinctive is supported by fact that Defendants' "Adopt Me!" mark, which is virtually identical to Adopt Me and used in connection with a similar game, was registered on the US Patent and Trademark Office's (PTO) principal trademark register. CMP ¶ 91. When, as in this case, the PTO registers a mark without requiring the applicant to prove secondary meaning, the holder of the mark is entitled "to a presumption that its registered trademark is inherently distinctive, as opposed to merely descriptive." *Borinquen Biscuit*, 443 F.3d at 117.

Even if "Adopt Me" were not a suggestive mark and were merely a descriptive mark, Impulse has alleged sufficient facts in the Complaint to assert that the mark has become distinctive because it has acquired "secondary meaning."  Descriptive marks are tentatively considered non-distinctive but can attain distinctive status upon an affirmative showing that the mark has acquired a "secondary meaning." *Borinquen Biscuit*, 443 F.3d at 116. This showing

requires the trademark holder to establish that "in the minds of the public, the primary significance of [the mark] is to identify the source of the product rather than the product itself." *Inwood Labs., Inc.* v. *Ives Labs., Inc.*, 456 U.S. 844, 851 n.11, 102 S. Ct. 2182, 72 L. Ed. 2d 606 (1982). Among the factors that courts generally look to in determining whether a term has acquired secondary meaning are (1) the length and manner of its use, (2) the nature and extent of advertising and promotion of the mark and (3) the efforts made in the direction of promoting a conscious connection, in the public's mind, between the name or mark and a particular product or venture. *Bos. Beer Co., Ltd. P'ship v. Slesar Bros. Brewing Co.*, 9 F.3d 175, 182 (1st Cir. 1993). *See, e.g., Bos. Sports Med., Inc. v. Bos. Sports Med. & Rsch. Inst., LLC*, No. 21-cv-11945-DJC, 2022 U.S. Dist. LEXIS 131261, at *9 (D. Mass. July 25, 2022) (finding distinctiveness sufficiently plead where allegations included that: mark was used "continuously" and "in connection with and to identify [mark owner's] services, in order to distinguish its services from the services offered by other companies;" mark owner had "made a substantial investment" in its company website and physical locations; and mark's "extensive use, continuous promotion, and prominent recognition by noteworthy publications".)

If "Adopt Me" is not deemed to be inherently distinctive, Impulse has alleged sufficient facts to support a claim that "Adopt Me" has acquired "secondary meaning" making it distinctive. Impulse has alleged that it first used "Adopt Me" in 1998, and has used it in connection with a virtual pets game without interruption since 2000. CMP ¶¶ 12, 16, 47. Until the Defendants first launched their game in 2017, Impulse's game was the only Adopt Me virtual pet game to be found on-line, and Impulse's Adoptme.com website was the #1 search result in Google and all other major search engines for the term "Adopt Me" and virtual pets. CMP ¶¶ 29, 129. Impulse has spent hundreds of thousands of dollars developing and marketing the Adopt Me

game. CMP ¶ 17. This money was spent on developing the Adopt Me game and on advertising

Adopt Me in various ways.  CMP ¶¶ 34-36, 43-44.  The Adopt Me game is available to members

of the public in all 50 states.  CMP ¶ 18. Impulse sold Adopt Me animal plush toys that

advertised and promoted its Adopt Me virtual pets game in national retailers such as Toys "R"

Us. CMP ¶¶ 21-22. Over its life, the Adoptme.com website has had thousands of visitors a day,

and there was a large community of users who loved the Adopt Me game.  CMP ¶¶ 31-33.

Millions of virtual pets have been adopted by members of the public playing the Adopt Me

game, and members of the public have associated the term Adopt Me with Impulse's Adopt Me

game. CMP ¶¶ 27, 121, 128. In light of all of the foregoing facts it has alleged, Impulse has

plausibly asserted that, even if Adopt Me is merely a descriptive mark, it has acquired a

secondary meaning over time and has become distinctive.  *Bos. Beer Co., Ltd. P'ship*, 9 F.3d

182.

Impulse has also sufficiently pled the element of Defendants' bad faith intent to profit

from the Adopt Me mark.[4]  Despite the Defendants' insistence that ACPA's requirement of a

defendant's bad faith intent to profit from a plaintiff's mark is solely concerned with persons

registering domain names to hold them ransom in exchange for money, the law actually applies

to a broader range of situations. The ACPA provides a non-exhaustive list of nine different

factors that a court may consider in determining whether a defendant is acting with the bad faith

required by the law. 15 USC §1125(d)(1)(B)(i).  Only one of these considerations actually

involves a defendant's offer to sell the domain name to the mark owner or a third party for

---

[4] Although the ACPA includes a safe harbor where a court may find the absence of bad faith intent in cases of fair
use or otherwise lawful use of a domain name, whether this defense applies in an action depends on factual
determinations as to whether the defendants "believed and had reasonable grounds to believe that the use of the
domain name was a fair use or otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(ii). It would therefore be inappropriate
to resolve this factual issue at the motion to dismiss stage.  *Roseville Fullerton Burton Holdings, LLC v. SoCal
Wheels, Inc.*, No. SACV 14-1954-JLS, 2016 U.S. Dist. LEXIS 186049, at *25-26 (C.D. Cal. May 20, 2016).

financial gain without having used or having the intent to use the domain name in commerce. *See* 15 USC §1125(d)(1)(B)(i)(VI). Other equally important factors that a court may consider include: the defendant's "intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;" the defendant's "registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names …," and "the extent to which the mark incorporated in the [defendant's] domain name registration is or is not distinctive… ." 15 USC §1125(d)(1)(B)(i).

Impulse has alleged many of the factors set forth in the ACPA that would permit this Court to find that Defendants acted with the requisite bad faith intent to profit from the Adopt Me mark. As shown immediately above, Impulse has alleged that the Adopt Me mark is distinctive. It has further alleged the following: that Impulse was the prior user of the adoptme.com domain name (CMP ¶¶ 12, 195-6); that Defendants registered multiple domain names which they knew were confusingly similar to Impulse's Adopt Me mark (CMP ¶¶ 195-7); that neither of the two domain names registered by Defendants, playadopt.me nor playadoptme.com, incorporates a legal or other name of the Defendants (CMP ¶ 207); that Defendants were infringing upon Impulse's trademark rights and had no trademark rights in the playadopt.me and playadoptme.com domain names (CMP ¶ 204-5); that, in registering and using the playadopt.me and playadoptme.com domains, the Defendants had and have the bad faith intent to profit from the Impulse's Adopt Me mark (CMP ¶ 203); and that Defendants intended

to, and actually did, divert users from Plaintiff's own adoptme.com website and Plaintiff's Adopt Me game to the playadopt.me and playadoptme.com websites for commercial gain and profit (CMP ¶ 208, 129-30).

Whether a party has acted in bad faith constitutes an issue of fact that must be determined by the factfinder following an examination of the totality of the circumstances. However, at the pleading stage a simple plausible allegation that defendants are using a domain name confusingly similar to plaintiff's mark with the intent to profit from that mark by diverting business from plaintiff to defendants is sufficient to support a claim of bad faith. *Bos. Sports Med., Inc. v. Bos. Sports Med. & Rsch. Inst., LLC*, No. 21-cv-11945, 2022 U.S. Dist. LEXIS 131261, at *17-18 (D. Mass. July 25, 2022) (citing *Flentye v. Kathrein*, 485 F. Supp. 2d 903, 915 (N.D. Ill. 2007) (denying motion to dismiss cybersquatting claim based upon allegations "that [d]efendants' websites are intended to confuse and drive away [p]laintiffs' customers, and tarnish [p]laintiffs' marks and goodwill to the commercial benefit of [defendant], a direct competitor")). Impulse has therefore pleaded sufficient facts to plausibly state a claim that the Defendants violated ACPA, and this Court should deny Defendants' motion to dismiss this claim.

## B.    COUNT IV: PLAINTIFF HAS STATED A PLAUSIBLE CLAIM OF UNFAIR COMPETITION UNDER RHODE ISLAND COMMON LAW

Impulse has also stated a plausible claim that Defendants engaged in unfair competition under Rhode Island common law, and therefore the Court should also deny Defendants' motion to dismiss this claim.

The law of unfair competition is rooted in the common-law tort of deceit; its general concern is with protecting consumers from confusion as to the source of a good and/or service. *Greater Westerly-Pawcatuck Area Chamber of Commerce v. S. Kingstown Chamber of*

22

*Commerce, Inc.*, No. WB-11-0741, 2012 R.I. Super. LEXIS 12, at \*5-6 (Super. Ct. Jan. 18, 2012).  Unfair competition occurs when "the device or means employed would be likely to confuse and mislead the public generally to purchase the product or patronize the shop of one person when the actual intention was to purchase the product or patronize the shop of another." *Nat'l Lumber & Bldg. Materials Co. v. Langevin*, 798 A.2d 429, 433 (R.I. 2002) (quoting *Merlino v. Schmetz*, 66 R.I. 425, 20 A.2d 266 (1941)).  In order to establish a <u>prima facie</u> case of unfair competition, a plaintiff is required to show some likelihood of consumer confusion arising as to the source or affiliation of its products or services and those of the defendant as a result of a false representation made by the defendant. *Greater Westerly*, 2012 R.I. Super. LEXIS 12, at \*13.

As a preliminary step to determining whether unfair competition has occurred, Rhode Island courts first examine a plaintiff's mark to determine whether it is sufficiently distinctive to be enforced against a defendant. *See Nat'l Lumber*, 798 A.2d at 433. As in the case of federal trademark analysis, a mark must either be inherently distinctive, or be descriptive and have acquired "secondary meaning," in order to be enforceable against a defendant. *Id*. In determining whether a descriptive mark has acquired secondary meaning, Rhode Island courts will examine factors similar to those examined in federal cases, such as the length and manner of the use of the mark and advertising of the mark.  *Id.* (finding that descriptive mark had acquired secondary meaning where mark owner had used mark first, had used mark continuously for over 40 years, and had advertised using the mark for over forty years).

In their Motion to Dismiss, Defendants argue that Impulse has failed to state a plausible claim of common law unfair competition.  They assert that Impulse has not alleged sufficient facts that its mark is strong enough to be enforceable. They further assert that the facts alleged

tend to show that the consuming public associates the Adopt Me mark with the Defendants and their game and not Impulse and its game and that there is a lack of evidence of continuous use of the mark for the years after 2011.

In its Complaint, Impulse alleged sufficient facts to state a claim of unfair competition under Rhode Island common law. As described in more detail in Section III.B.1. above, Impulse's Adopt Me mark is suggestive, and therefore inherently distinctive, or at the very least, it is descriptive and has acquired sufficient secondary meaning to make it distinctive. It is therefore strong enough to be enforceable against Defendants in an unfair competition claim.

Impulse has also alleged sufficient facts to show a likelihood of confusion in the marketplace resulting from Defendants' infringement of its mark. It has alleged that Defendants have used Impulse's Adopt Me trademark in their Adopt Me! game and related goods and services in a manner that is likely to cause confusion or mistake as to the affiliation of Defendants with Plaintiff and as to the origin of Defendants' game, goods, services and commercial activities. CMP ¶ 228. More specifically, Impulse has alleged that its Adopt Me mark and the Defendants' later Adopt Me! mark are nearly identical (CMP ¶ 239); that Impulse has used the Adopt Me mark continuously from 2000 until the present (CMP ¶ 16);  that the Adopt Me and Adopt Me! games both focus on virtual pets (CMP ¶57); and that the games share the same consumer base and target demographic, which is children and young teenagers who like to play online games (CMP ¶ 60).  Impulse has further alleged that Defendants do business within the same states where Plaintiff does business and that Defendants have used Plaintiff's Adopt Me trademark in connection with services and products similar to those of the Plaintiff and thus created a likelihood of confusion. CMP ¶¶ 71-72. Finally, Impulse has alleged multiple instances in which Consumers have actually confused the Adopt Me and Adopt Me! marks.

CMP ¶¶ 125-8. Clearly, Impulse has plausibly asserted that there exists a likelihood of consumer confusion about the Adopt Me and Adopt Me! marks and games and their respective sources.

Whether, as the Defendants assert, more of the public presently associates Adopt Me with the Defendants or with Impulse is irrelevant. The pertinent question, in the case of this unfair competition claim and all of Impulse's other claims, is whether the consuming public associated Adopt Me with Impulse at the time that Defendants began their infringing use of the Adopt Me mark in 2017. Impulse has sufficiently alleged that the public only associated Adopt Me with Impulse until the Defendants started using Impulse's Adopt Me mark without authorization. Everything occurring later, including any greater association that the public may have between the Defendants and Adopt Me today, flows from the Defendant's use of unfair competition to divert consumers from Impulse's product to the Defendant's product.

Because Impulse has asserted a plausible claim against Defendants of common law unfair competition, this Court should deny Defendants motion to dismiss this claim.

## VI.  **CONCLUSION**

WHEREFORE, Impulse respectfully asks this Honorable Court to Deny the Defendants' Motion to Strike as to all of the paragraphs that they seek to Strike, and to Deny the Defendants' Motion to Dismiss Counts VI and IV of Impulse's Complaint. In the alternative, Impulse requests that it be granted leave to file an amended complaint to the extent additional facts are required to state its claims for relief.

*Plaintiff,*

IMPULSE COMMUNICATIONS, INC.,
By Its Attorneys,


/s/ Joseph Hoefferle, Jr.
Chip Muller, Esq. (#7686)
Joseph Hoefferle, Jr., Esq. (#8421)
Muller Law, LLC
47 Wood Avenue
Barrington, RI  02806
(401) 256-5171 (ph.)
(401) 256-5025(fax)
chip@mullerlaw.com
joe@mullerlaw.com


## **CERTIFICATION**

I hereby certify that on this 11th day of September, 2024, a copy of this document was served via U.S. mail and/or filed electronically with the Court's filing system to the following:


/s/   Joseph Hoefferle, Jr., Esq.