## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

Impulse Communications, Inc.

    Plaintiff,

v.                                Case No. 1:24-cv-00166-JJM-LDA

Uplift Games LLC, Treetop Games LLC
and Lionfield Investments Ltd

    Defendants.

**DEFENDANTS UPLIFT GAMES LLC, TREETOP GAMES LLC AND LIONFIELD INVESTMENTS LTD'S REPLY IN SUPPORT OF MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6) AND TO STRIKE PURSUANT TO FED. R. CIV. P. 12(f)**

        Pursuant to the Court's October 17, 2024 order, Defendants Uplift Games LLC ("Uplift"), Treetop Games LLC ("Treetop") and Lionfield Investments Ltd ("Lionfield") (collectively "Defendants") jointly submit this reply memorandum in support of their motions (ECF Nos. 14 and 22) to dismiss Counts II, III, IV, VI, VIII, and IX of the Complaint filed by Plaintiff Impulse Communications, Inc. ("Plaintiff") for failure to state a claim and to strike paragraphs 131, 137-141, 143, 146, 151-153, and a portion of paragraph 201, of the Complaint for inclusion of immaterial, impertinent and/or scandalous matter.

        Given Plaintiff's indication in its opposition briefing that it voluntarily withdraws Counts II (dilution by blurring), III (dilution by tarnishment), VIII (tortious interference with contractual relations), and IX (tortious interference with prospective business relations),[1] this reply focuses solely on Count IV (alleged violation of the Anticybersquatting Consumer Protection Act

---

[1] Plaintiff's Memorandum in Opposition to Defendants Uplift Games, LLC and Treetop Games, LLC's Motion to Strike and Dismiss (ECF 20-1) at 1 and Memorandum in Opposition to Defendant Lionfield Investments Ltd's Motion to Strike and Dismiss (ECF 27-1) at 2.

("ACPA")), Count VI (alleged common law unfair competition) and the material Defendants seek be stricken, namely, paragraphs 131, 137-141, 143, 146, 151-153, and a portion of paragraph 201, of the Complaint.

Defendants appreciate Plaintiff's recognition that the withdrawn claims were unfounded. However, the crux of the case remains Defendants' use and registration of the ADOPT ME! trademark. As described in Defendants' opening brief and below, the ACPA and unfair competition claims each require plausible allegations of bad faith on the part of Defendants which are not present in this case in order to survive. Accordingly, they should also be withdrawn or dismissed. In addition, the scandalous allegations unrelated to the actions of Defendants' award winning, celebrated and family-run studio should be stricken as they unfairly attempt to impute the reprehensible alleged conduct of third parties to Defendants, and Plaintiff admits in its own allegations that this conduct is not the result of Defendants' actions.

**I.     THE ACPA WAS NOT INTENDED TO BE USED AS A WEAPON AGAINST COMPANIES SUCH AS DEFENDANTS WHO HAVE ACTED IN GOOD FAITH, ARE ENGAGED IN LEGITIMATE BUSINESS ACTIVITY, AND HAVE NEVER ATTEMPTED TO MONETIZE THEIR DOMAINS THROUGH SALE.**

Plaintiff asserts that Uplift's ownership and Defendants' use of PLAYADOPT.ME and PLAYADOPTME.COM subject Defendants to potential ACPA liability despite the fact that these domains names are used in Defendants' legitimate business offerings and have never been offered for sale to Plaintiff or others. This is plainly not the case. *See, e.g. Nero, International Holding Co., Inc. v. NEROtix Unlimited Inc.*, 695 F.Supp.3d 110, 129-30 (D. Mass. 2023) (finding defendants were "not the type of 'cybersquatters' that the ACPA intended to target" and rejecting ACPA claim where, as here, defendants had been engaged in the bona fide offering of services and had not engaged in the sale of their domains to third parties for financial gain).

Plaintiff has offered noting more than unsupported allegations and speculation that Defendants were even *aware* of the Plaintiff at the time the PLAYADOPT.ME and PLAYADOPTME.COM domains were registered. Accordingly, it attempts to bootstrap an infringement claim into an ACPA claim simply because domain names are part of Plaintiff's theory of infringement.[2] However, in analyzing an ACPA claim, "disputed issues of trademark ownership, distinctiveness, and likelihood of confusion" must be "set[] aside". *Nero,* 695 F.Supp.3d at 129. Plaintiff devotes the bulk of its discussion of the ACPA claim in its Opposition to an analysis of where the term ADOPT ME falls on the spectrum of a trademark's distinctiveness. *See* ECF 20-1 at 16-20. While this continuum is relevant to assessing the relative strength or weakness of a trademark, Plaintiff's misplaced focus in this area only underscores the manner in which Plaintiff has taken factors relevant to its claim of alleged trademark infringement and attempted to mold them into factors that would support a variety of other unsubstantiated claims.

Plaintiff concedes the clear premise that entitlement to relief on an ACPA claim requires a "bad faith intent to profit from the trademark owner's mark" (ECF 20-1 at 16) and later cites a District of Massachusetts case involving two direct competitors for the proposition that a "plausible allegation that defendants are using a domain name confusingly similar to plaintiff's mark ***with the intent to profit from that mark by diverting business from plaintiff to defendants*** is sufficient to support a claim of bad faith." ECF 20-1 at 22 (citing *Bos. Sports Med., Inc. v. Bos. Sports Med. & Rsch. Inst., LLC*, No. 21-cv-11945, 2022 U.S. Dist. LEXIS 131261, at *17-18 (D. Mass. July 25, 2022)). Despite Plaintiff's clear pleading of this standard, Plaintiff sets forth

---

[2] Defendants deny Plaintiff's theories of infringement and reserve any and all infringement claims they have against Plaintiff. As that issue is beyond the scope of the current motion, Defendants' note their disagreement and preserve the issue for later briefing.

numerous examples where correspondence meant for Defendants was diverted to Plaintiff, which is the inverse of the standard Plaintiff attempts to assert. The only allegations in the Complaint that Plaintiff cites in support of its argument that Defendants have allegedly diverted users from the Plaintiff's website are in paragraphs 129-30. *See* ECF 20-1 at 22. These paragraphs reference the fact that the Plaintiff's website is "nowhere to be found" in the results of a Google search for the term "ADOPT ME" and that web traffic to Plaintiff's website has "significant[ly] decrease[d]". This has far more to do with Plaintiff's overt statements that it was shutting down its nonfunctional website programmed in the obsolete Flash programming language than it does with any perceived bad faith or conduct on the part of Defendants. As noted above, Plaintiff does not allege that Defendants were aware of Plaintiff prior to 2020; even if they were, mere knowledge of a trademark is insufficient for proving bad faith. *See Nero,* 695 F.Supp.3d at 130; 145 Cong. Rec. S9744, S9749 (daily ed. July 29, 1999) (Statements on Introduced Bills and Joint Resolutions) (declaring that cybersquatting "does not extend to ... someone who is aware of the trademark status of the name but registers a domain name without a bad faith intent to profit").

In *Bos. Sports Med.*, the court observed that under 15 U.S.C. 1125(d)(1)(B)(i)(I)-(IX), the following factors are relevant to determining whether the requisite finding of bad faith necessary to support an ACPA claim are met, most of which the Plaintiff ignores entirely in the allegations set forth in its Complaint and response to the present motion:

  (I) the trademark or other intellectual property rights of the person, if any, in the domain name;

  (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

(III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

4

Case 1:24-cv-00166-JJM-LDA    Document 28    Filed 10/31/24    Page 5 of 18 PageID #: 250

5

(IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark;

(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services;

(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name;

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others; and

(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous.

*Bos. Sports Med.,* 2022 U.S. Dist. LEXIS 131261, at *17-18.

Perhaps the most critical of the foregoing factors are numbers III (use of the domain for the bona fide offering of goods and services) and VI (whether user has offered to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services) since Congress passed the ACPA "primarily in an effort to stop cybersquatters who register numerous domain names containing American trademarks or tradenames only to hold them ransom in exchange for money."[3] As highlighted in Defendants' opening brief, unlike the cybersquatters the ACPA was enacted to curtail, Defendants are and always have been engaged in the bona fide offering of goods and services and have never offered to transfer, sell, or otherwise assign its domain names to Plaintiff or any third party for financial gain.

---

[3] *N. Light Tech., Inc. v. N. Lights Club*, 97 F. Supp. 2d 96, 115 (D. Mass. 2000) (quoting H.R. Rep. No. 106-412, at 5), aff'd, 236 F.3d 57 (1st Cir. 2001).

6

With respect to factor I (trademark rights of the user), Plaintiff ignores the critical fact that Treetop and Lionfield are joint owners of federal trademark registrations for ADOPT ME! and that Uplift uses the ADOPT ME! mark with the owners' permission.[4] Perhaps the most critical benefit that federal trademark registration confers is the "presumption that you own the trademark and have the right to use it."[5][6] Though the USPTO registrations for ADOPT ME! occurred after the domains were registered, Defendants' first use of the mark, and therefore their common law trademark rights underlying the registrations, began accruing through continuous, uninterrupted use before purchasing the domains PLAYADOPTME.COM and PLAYADOPT.ME.

Although Plaintiff discusses factor II (the extent to which the domain consists of the legal name of the person or a name that is otherwise commonly used to identify that person), it ignores that ADOPT ME! is indeed a name "otherwise commonly used" to identify the registrant of PLAYADOPT.ME and PLAYADOPTME.COM. Instead, Plaintiff dismisses the relevance of this factor by stating that "neither of the two domain names registered by Defendants [. . .] incorporates a legal or other name of the Defendants" (ECF 20-1 at 21.)

Regarding factor VII, Defendants did not provide misleading contact information when applying for the registration of the domain names, nor does Plaintiff allege that this occurred. This touches on factor V as well, as one would only submit misleading information if the person's intent was to divert consumers from the mark owner's online location to a site accessible under

---

[4] USPTO Reg. Nos. 6626699 and 7130097.
[5] United States Patent and Trademark Office "Why Register Your Trademark" page, located at https://www.uspto.gov/trademarks/basics/why-register-your-trademark (last visited September 24, 2024).
[6] Plaintiff may claim in a separate count that Lionfield and Treetop's trademark registrations should be cancelled, but, as noted in Defendants' opening brief, Plaintiff did not oppose registration with ***full prior knowledge*** of Defendants' use of the mark.

7

the domain name that could harm the goodwill represented by the mark. Plaintiff has not plausibly alleged that this was Defendants' intent.

As discussed above, the only facts alleged in the Complaint which Plaintiff cites in support of its argument that Defendants have allegedly diverted users from the Plaintiff's website are that (i) traffic to Plaintiff's website has significantly decreased in recent years, and (ii) Plaintiff's website is "nowhere to be found" in Google search results for the term "ADOPT ME".[7] This is attributable to Plaintiff's nonuse of the ADOPT ME trademark and ADOPTME.COM domain, including its public statement of abandonment, and not as a result of any action on the part of Defendants. As described in Defendants' opening brief, while Plaintiff makes the conclusory statement that it has used the ADOPT ME trademark "continuously for over 20 years" (Compl. ¶164), figures detailing Plaintiff's web traffic and ad revenue in recent years are notably absent from the Complaint. This conclusory statement also seemingly ignores Plaintiff's public statement in 2020 that "AdoptMe.com is shutting down" and directing the consuming public to "[p]lease go to our new site instead at BoredHumans.com."[8] Given these contradictions, the Complaint is void of any credible allegations that attribute Plaintiff's disappearance from the web and elsewhere to Defendants "divert[ing] consumers" from its online location. Such allegations by Plaintiff are no more than speculation which, unaccompanied by any factual predicate, are insufficient to meet the plausibility required to survive a motion to dismiss. *Morales-Cruz v. Univ. of P.R.*, 676 F.3d 220, 225 (1st Cir. 2012).

As for factor IX ("the extent to which the mark incorporated in the person's domain name registration is or is not distinctive ***and famous***" (emphasis added)), Plaintiff's withdrawal of its

---

[7] ECF 20-1 at 21-22 (citing Complaint ¶¶ 129-130).
[8] *See* ECF 14-1 at note 23 (citing https://web.archive.org/web/20200506021652/http://www.adoptme.com/).

8

dilution claims appears to be an acknowledgement that it has not achieved fame. As noted in the opening brief, numerous admissions in the Complaint negate that Plaintiff's use of ADOPT ME has been continuous or widespread enough to support such a finding.

In short, Plaintiff has not credibly alleged the required element of bad faith in support of its ACPA claim under the traditional bad faith factors articulated in *Bos. Sports Med*. Plaintiff attempts to remedy this shortfall with speculation that its declining business is a result of unspecified actions on the part of Defendants to divert business from Plaintiff and not resulting from Plaintiff's own actions, such as its public statement of abandonment. Plaintiff's theory is off-base as no facts have been alleged that even suggest an attempt by Defendants to divert business away from Plaintiff. Plaintiff instead cites alleged instances where the public seeks out Defendants' business and mistakenly contacts Plaintiff. This is the *inverse* of what is required to plausibly allege an "intent to divert consumers" from the plaintiff on an ACPA claim. Since allegations of actual confusion with potential bearing on the likelihood of confusion analysis must be "set[] aside"[9] in evaluating a distinct cause of action for violation of the ACPA and the Plaintiff offers nothing more, the facts alleged do not support a viable ACPA claim and the count should be dismissed.

One issue raised by both Plaintiff and Defendant in Lionfield's motion to dismiss is that of domain ownership. Plaintiff cites several cases for the proposition that a defendant need not be the owner of a registered domain in order to violate the ACPA.[10] While this may be true, the cases cited only underscore why Plaintiff's ACPA claim should be dismissed as to all Defendants,

---

[9] *Nero,* 695 F.Supp.3d at 129.
[10] Plaintiff also claims that Uplift "has *effectively transferred all of its intellectual property* relating to Adopt Me! to Lionfield and Treetop since they are now the co-owners of the Adopt Me! trademarks." ECF 27-1 at 19-20. This assertion is faulty and ill conceived.

9

regardless of which is the registered owner. In both *KB Home v. Smith*, 8:13-cv-2644-T-27EAJ, 2014 WL 1946622 (M.D. Fla. May 14, 2014) and *Flentye v. Kathrein*, 485 F. Supp.2d 903 (N.D. Ill. 2007), unlike in this case, the facts asserted included credible allegations that the defendants actively sought to divert business from the plaintiff. For example, in *KB Home*, the defendant, an aggrieved homeowner, registered a domain not to conduct its own legitimate business, but to actively disparage the plaintiff condominium developer's reputation, criticize the quality of plaintiff's construction, and discourage prospective home buyers from purchasing a home in plaintiff's condominium complex.[11] The defendant in *KB Home* also held the domain for ransom by attempting to coerce the plaintiff into buying back the defendant's unit or paying the defendant for transfer of the domain to the plaintiff.[12] In *Flentye*, a direct competitor of the plaintiff whose business name, Lee Street Management, had nothing to do with the plaintiff's assumed name "Flentye Properties" registered the domains FLENTYE.COM, TIMFLENTYE.COM, and FLENTYEPROPERTIES.COM. It then used the domains to publish defamatory statements about the plaintiff and redirect users to its own website, LEESTREET.COM, in a clear effort to divert business intended for Flentye to the defendant.[13] All precedents on which Plaintiff relies require some action by Defendants to divert or otherwise interfere with Plaintiff's business. As articulated above, Plaintiff has not and cannot plausibly allege that any of the Defendants have engaged in such activity. Accordingly, the Complaint fails to state a plausible ACPA claim against Defendants collectively or individually. The facts alleged do not support a viable ACPA claim and the count should be dismissed.

---

[11] *KB Home,* 2014 WL 1946622 at *1.
[12] *Id.* at 1 and 4.
[13] *Flentye,* 485 F. Supp. 2d at 909-10.

## II. THE UNFAIR COMPETITION CLAIM REQUIRES ACTS OF DECEPTION NOT ALLEGED OR PRESENT HERE.

Plaintiff acknowledges that unfair competition requires a nefarious act or element of "deceit" (ECF 20-1 at 22) and that a plaintiff is "required to show some likelihood of consumer confusion arising as to the source or affiliation of its products or services and those of the defendant *as a result of a false representation made by the defendant*." (ECF 20-1 at 23 citing *Greater Westerly-Pawcatuck Area Chamber of Commerce v. S. Kingstown Chamber of Commerce, Inc.*, No. WB-11-0741, 2012 R.I. Super. LEXIS 12, at \*5-6 (Super. Ct. Jan. 18, 2012)).

As noted in Defendants' opening brief and in the foregoing section related to the ACPA claim which Defendants also respectfully request be dismissed, Plaintiff has not alleged a set of facts that allow the court to make a reasonable inference that Plaintiff has been continuously engaged in a legitimate business where goods and services have been actively marketed and sold to the consuming public under the ADOPT ME mark or that Defendants have acted in the nefarious manner that claims of ACPA violations and unfair competition require. Defendants do not divert prospective customers of the Plaintiff to their own game when those individuals intend to engage with the Plaintiff's business, nor has Plaintiff plausibly alleged this is the case.

Plaintiff cites *Nat'l Lumber & Bldg. Materials Co. v. Langevin*, 798 A.2d 429, 433 (R.I. 2002) for the proposition that the length and manner of use of a plaintiff's mark are central to the question of whether unfair competition has occurred. (ECF 20-1 at 23) In that case, as in *Bos. Sports Med.*, the parties were direct competitors. Plaintiff had allowed its registration for the fictitious business name "National Lumber Company" to lapse. However, it submitted "uncontradicted evidence, through exhibits and testimony" that it had conducted business under the name in question continuously during the time after its registration had lapsed. By contrast, the defendant waited 27 years after commencing use of the trade name National Lumber Company

11

of Massachusetts to attempt to register the name, and when it did, the Secretary of State determined that it was already taken by the plaintiff. *Nat'l Lumber & Bldg. Materials Co. v. Langevin* No. C.A. M.P. 97-1540, 2000 WL 1910039 at *3 (R.I. Super Dec. 8, 2000).

The evidence presented by the plaintiff in *Nat'l Lumber* included company checks and correspondence containing the name, the use of the name on the company's trucks, proof that its employees answered the corporation's phones by announcing the name "National Lumber" or "National Lumber Company," and, "most importantly" in the Court's estimation, facts tending to show that the company was ***actually known to the public*** by the name "National Lumber" continuously during the time in question. *Id.* Unlike here, where the Plaintiff has made affirmative statements to the public disavowing itself of an affiliation with the domain bearing the name ADOPT ME and pleaded facts tending to show that the public primarily associates the name ADOPT ME with the defendant, the plaintiff in National Lumber provided uncontroverted evidence that the public associated "National Lumber" with the plaintiff. Moreover, unlike in this case, in addition to being the first to use the name in question, the plaintiff in National Lumber was also the first to register it. *Id.*

In the present case, two young software developers used the name ADOPT ME! in a nascent game because the game itself is a roleplay game where players assume parental responsibilities for other avatars such as feeding, teaching, and medical care. They later attempted to lawfully procure a domain that was "shutting down" to use it as a redirect to its own website and filed a trademark application that was granted without any office action citing a likelihood of confusion with Plaintiff by the trademark examiner or any opposition by Plaintiff during the public opposition period. This was true despite the Plaintiff having full knowledge of the existence of Defendants and their Adopt Me! game. At every stage, Defendants have sought to act fairly, while

by contrast, Plaintiff waited years to attempt to enforce any purported rights it has in the ADOPT ME mark and grasps at straws to make out a credible allegation that it is engaged in any sort of legitimate business activity or bona fide use of the ADOPT ME trademark.  The unfair competition claim is another example of Plaintiff extrapolating elements of a tenuous trademark infringement claim as a basis for a secondary claim without pleading the required additional elements of the secondary claim.  The facts alleged do not state a claim for unfair competition that is "plausible on its face"[14]  and the claim should accordingly be dismissed.

### III. SCANDALOUS AND INFLAMMATORY ALLEGATIONS AGAINST THIRD PARTIES CANNOT SERVE AS A BASIS FOR PLAINTIFF'S CLAIMS AND ARE NOT RELEVANT TO DAMAGE CLAIMS.

Plaintiff acknowledges that the scandalous and irrelevant allegations in paragraphs 131, 137-141, 143, 146, 151-153, and 201 of the Complaint which relate to pedophilia, sex, gambling, and illegal child labor do not "explicitly implicat[e] the Defendants' Adopt Me! game".  Compl. ¶ 141.  Nevertheless, it argues the allegations should remain in the Complaint. This is plainly untrue, since "repugnant" statements that are superfluous and not substantive elements of a well-pleaded cause of action "have no place in pleadings before the court."  *Alvarado-Morales v. Digital Equipment Corp.,* 843 F.2d 613, 618 (1st Cir. 1988) Defendants should not be forced to suffer reputational damage or be required to defend themselves against allegations stemming from third party activity Plaintiff incorrectly attempts to impute to Defendants.

While motions to strike may be granted relatively sparingly, "[t]he disfavored character of Rule 12(f) is relaxed somewhat in the context of scandalous allegations" such as those here, and "matter of this type often will be stricken from the pleadings in order to purge the court's files and protect the subject of the allegations." 5 C. Wright & A. Miller, Fed. Prac. & Proc. Civ. § 1382

---

[14] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

(3d ed.). This protection is necessary since, "once filed, pleadings generally are public documents and become generally available" and allowing baseless and offensive material would "give[] the allegations . . . unnecessary notoriety." *Id*.

The allegations which are the subject of Defendants' motion to strike are not only scandalous; they are also based on fundamental misunderstandings of both the law and Defendants' product. Allowing them to remain in the Complaint risks unfairly confusing or obscuring the issues in the case. Plaintiff cites a nonbinding Second Circuit case that dealt with claims of federal dilution by blurring and tarnishment, both of which Plaintiff has withdrawn, in support of its Rhode Island state law claim.[15] It also repeatedly cites articles and other public information about the overall Roblox environment, the Roblox chat feature, and the Roblox monetization system and infers that alleged issues in those environments are somehow attributable to Defendants' conduct because their Adopt Me! game is available on the Roblox platform. Plaintiff takes the faulty position that since Defendants operate a successful Roblox game, the allegations against Roblox must apply to Defendants even though Defendants have not been named in any of the lawsuits referenced in the Complaint, are not engaged in the objectionable behavior, and have never been linked to the objectional behavior, except by Plaintiff's misguided attempts to do so in the instant lawsuit. As Plaintiff repeatedly acknowledges in its Opposition, "Adopt Me! is not directly implicated in bad or illegal behavior."[16] Such extrapolation is not simply misplaced speculation founded on faulty logic, it is an attempt to attribute the actions of unrelated third parties to Defendants in order to incite fear and inflict reputational damage. These attempts are transparent

---

[15] ECF 20-1 at 13 (citing *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 110 (2d Cir. 2009)).
[16] ECF 20-1 at 5; *see also* ECF 20-1 at 10, n. 2.

14

and can have no possible bearing on the subject matter of this litigation, as the Defendants did not engage in or actively facilitate the cited third party conduct.

Plaintiff spends significant time in its opposition arguing that reputational harm can serve as a foundation for damages, citing both *Beacon Mut. Ins. Co. v. OneBeacon Ins. Grp.*, 376 F.3d 8 (1st Cir. 2004) and *Kusan, Inc. v. Fairway Siding Corp.*, C.A. No. 87-0212-F, 1988 WL 96577, at *12 (D. Mass. Feb. 3, 1988).  This argument obfuscates the point, perhaps intentionally, that in order for liability to attach to Defendants, Defendants must somehow have engaged in or actively facilitated the reputational harm.  For example, in *Kusan*, a case involving two previously related companies selling vinyl siding and one of its distributors, the court diverged in its treatment of defendant Vytec, which did not mischaracterize its prior relationship with the plaintiff, and defendant Fairway, a distributor of co-defendant Vytec's products which included misleading statements in its marketing materials suggesting false association with the plaintiff. *Kusan,* 1988 WL 96577 at *11-12 (D. Mass. Feb. 3, 1988). Although a preliminary injunction was granted as to Fairway prohibiting it from using the brochures that contained misleading statements, the court allowed Fairway to continue using the plaintiff's name, provided it did so in a manner that did not suggest a present association between the parties and instead accurately recounted the prior history between the parties. No relief was granted as to Vytec because it had not acted in a deceptive manner. *Id.* at *7-8.

Plaintiff itself acknowledges that its infringement claim "requires a showing of damages *resulting from the alleged infringer's acts*."[17]  (emphasis added).  Plaintiff then goes on to refer to the Roblox chat feature, which is policed, monitored, and maintained by Roblox for all 40

---

[17] See ECF 20-1. at 7.

million plus games offered in the Roblox platform[18], as a "dangerous feature[s] that Defendants have decided to make available on the problematic and potentially dangerous Roblox a[*sic*] platform."[19] In short, Plaintiff cites the correct standard and acknowledges that any reputational harm alleged must be caused by Defendants in order to be relevant, then points to a feature designed and controlled by Roblox as the basis for why its scandalous allegations against Defendants are not only necessary but also proper and well pleaded.

This gap in logic can only be explained by Plaintiff's misunderstanding of the Roblox environment, misunderstanding of Defendants' game, or misapplication of the law it clearly cites. To the extent Plaintiff misunderstands Defendants' game or the Roblox environment, a simple Internet search prior to filing the Complaint would have cleared up any such misunderstanding. Moreover, Plaintiff's own Opposition puts the applicable legal standard in clear focus, thereby negating its claim that the abhorrent conduct it attempts to impute to Defendants is necessary, proper, or well pleaded.

Defendants should not be forced to suffer reputational damage for activity Plaintiff attempts to incorrectly and unfairly impute to Defendants. The objectionable allegations are analogous to assertions that a candy manufacturer is liable for making and distributing lollipops to the consuming public because a pedophile purchased and used them to groom children. While Defendants find the purported conduct to be abhorrent and condemn any such actions in the strongest possible way, they cannot be and are not liable for damages resulting from third party conduct that they do not control and did not actively facilitate. The public record should not be left

---

[18] *See* https://en.help.roblox.com/hc/en-us/articles/203313120-Safety-Features-Chat-Privacy-Filtering#:~:text=All%20chat%20on%20Roblox%20is,experiences%20based%20on%20their%20age.
[19] See ECF 20-1 at 8.

to suggest otherwise and the scandalous material improperly injected by Plaintiff should be stricken.

## IV.  <u>CONCLUSION</u>

For the reasons set forth above and in their opening briefing, Defendants respectfully request that remaining Count IV (alleged violation of the Anticybersquatting Consumer Protection Act ("ACPA")), and Count VI (alleged common law unfair competition) be dismissed with prejudice and paragraphs 131, 137-141, 143, 146, 151-153, and portions of 201 of the Complaint which refer to pedophilia and gambling be stricken with prejudice for improper inclusion of immaterial, impertinent and/or scandalous matter.

          Respectfully submitted,
          DEFENDANTS,
          UPLIFT GAMES LLC, TREETOP GAMES LLC
          AND LIONFIELD INVESTMENTS LTD.
          By their Attorneys,

          <u>/s/ R. Bart Totten</u>
          R. Bart Totten [No. 5095]
          Jeffrey K. Techentin [No. 6651]
          ADLER POLLOCK AND SHEEHAN, P.C.
          100 Westminster Street, 16th Floor
          Providence, RI 02903

          Michael D. Adams
          (*pro hac vice application pending*)
          Emily A. Nash
          (*pro hac vice application pending*)
          MAYER BROWN LLP
          71 S. Wacker Dr.
          Chicago, IL 60606

Dated:  October 31, 2024

## **CERTIFICATE OF SERVICE**

      I hereby certify that on October 31, 2024, a true copy of the within was filed electronically via the Court's CM/ECF System. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system and the filing is available for viewing and downloading from the Court's CM/ECF System.

      /s/ R. Bart Totten

4881-1401-8292, v. 1