UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| IMPULSE COMMUNICATIONS, INC., *a Delaware corporation headquartered in Rhode Island* <br> Plaintiff, <br> v. <br> UPLIFT GAMES, LLC, *a limited liability company;* TREETOP GAMES LLC, *a limited liability company;* and LIONFIELD INVESTMENTS LTD., *a private limited company* <br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | C.A. No. 24-cv-166-JJM-LDA |

MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., United States District Court Chief Judge

In 1998, Plaintiff Impulse Communications, Inc. ("Impulse") launched its website "AdoptMe.com" (*see* ECF No. 1 at 4, ¶¶ 11-12), which two years later began featuring a virtual pet game called "Adopt Me". *Id.* ¶ 12. In 2017, Defendant Uplift Games, LLC ("Uplift") launched its virtual pet game "Adopt Me" on the Roblox platform.[1]  *Id.* at 11, ¶¶ 50-51. Impulse has sued Uplift, Treetop Games LLC ("Treetop"), and Lionfield Investments Ltd. ("Lionfield") (collectively "Defendants") for various trademark infringement claims. The crux of the Complaint is that Defendants knew or should have known about the popularity of Impulse's "Adopt Me"

---

[1] "Roblox is an online game platform and game creation system developed by Roblox Corporation that allows users to program and play games created by themselves or others." Wikipedia, https://en.wikipedia.org/wiki/Roblox.

brand, showed by its expansion into other markets and into the mobile iOS[2] application arena, and as a result, should not have tried to register almost identical federal trademarks. Defendants maintain that the "Adopt Me" consumers did not so widely recognize the brand that it would to be considered famous, and that the requisite bad-faith intent to profit off their domain names "playadopt.me" and "playadoptme.com" was absent.

Impulse's Complaint includes the following counts:

- Count I       Trademark Infringement under 15 U.S.C. § 1125(a))
- Count II      Dilution of Trademark by Blurring under 15 U.S.C. § 1125(c))
- Count III     Dilution of Trademark by Tarnishment under 15 U.S.C. § 1125(c)
- Count IV      Violation of the Anticybersquatting Consumer Protection Act under 15 U.S.C. § 1125(d)
- Count V       Common-Law Trademark Infringement
- Count VI      Common-Law Unfair Competition
- Count VII     Violation of Trademark Anti-Dilution Statute under R.I.G.L. § 6-2-12
- Count VIII    Tortious Interference with Contractual Relations
- Count IX      Tortious Interference with Prospective Business Relations
- Count X       Petition for Cancellation of Trademarks

Before the Court is Defendants'[3] Motion to Dismiss Counts IV and VI.[4]

## I. FACTUAL BACKGROUND

### A. Impulse's "Adopt Me" – Inception

Impulse has been using its "Adopt Me" mark continuously since 2000, despite never registering its trademark. *Id.* at 5, ¶ 16. Since then, Impulse has invested

---

[2] iPhone Operating System.

[3] Defendant Lionfield notes in its Motion to Dismiss and Strike that its motion is "substantively nearly identical with the present motion." ECF No. 22. Therefore, Uplift, Treetop, and Lionfield will hereinafter be called "Defendants."

[4] Plaintiffs have withdrawn Counts II, III, VIII, and IX of its Complaint. Defendants have moved to dismiss Counts IV and VI only. Therefore, Counts I, V, VII and X stand unchallenged at this stage.

approximately $200,000 in the brand. *Id.* ¶ 17. The game is available to players in all fifty states, and while the game is free, Impulse generates approximately $1,600 a month in revenue from third-party advertising.[5] *Id.* ¶¶ 18-19. In the mid-2000s, Impulse expanded its "Adopt Me" brand from an online game into the plush toy market through an agreement with Toys "R" Us. *Id.* ¶ 21. This expansion allowed consumers to buy an "Adopt Me" stuffed animal equipped with a code for the animal's virtual presence in the "Adopt Me" game. *Id.* at 6, ¶ 22. Impulse's "Adopt Me" brand has sought to cultivate a "wholesome, safe, child-and-family-friendly experience." *Id.* at 6-7, ¶ 24. They have tried to do so by prohibiting interaction or communication among players. *Id.* at 7, ¶ 26. Since the game was launched, "millions of virtual pets have been adopted," and there have been about 5,000 visitors a day. *Id.* ¶¶ 27-28. During this time, "Adopt Me" was the number one Google search result under the search term "virtual pets." *Id.* ¶ 29. Impulse cites many blog posts and emails from users to support its popularity. *Id.* at 7-8, ¶ 32.

B. Impulse's "Adopt Me" – Recent Changes

In 2020, Impulse converted its website version to an iOS application and used the existing website domain to instruct users where to download the new application. *Id.* at 9, ¶ 34. The next year, it launched an updated version of its website platform, which had been reprogrammed. *Id.* ¶ 35. A few months later, Impulse issued a press release announcing six new "Adopt Me" pets and created a theme song music video.

---

[5] At one point, Impulse generated $5,000 a month from its third-party advertisements. *Id.* at 7, ¶ 30.

3

*Id.* ¶¶ 36-37. An internal blockchain[6] was also added to the website to keep track of all transactions. *Id.* at 10, ¶ 39. Later that year, Impulse added a metaverse auction room to the website, enabling users to bid on the virtual pets. *Id.* ¶ 41. Impulse eventually partnered with RescueGroups.org to allow users to adopt virtual versions of real pets in animal shelters. *Id.* ¶ 42. In 2023, the website was redesigned for a second time, with a focus on AI-powered virtual pets. *Id.* at 11, ¶ 46.

### C. Defendants' "Adopt Me!"

Uplift first launched its virtual game "Adopt Me" on the Roblox online gaming platform in 2017. *Id.* ¶¶ 50-51. Although Uplift's game was originally for virtual humans, it changed to virtual pets in 2019. *Id.* at 12, ¶ 57. After launching, Uplift registered the "play.adoptme" domain for its game. *Id.* at 11, ¶ 53. The next year, Uplift added an exclamation point to its brand "Adopt Me!" presumably to differentiate it from Impulse's application. *Id.* at 13, ¶ 61. After doing so, Uplift's game soared in popularity on Roblox attracting billions of visitors each year. *Id.* at 12, ¶ 58. Despite the addition of the exclamation point, Defendants' website continued to omit the exclamation point. *Id.* at 13, ¶ 62. Defendants' employees regularly omitted the exclamation point when referring to their own game in emails and news releases.[7] *Id.* ¶ 63. Defendants have recently expanded their brand into the toy markets at Target, Walmart, and Amazon by offering plush "Adopt Me!" pets.

---

[6] A blockchain is a digital ledger that records transactions.
[7] Impulse includes an email correspondence from Uplift employee Josh Ling that reads: ". . . I work on Adopt Me, the Roblox game." ECF No. 1 at 13, ¶ 63; the Plaintiff also cites to several news releases where the exclamation point has been omitted. *Id.* ¶ 64.

*Id.* at 14 ¶ 67. They have also licensed "Adopt Me!" to Hasbro's NERF division and McDonald's Happy Meals. *Id.* ¶ 68. "Adopt Me!" is now available on an iOS application as well. *Id.* ¶ 69.

### D. Recent Actions

In 2020, Uplift contacted Impulse about purchasing the "AdoptMe.com" domain, though Impulse had not listed it for sale. *Id.* at 15-16, ¶¶ 77, 81. Even so, Impulse entered negotiations with Uplift. *Id.* at 16, ¶¶ 82-83. During this negotiation period, Impulse paid $100/month to keep the website active and updated it to include a public notice that the website was no longer available and provided a new website URL to which visitors could go.[8] *Id.* at 16, ¶¶ 84, 87; *see id.* at 19, ¶ 106. In August of that year, the negotiations ended without resolution, and Impulse went ahead with existing investment plans, which included creation of an iOS application. *Id.* at 16, ¶¶ 85-86. Impulse also sent notice to Defendants of its intent to continue using the "Adopt Me" mark in commerce, through an iOS app. *Id.* at 16-17, ¶ 88.

Despite this notice of intent, Uplift applied for a federally registered trademark of "Adopt Me!" for use first in downloadable games software in 2021 and then for physical items, such as toys in 2022. *Id.* at 17, ¶¶ 91-92. Impulse alleges that Uplift used Treetop and Lionfield to hold ownership of the trademark to insulate it from liability. *Id.* ¶ 93. Impulse alleges that before filing their federal trademark applications, Defendants had an obligation to reasonably investigate that the use of

---

[8] In its public notice, Impulse instructed users to visit its affiliated artificial intelligence sites: "BoredHumans.com" while the game was down. *Id.* at 16, ¶ 88.

5

"Adopt Me!" did not infringe on anyone else's rights. *Id.* at 21, ¶ 117. Impulse also alleges that the misdirected communications from users of "Adopt Me!" that it received sheds light on the consumer confusion, which supplies support for trademark infringement. *Id.* at 22, ¶ 125. Impulse has received many complaints from users of Defendants' game who feel they have been defrauded (*id.* at 22-23, ¶ 126); the usual 600 visitors a day that Impulse was used to increase to 15,000 *id.* at 22,¶ 125); members of the public have posted videos and posts confusing the two marks on public platforms such as YouTube (*id.* at 23, ¶ 127); users of "Adopt Me" include disclaimers in their posts to clarify to which mark they are referring (*id.* at 23-24, ¶ 128); Impulse was improperly named as a defendant in multiple lawsuits (*id.* at 28, ¶ 143); and "AdoptMe.com" is no longer the first search result. *Id.* at 24, ¶ 129. This confusion has also led users to associate the bad behavior[9] on "Adopt Me!" with Impulse's game, which has damaged its reputation. *Id.* at 27-28, ¶ 142.

As a result, Impulse filed this ten-count Complaint against Defendants. ECF No. 1. Defendants move to dismiss Count IV and VI. *See* ECF No. 14. In its opposition to Defendants' motion, Impulse voluntarily withdraws its claims for Counts II, III, VIII, and IX. Defendants also move to strike paragraphs ¶¶ 131, 137-141, 143, 146, 151-153, and a portion of ¶ 201 from the Complaint. *See id.*

---

[9] Impulse alleges that Defendants' "Adopt Me!" game was "illegally facilitating gambling by selling 'loot boxes' in [other countries], and the game was temporarily shut down in those countries." *Id.* at 26, ¶ 137.

6

## II.   STANDARD OF REVIEW

### A. Motion to Dismiss

To survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"), a plaintiff must present facts that make her claim plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). To determine plausibility, the Court must first review the complaint and separate conclusory legal allegations from allegations of fact. *See Rodriguez-Reyes v. Molina-Rodriguez*, 711 F.3d 49, 53 (1st Cir. 2013) (citation omitted). Next, the Court must consider whether the remaining factual allegations give rise to a plausible claim of relief. *See id.* (citations omitted).

To state a plausible claim, a complaint need not detail factual allegations, but must recite facts sufficient at least to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citation omitted). A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" cannot suffice. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Id.* (alteration in original) (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 557); *see also Soto-Torres v. Fraticelli*, 654 F.3d 153, 159 (1st Cir. 2011) (internal quotation marks omitted) (citation omitted) ("[C]ombined allegations, taken as true, must state a plausible, not a merely conceivable, case for relief.").

7

### B. Motion to Strike

Fed. R. Civ. P. 12(f) provides that the Court may strike from a pleading "any redundant, immaterial, impertinent, or scandalous matter." Paragraphs that are "irrelevant to plaintiff's case" or crowd a complaint with "superfluous" matter can and should be stricken. *See Sheffield v. City of Boston*, 319 F.R.D. 52, 55-56 (D. Mass 2016). Although courts possess "broad discretion to strike comments that are not 'substantive elements of the cause of action,'" courts exercise such discretion judiciously, exercising such discretion only in limited circumstances. *Id.* at 54.

## III. DISCUSSION

### A. Whether Count IV Plausibly Alleges Violation of the Anticybersquatting Consumer Protection Act ("ACPA")

Count IV alleges that Defendants violated the ACPA by registering the "playadopt.me" and "playadoptme.com" domains and having a bad-faith intent to profit from Impulse's "Adopt Me" trademark. ECF No. 1 at 36, ¶ 203. Defendants counter that Impulse has not alleged the requisite bad-faith intent to profit from the domains. ECF No. 14 at 1.

The ACPA provides that a person shall be liable in a civil action if:

(1) [t]he person has a bad-faith intent to profit off the mark, including a personal name which is protected as a mark under this section; and
(2) registers, traffics in, or uses a domain name that:
    i.   in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark
    ii.  in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark . . .

15 U.S.C. § 125(d)(1)(A). Some relevant factors to consider in deciding whether there was bad faith include:

8

> (II) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site; *** (IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c).

15 USC § 125(d)(1)(B)(i)(II); 15 USC § 125(d)(1)(B)(i)(IX).

Here, Impulse alleges that "[its] [mark] is inherently distinctive or has acquired distinctiveness through repeated use in commerce." ECF No. 1 at 34, ¶ 192. It also alleges that its "Adopt Me" mark is "famous and widely recognized by the general consuming public of the United States." *Id.* ¶ 193. The fact that "millions of virtual pets have been adopted," and that "there have been about 5,000 visitors a day" to the website tends to suggest that its "Adopt Me" brand is at a minimum distinctive. *Id.* at 7, ¶¶ 27-28. Impulse "has been using the mark continuously since 2000" and expanded the "Adopt Me" brand into the toy market through an agreement with Toys "R" Us in the mid-2000s. *Id.* at 5, ¶¶ 16, 21. Thus, Impulse has plausibly alleged that, at the time Defendants registered their trademark in 2020, its "Adopt Me" mark was distinctive or famous.

The fact that Defendants simply added a period and the term "play" to what is otherwise Impulse's mark (*id.* at 35, ¶¶ 198-199); that Defendants' domain is also for a virtual pet game (*id.* at 12, ¶ 57); and that Impulse received "misdirected communications from users" (*id.* at 22, ¶ 125) support the conclusion that it is plausible that Defendants registered or used a domain name that is "identical or confusingly similar to [Impulse's] mark" or "identical or confusingly similar or

9

dilutive of [Impulse's] mark."  15 U.S.C. § 125(d)(1)(A)(2)(i); 15 U.S.C. § 125(d)(1)(A)(2)(ii).

In support of Defendants' bad-faith intent to profit, Impulse alleges that Defendants were aware of the "AdoptMe.com" domain, as its mark had been around for seventeen years before registration of the trademark (ECF No. 1 at 36, ¶¶ 206, 209), but continued to register or license "playadopt.me" and "playadoptme.com" domains. *Id.* at 37, ¶ 211. Defendants never requested or received authorization from Impulse to use its mark. *Id.* at 12, ¶ 55. Like Impulse, Defendants also expanded their brand into the plush toy market. *Id.* at 14, ¶ 67. Defendants' site had billions of visits each year (*id.* at 12, ¶ 58), and they created an iOS application for the game, presumably a profitable venture. *Id.* at 14, ¶69. Impulse also alleges that its brand was damaged by the public confusion between the marks with Defendants' "implicating 'Adopt Me' with bad behavior." *Id.* at 25, ¶ 131. It is plausible that Defendants intended to "divert consumers from Impulse's website to a site accessible under the domain name[s] (i.e., "playadopt.me" "playadoptme.com") that could harm the goodwill represented by the mark." 15 U.S.C. § 125(d)(1)(B)(i)(II).

Thus, the Court finds that Impulse has properly pled a claim for relief in Count IV under the ACPA. The Court DENIES Defendants' Motion to Dismiss Count IV.

### B. Whether Count VI Plausibly Alleges a Common-Law Claim for Unfair Competition

Count VI alleges that Defendants engaged in unfair competition by using Impulse's "Adopt Me" mark in its own "Adopt Me!" mark "in a manner likely to cause confusion or mistake as to the affiliation of Defendants with [Impulse]" that has

10

caused Impulse harm. *Id.* at 39, ¶¶ 228-229. Defendants counter that Impulse has failed to show that "the consuming public widely identifies [Impulse] as the source of any particular goods and services bearing the ["Adopt Me"] trademark" (ECF No. 14 at 2), and that Defendants have "diverted business from [Impulse]." ECF No. 14-1 at 19.

Under Rhode Island law, a distinctive trade name is one that "is distinctive of a person's business or other enterprise and that is used in a manner that identifies that business or enterprise and distinguishes it from the businesses or enterprises of others." Restatement (Third) *Unfair Competition* § 12 (1995). A trade name may "acquire a distinctiveness as a 'secondary meaning' if prospective purchasers have come to identify the business with the trade name." *Id.* at § 13.

Unfair competition occurs when "the device or means employed would be likely to confuse and mislead the public generally to purchase the product or patronize the shop of one person when the actual intention was to purchase the product or patronize the shop of another." *Nat'l Lumber & Bldg. Materials Co. v. Langevin*, 798 A.2d 429, 433 (R.I. 2002) (quoting *Merlino v. Schmetz*, 20 A.2d 266, 267 (R.I. 1941) (finding that the plaintiff's trade name acquired secondary meaning where it had been used continuously since 1957, appeared on public documents, and customers had confused the two entities)).

Here, it is plausible that Defendants' act of registering its domains and iOS application, which were nearly identical with Impulse's, were likely to "confuse and mislead the public generally" to buy plush toys from Defendants when their actual

11

intention was to purchase the plush toy from Impulse's brand. Impulse alleges that its "Adopt Me" brand has been around since 1998 and got a distinctiveness through its secondary meaning evidenced by its continued use (ECF No. 1 at 4, ¶¶ 11-12); that it expanded into the toy market in the mid-2000s at a well-known toy store (*id.* at 6, ¶ 22); that Defendants only recently expanded into the toy market for similar plush toys (*id.* at 14, ¶ 67); and that there is evidence of user confusion (*id.* at 22, ¶ 125) (i.e., YouTube videos about confusion as to domain. *See id.* at 23-24, ¶¶ 127-28).

Thus, Impulse has properly pled a common-law claim for unfair competition under Rhode Island law.[10] The Court DENIES Defendants' Motion to Dismiss.

### C. Whether the Following Allegations Should be Stricken for "Immaterial, Impertinent, or Scandalous Matter" Under Fed. R. Civ. P. 12(f)

Defendants move to strike paragraphs ¶¶ 131, 137-141, 143, 146, 151-153, and a part of ¶ 201 from the Complaint. *See* ECF No. 14 at 1. They assert that "immaterial and scandalous" allegations were made "in an effort to unfairly impute allegations against Roblox to Defendants, inflame the reader, and disparage the reputation of Defendants and their ["Adopt Me!"] game." ECF No. 14-1 at 9.

### A. Paragraphs 131, 137, 138

Paragraph 131 alleges that the public confusion between "Adopt Me" and "Adopt Me!" has the effect of implicating "Adopt Me" with bad behavior such as: scamming, pedophilia, sex, gambling, and illegal child labor. ECF No. 1 at 25, ¶ 131. Defendants assert that these accusations "relate to alleged activities of third-party

---

[10] But this conclusion as to plausibility does not foreclose the possibility that Impulse's trade name is inherently distinctive.

12

criminals and third-party businesses." ECF No. 14-1 at 11. Paragraph 137 alleges that a Google search of the term "adopt me pedophile" returned results implicating Defendants' "Adopt Me!" game. ECF No. 1 at 26, ¶ 137. Defendants assert that the reference to use of "Roblox currency" (known as "Robux") in one of them is unfounded because they do not sell it (ECF No. 14-1 at 9), and that the mention of Snapchat and Discord, which are third-party forums, do not provide a basis for holding Defendants liable. *Id.* Paragraph 138 alleges that a Google search of the term "adopt me rape" returned results implicating the Roblox platform with child predators. *Id.* at 26, ¶ 138. Defendants counter that the allegations in paragraph 138 fail to mention any connection to their "Adopt Me!" game. ECF No. 14-1 at 10. They assert that Impulse cited no articles or links to show this connection. *Id.* They also argue that the "independent hosting platform Roblox" is not "synonymous with or attributable to Defendants' actions." *Id.*

Although the allegations implicate third-party forums, that does not negate their materiality. The Complaint nonetheless alleges a factual connection to the "Adopt Me!" platform, which is sufficient for the pleading stage. *See* ECF No. 1 at 26, ¶¶ 137-38. Because of the specific references to "Adopt Me!." the allegations of paragraphs 131, 137, and 138 are material and pertinent to Impulse's showing of the consequences of consumer confusion and the damages it has suffered as a result. Therefore, the Court DENIES Defendants' Motion to Strike ¶¶ 131, 137, 138.

13

### D. Paragraphs 139, 140

Paragraph 139 alleges that "there are dozens of articles and forum postings about objectionable activity on the Roblox platform generally." *Id.* ¶ 139. Defendants counter that the articles cited by Impulse do not reference "Adopt Me!" anywhere and that they have not been named in any lawsuits related to these allegations. ECF No. 14-1 at 11. Paragraph 140 alleges that "Roblox has been the subject of multiple lawsuits" and cites various articles to support. ECF No. 1 at 27, ¶ 140. Defendants counter similarly that there is no connection or reference to "Defendants' business," as they have not been named in any lawsuits. ECF No. 14-1 at 11.

Here, Defendants are correct that the allegation in ¶ 139 is void of any mention or connection to their "Adopt Me!" brand – the focus of this lawsuit. Because Roblox is not a party and "Adopt Me!" is not mentioned, the allegations of bad behavior are immaterial to this Complaint. Similarly, the allegations in ¶ 140 are immaterial as they do not mention Defendants or "Adopt Me!" at all. Therefore, the Court GRANTS Defendants' Motion to Strike ¶¶ 139-140.

### E. Paragraph 141

Paragraph 141 alleges that most of the articles and postings involving bad behavior on the Roblox platform "cite 'Adopt Me' as an example of a popular game on Roblox, even if not explicitly implicating Defendants' ["Adopt Me!"] game. ECF No. 1 at 27, ¶ 141. Defendants argue that the allegations were meant to "unfairly impute allegations against Roblox against Defendants and their ["Adopt Me!"] game." ECF No. 14-1 at 9.

14

Because of Impulse's admission that Defendants were cited even if not explicitly involved, the allegations in ¶ 141 do not connect to "Adopt Me!" and are thus immaterial. The Court GRANTS Defendants' Motion to Strike ¶ 141.

### F. Paragraph 143

Paragraph 143 alleges Impulse's concern over potential legal exposure due to consumer confusion. It mentions "two instances in which [Impulse] became involved in lawsuits when litigants mistakenly either named [Impulse] as a defendant or served [Impulse] with a subpoena." ECF No. 1 at 28, ¶ 143. Defendants do not provide a basis to strike ¶ 143 in their Memorandum of Law Supporting their Motion to Strike. *See* ECF No. 14-1.

Unlike some of the other paragraphs, ¶ 143 does not mention any third-party forums. Instead, the allegations focus on the consumer confusion as evidenced by Impulse being improperly named as a party. This allegation is material to Impulse's general claim of consumer confusion. The Court DENIES Defendants' Motion to Strike ¶ 143.

### G. Paragraph 146

Paragraph 146 alleges that because of Defendants' trademark violations, the negative associations with Impulse's brand have "grown from being related to run-of-the-mill scams to more severe issues such as pedophilia, rape, pornography, music copyright violations, underage gambling, and child labor." ECF No. 1 at 28, ¶ 146. Defendants argue that the severe issues mentioned do not implicate "Adopt Me!" in any way and simply implicate Roblox.

While Impulse has successfully pled material facts showing how bad behavior such as pedophilia and rape has been associated with Defendants' "Adopt Me!" brand, it has failed to show how the other "severe issues" are associated. As a result, ¶ 146 is immaterial when taken in its entirety. Therefore, the Court GRANTS Defendants' Motion to Strike ¶ 146.

### H. Paragraphs 151-153

Paragraph 151 alleges that because of the criminal acts that have become associated with Defendants and the Roblox platform, "potential criminal actions against Defendants are now possible, and as a result of the confusion . . . criminal actions against [Impulse] [are possible]." ECF No. 1 at 29, ¶ 151. Paragraph 152 alleges that because of the criminal acts associated with Defendants, "especially those involving children, also now create the risk that victims . . . could seek revenge and seek to injure or kill those they believe to be associated with the ["Adopt Me!'] game." *Id.* ¶ 152. Paragraph 153 alleges that Defendants' trademark violations "carry the risk of personal harm to and wrongful imprisonment of [Impulse's] owner." *Id.* at 29-30, ¶ 153. Defendants counter that these allegations are "hyperbolic" (*see* ECF No. 14-1 at 12) and argues that the "extrapolation to hypothetical arrests, injuries, and even murder are unwarranted." *Id.*

While Impulse may very well be fearful, that fear alone absent any allegations implicating criminal acts against Defendants is not sufficient for it to allege potential criminal acts against Impulse, by consumer confusion. Defendants are correct that these allegations are "hyperbolic," as nowhere in the Complaint are there any

16

allegations of criminal actions against Defendants themselves. To allege fear of hypothetical criminal acts such as murder is immaterial to the facts of the Complaint. Therefore, the Court GRANTS Defendants' Motion to Strike ¶ 151-153.

### I. Portion of Paragraph 201

Paragraph 201 alleges that the confusion caused by Defendants' domains has "harmed the good will that [Impulse] has cultivated for its ["Adopt Me"] mark and [website], because ["Adopt Me!"] . . . is associated with bad behavior such as scamming, pedophilia, gambling, and the like." ECF No. 1 at 35-36, ¶ 201. Defendants take issue with the second part of the allegation (i.e., bad behavior). *See* ECF No. 14-1 at 13. They argue that Impulse cites "morally reprehensible and scandalous conduct related to third-party lawsuits" and thus it should be stricken. *Id.*

Because Impulse has alleged instances of rape and pedophilia being associated specifically with Defendants' "Adopt Me!" earlier in the Complaint (*see id.* at 26, ¶¶ 137-138), the consequences of consumer confusion shown in this allegation are material. Therefore, the Court DENIES Defendants' Motion to Strike a portion of ¶ 201.

### IV. CONCLUSION

For these reasons, the Court DENIES Defendants' Motion to Dismiss Counts IV and VI. The Court DENIES Defendants' Motion to Strike ¶¶ 131, 137, 138, 143, and a part of ¶ 201. The Court GRANTS Defendants' Motion to Strike ¶¶ 139, 140, 141, 146, and 151-153.

IT IS SO ORDERED.

*s/John J. McConnell, Jr.*
_____
John J. McConnell, Jr.
Chief Judge
United States District Court

December 23, 2024