**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| Impulse Communications, Inc.,<br><br>Plaintiff and Counterclaim Defendant,<br><br>v.<br><br>Uplift Games LLC, Treetop Games LLC and Lionfield Investments Ltd,<br><br>Defendants and Counterclaim Plaintiffs. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | Case No. 1:24-cv-00166-JJM-AEM<br><br>**ORAL ARGUMENT REQUESTED** |

**DEFENDANTS' MEMORANDUM OF LAW**
**<u>IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS


I. INTRODUCTION ........ 1

II. RELEVANT CHRONOLOGY ........ 3

A. Plaintiff Acquires a Website Using the Adopt Me Name, but Fails to Achieve Commercial Success (2000-2020) ........ 4

B. Defendants Launch their Adopt Me! Game Which Quickly Becomes a Major Commercial Success (2017-present) ........ 5

C. Defendants Learn of Plaintiff's Website and the Parties Unsuccessfully Negotiate a Domain Name Sale (2020) ........ 6

D. Defendants File Their U.S. Trademark Application After Investigating Plaintiff's Website and Mobile App ........ 6

E. Plaintiff Launches a Mobile App to "Piggyback" on Defendants' Hugely Successful Game ........ 7

F. Plaintiff's Allegations ........ 8

III. LEGAL STANDARD ........ 9

IV. ARGUMENT ........ 9

A. Summary Judgment Should Be Entered on Plaintiff's Trademark Claims ........ 10

1. The Requirements for Common Law Trademark Rights ........ 10

2. Plaintiff Fails to Meet the "Geographic Scope" Requirement ........ 10

3. Plaintiff Fails to Meet the "Market Penetration" Requirement ........ 12

a. Volume of Sales ........ 13

b. Growth Trends ........ 15

c. The Number of Consumers Who Actually Played Plaintiff's Game Versus the Number of Potential Players ........ 17

d. Advertising by Plaintiff ........ 18

B. Summary Judgment Should Be Entered on Plaintiff's Claim for Actual Damages ........ 19

C. Summary Judgment Should Be Entered on Plaintiff's Disgorgement Claim ........ 21

1. General Principles of Disgorgement ........ 21

2. Plaintiff Presents No Evidence that Defendants Intended to Deceive Consumers or Otherwise Acted in Bad Faith ........ 22

3. Plaintiff Suffered No Harm—and Defendants Gained No Benefit—From the Alleged Reverse Confusion ........ 25

4. By Unreasonably Delaying in Bringing Suit, Plaintiff was Able to Implement a Scheme Constituting Unclean Hands ........ 26

5. The Undisputed Facts Show that Defendants' Profits Resulted from Factors Having Nothing to Do with the Name Adopt Me! ........ 27

V. CONCLUSION ........ 29

# TABLE OF AUTHORITIES

**Cases**

*4 Pillar Dynasty LLC v. N.Y. & Co.*, 933 F.3d 202 (2d Cir. 2019) .......... 22

*Ahern v. Shinseki*, 629 F.3d 49 (1st Cir. 2010) .......... 9

*Aktiebolaget Electrolux v. Armatron Int'l, Inc.*, 999 F.2d 1 (1st Cir. 1993) .......... 19

*Am. Auto. Ass'n of N. Cal., Nev. & Utah v. Gen. Motors LLC*, 367 F. Supp. 3d 1072 (N.D. Cal. 2019) .......... 9, 22, 23, 24

*Avco Corp. v. Turn and Bank Holdings, LLC*, 659 F. Supp. 3d 483 (M.D. Pa. 2023) .......... 27

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .......... 9

*Comm. for Idaho's High Desert Inc. v. Yost*, 92 F.3d 814 (9th Cir. 1996) .......... 21

*D & D Greek Restaurant*, 2022 WL 4596548 (C.D. Cal. Aug. 26, 2022) .......... 12

*D'Pergo Custom Guitars, Inc. v. Sweetwater Sound, Inc.*, 114 F.4th 125 (1st Cir. 2024) .......... 27

*God's Era v. New Era Cap, Co. Inc.*, 613 F. Supp. 3d 521 (D. Mass. 2020) .......... 11, 12, 15

*Grossman v. Martin*, 566 F. Supp. 3d 136 (D.R.I. 2021) .......... 9

*Gucci Am., Inc. v. Guess?, Inc.*, 858 F. Supp. 2d 250 (S.D.N.Y. 2012) .......... 21

*Hanginout, Inc. v. Google, Inc.*, 54 F. Supp. 3d 1109 (S.D. Cal. 2014) .......... 10, 11, 12, 13, 16

*Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403 (1916) .......... 10

*Kars 4 Kids, Inc. v. Am. Can!*, 8 F.4th 209 (3d Cir. 2021) .......... 22

*Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400 (9th Cir. 1993) .......... 19, 27

*McClaran v. Plastic Indus., Inc.*, 97 F.3d 347 (9th Cir. 1996) .......... 20

*McLean v. Fleming*, 96 U.S. 245 (1878) .......... 26

*Medical Depot, Inc. v. Med Way US, Inc.*, 774 F. Supp. 3d 554 (E.D.N.Y. 2025) .......... 23, 24, 25

*Monahan Prod. LLC v. Sam's E., Inc.*, 463 F. Supp. 3d 128 (D. Mass. 2020) .......... 19

*Move Press LLC v. Peloton Interactive, Inc.*, 2019 WL 4570018 (C.D. Cal. Sept. 5, 2019) .......... 11

*Nat'l Fire Prot. Ass'n, Inc. v. Int'l Code Council, Inc.*, 2006 WL 839501 (D. Mass. Mar. 29, 2006) .......... 19

*Natural Footwear, Ltd. v. Hart, Schaffner & Marx*, 760 F.2d 1383 (3d Cir. 1985)..................... 15

*Optimal Pets, Inc. v. Nutri-Vet, LLC*, 877 F. Supp. 2d 953 (C.D. Cal. 2012) .................. 11, 12, 15

*Romag Fasteners, Inc. v. Fossil, Inc.*, 590 U.S. 212 (2020)........................................................ 22

*Sweetarts v. Sunline, Inc.*, 436 F.2d 705 (8th Cir. 1971)............................................................ 15

*Texaco Puerto Rico, Inc. v. Dep't of Consumer Affairs*, 60 F.3d 867 (1st Cir. 1995)............ 26, 27

*The Apollo Theatre Found., Inc. v. W. Int'l. Syndication*, 2005 WL 1041141 (S.D.N.Y. May 5, 2005)........................................................................................................................ 21

*Thrifty Rent-A-Car Sys. v. Thrift Cars, Inc.*, 639 F. Supp. 750 (D. Mass. 1986)............. 10, 12, 15

*Town of Westport v. Monsanto Co.*, 877 F.3d 58 (1st Cir. 2017)..................................................... 9

*Trojan Battery Co. v. Golf Carts of Cypress, LLC*, 175 F.4th 582 (5th Cir. 2026)...................... 22

*UFirst Fed. Credit Union v. Univ. First Fed. Credit*, 2023 WL 6295615 (D. Utah Sept. 27, 2023) ........................................................................................................................ 11, 12, 22

*Visible Systems Corp. v. Unisys Corp.*, 551 F.3d 65 (1st Cir. 2008).................... 21, 22, 23, 24, 25

**Statutes**

15 U.S.C. § 1117(a). ........................................................................................................... 19, 21

**Treatises**

J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 26:29-30 (5th ed. 2023)........................................................................................................................ 11

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendants and Counterclaim Plaintiffs Uplift Games LLC, Treetop Games LLC and Lionfield Investments Ltd (collectively, "Defendants") submit the following Memorandum in Support of their Motion for Summary Judgment against Plaintiff and Counterclaim Defendant Impulse Communications, Inc. ("Plaintiff").

## I. INTRODUCTION

In this trademark infringement case, Plaintiff seeks to disgorge Defendants' profits worth many millions of dollars based on an alleged common law trademark that generated no more than *ten dollars* in *annual* revenue in each of the last four years.[1] The dispute arises from Plaintiff's common law claims based on the "Adopt Me" name, which Defendants allegedly infringed by launching their online Adopt Me! game in 2017. Plaintiff asserts that the worldwide success of Defendants' game resulted in so-called "reverse confusion" in which consumers looking for Defendants' game mistakenly came to Plaintiff's website instead.[2] Based on this "reverse confusion" theory, Plaintiff asserts that it suffered a "reputational" harm and other damages.[3]

All of these claims fail because Plaintiff cannot satisfy either one of the two fundamental requirements for common law rights—geographic scope and market penetration. First, Plaintiff presents no material evidence identifying the specific geographic area in which it allegedly acquired common law rights. By its own admission, Plaintiff maintained no records reflecting the state-by-state breakdown of revenue that it generated through the use of its mark prior to 2024. Instead, Plaintiff relies on its Internet presence to argue that its common law rights have a

[1] *See* **Ex. 6** to the Declaration of James R. Ferguson ("Ferguson Decl.") at ¶ 129 (Between 2024-2025, Plaintiff's revenue declined to earning around $3 over a five-month period, implying an annualized revenue of less than $10).
[2] ECF No. 1, ¶¶ 125-126
[3] *Id*.

"national" scope.

This argument ignores the unbroken line of authority holding that the mere use of a mark on the Internet does not confer a national market. Under these authorities, Plaintiff must produce material evidence showing the specific geographic location of its consumers—a burden that Plaintiff cannot carry here.

Second (and alternatively), Plaintiff also presents no evidence establishing a sufficient market presence in any specific territory. Under well-settled law, a party claiming common law rights must prove that it has a sufficient market presence in a specific area to create a "likelihood of confusion" if another party enters the same area using the same mark. Here, Plaintiff's own documents show that its website generated just $50 per month in 2015 and less than $5 per month, or under $60 a year, from approximately 2016 through 2020.[4] In other words, the website earned no more than $60 in annual worldwide revenue in each year before and after Defendants launched Adopt Me! As a matter of law, this *de minimis* revenue is insufficient to establish a sufficient market presence in any state, much less the U.S. as a whole.

Even if Plaintiff could establish a factual basis for common law rights, it cannot show any entitlement to either actual damages or disgorgement. With respect to actual damages, Plaintiff presents no documents, no expert and no evidence to specify and quantify any of the reputational harms or other damages it allegedly suffered.

With respect to disgorgement (which is Plaintiff's primary damages theory), Plaintiff fails to satisfy any of the factors cited by the courts in evaluating disgorgement claims. Most notably, in this reverse confusion case, Plaintiff cannot show that Defendants intended to divert Plaintiff's

[4] Defendants' Statement of Undisputed Facts in Support of their Motion for Summary Judgment ("SUF") ¶¶ 20, 22.

customers, exploit its goodwill, or otherwise deceive consumers. Nor can Plaintiff show that Defendants were unjustly enriched or that Plaintiff suffered any actual harm.

Finally, two other equitable points bear note. First, the undisputed facts show that Plaintiff never achieved any measurable commercial success using the name "Adopt Me"—and therefore the name "Adopt Me" never carried any goodwill or reputation that could benefit Defendants. As a result, Defendants' commercial success resulted not from the use of the name Adopt Me!, but from unrelated factors such as innovative game design, robust marketing and sustained customer engagement.

Second, Plaintiff's own documents show that Plaintiff is the party that sought to create confusion through the use of the "Adopt Me" name. In those documents, Plaintiff lays out a plan to "take advantage of the popularity of [Defendants'] Adopt Me" by using the Adopt Me name to "get free users from the confusion with [Defendants'] game."[5] As Plaintiff put it, "*everyone looking for [Defendants' game] will find me instead*," with the explicit goal to "piggyback" on Defendants' goodwill and reputation.[6]

These undisputed facts provide additional equitable grounds for granting Defendants' summary judgment motion on Plaintiff's disgorgement claim.

## II. RELEVANT CHRONOLOGY

The relevant chronology in this case can be divided into the following six stages that cover the period 2000-present.

[5] SUF ¶ 40.
[6] SUF ¶¶ 41, 43-44 (emphasis added).

### A. Plaintiff Acquires a Website Using the Adopt Me Name, but Fails to Achieve Commercial Success (2000-2020)

Plaintiff is owned by Eric Borgos, a domain name investor who has made millions of dollars by buying and selling domain names, including domains for adult entertainment sites.[7] In or about 2000, Mr. Borgos started a virtual pets game using the domain name adoptme.com, which Mr. Borgos had previously acquired as part of his domain name business.[8] In or about 2006, Mr. Borgos formed Plaintiff as a Delaware corporation and allegedly caused the sale of the Adopt Me domain name and mark to Plaintiff for one dollar in 2007.[9] Plaintiff never filed an application to secure a federal registration for the Adopt Me mark.[10]

At all times relevant here, Plaintiff's online game consisted of a simple, single player experience in which one player could "adopt" and maintain different types of virtual pets.[11] The game did not charge an access fee but generated occasional revenue through online ad networks such as Google AdSense.[12] According to Plaintiff, the revenue generated by its website never exceeded more than a few thousand dollars a month (in the period 2006-2012) and it then steadily declined to only a few dollars a month.[13]

Indeed, by 2015 (two years *before* Defendants launched their Adopt Me! game), the revenue from adoptme.com had declined to only $50 per month, which prompted Mr. Borgos to make no meaningful investments in upgrading the site.[14] Most notably, in that year, Mr. Borgos declined to convert the site to a different programming format, even though its Flash programming

[7] SUF ¶¶ 1-2.
[8] SUF ¶ 3.
[9] SUF ¶ 4.
[10] SUF ¶ 5.
[11] SUF ¶ 6.
[12] SUF ¶ 7.
[13] SUF ¶ 21.
[14] SUF ¶ 22.

was outdated and scheduled to be discontinued in December 2020.[15] As Mr. Borgos explained, "[i]t would be much too expensive for me to convert the site to another format so *I am just letting it die a slow death*."[16]

Consistent with his "slow death" strategy, on May 4, 2020, Mr. Borgos posted an online notice stating that the adoptme.com website was "shutting down," citing as its "main" reason the "old" Flash programming that had "stopped working recently."[17]

**B. Defendants Launch their Adopt Me! Game Which Quickly Becomes a Major Commercial Success (2017-present)**

Defendants Lionfield Investments Ltd. (a U.K. company) and Treetop Games LLC (a U.S. company) own the Adopt Me! trademarks and Defendant Uplift Games LLC (a U.S. company) operates the game.[18]

In 2017, the two founders of Adopt Me! launched their family-friendly game on Roblox, which is an online platform that allows users to participate in a wide range of user-created digital experiences.[19] At the time of the launch, the founders chose the name "Adopt Me!" (without any knowledge of Plaintiff or its website) because the game appealed to younger viewers and it initially focused on adoption scenarios involving virtual children.[20]

To improve and upgrade the game, Defendants expanded Adopt Me! to include virtual pets and developed social, gaming and entertainment elements enabling players to collect, raise and trade their pets, make new friends, and create their own stories and experiences.[21] These elements combined to create and maintain for Adopt Me! an extensive user base and immense popularity.

---

[15] SUF ¶ 25.
[16] *Id.* (emphasis added).
[17] SUF ¶ 28.
[18] SUF ¶ 57.
[19] SUF ¶ 8.
[20] SUF ¶ 9.
[21] SUF ¶ 10.

Indeed, [redacted].[22]

### C. Defendants Learn of Plaintiff's Website and the Parties Unsuccessfully Negotiate a Domain Name Sale (2020)

While Defendants did not know of Plaintiff's website when they selected the Adopt Me! name in 2017, they subsequently discovered the website and later learned of Mr. Borgos's May 2020 shutdown notice.[23] In light of the shutdown notice, Defendants contacted Mr. Borgos to explore a possible purchase of the adoptme.com domain name.[24]

To conduct the negotiations, Defendants retained counsel who exchanged a series of emails with Mr. Borgos discussing a possible purchase price.[25] In the course of the negotiations, the lawyer shared with Mr. Borgos the lawyer's opinion that Mr. Borgos had abandoned whatever rights he may have had in the Adopt Me name by failing to make a continuous use of the name and then shutting down the game.[26]

Ultimately, the parties were unable to reach an agreement, and on August 20, 2020, Mr. Borgos terminated the negotiations, stating that he wanted to create a "new version of Adopt Me in the form of a mobile app."[27]

### D. Defendants File Their U.S. Trademark Application After Investigating Plaintiff's Website and Mobile App

After learning of Plaintiff's website, Defendants investigated both Mr. Borgos and the website itself. In this investigation, Defendants learned that Mr. Borgos had made millions of

---

[22] SUF ¶¶ 11-12.
[23] SUF ¶ 28.
[24] SUF ¶¶ 29-30.
[25] SUF ¶ 30.
[26] SUF ¶ 33.
[27] SUF ¶ 37.

dollars through the sale of domain names, but he had no significant experience with (or interest in) online gaming. Defendants also learned that (1) Plaintiff's game bore a 2004 copyright and featured outmoded design and formatting characteristics; (2) the game relied on soon-to-be-discontinued Flash programming; (3) the game displayed no advertising on its home page, or any other evidence of commercial use; and (4) the game appeared to be a "dying game" and its website traffic had steadily declined in recent years.[28] Defendants also investigated Plaintiff's mobile app (launched in late 2020) and found that it was almost completely non-functional with no access fee or advertising or any evidence of commercial use.[29]

In light of these findings, Defendants' counsel submitted a U.S. trademark application on February 4, 2021, which affirmed (*inter alia*) that "To the best of the signatory's knowledge and belief, no other persons . . . have the right to use the [Adopt Me] mark in commerce. . ."[30]

### E. Plaintiff Launches a Mobile App to "Piggyback" on Defendants' Hugely Successful Game

When Mr. Borgos first learned of Defendants' game in at least 2019, he discussed with Mr. William Keck, a close business associate, the idea of suing Defendants for trademark infringement.[31] Ultimately, however, Mr. Borgos did not file a lawsuit at that time, choosing instead to explore other options.

In particular, in 2020, Mr. Borgos finalized plans to launch an Adopt Me app. In an email to his programmer, Mr. Borgos confided that he decided to launch the app as an "experiment" to see if it could create enough "confusion" with Defendants' Adopt Me! game to get "free users":[32]

[28] SUF ¶ 31.
[29] SUF ¶ 32.
[30] SUF ¶ 35.
[31] SUF ¶ 38.
[32] SUF ¶ 40 (emphasis added).

> ***The whole point of me doing [the app]*** was to take advantage of the popularity of the Roblox Adoptme *as an experiment* to see if I could get ***free users from the confusion with them. I did not want to launch an AdoptMe app for any other reason.***

This idea resulted from Mr. Borgos's recognition that the "confusion" with Defendants' Adopt Me! game had benefited Plaintiff "because it sent a lot of extra traffic to my site."[33] In fact, "my traffic went up 10x because of it."[34] As a result, the launching of a mobile app created a "huge opportunity" for Plaintiff to create confusion and siphon consumers from Defendants:[35]

> Also the AdoptMe Roblox game does not have an app, because as part of Roblox it can't. **So *that creates a huge opportunity*** if I have one because I will be the only 'AdoptMe' app. ***Everybody looking for them will find me instead.***

To pursue this "opportunity," Mr. Borgos launched the app in December 2020, but his "experiment" did not succeed. In the period 2020-2024, the app was often dysfunctional; it displayed no advertising or other source of monetization; and it generated virtually no revenue for the entire four-year period.[36]

Consequently, with no prospects of any income from either its website or its app, Plaintiff filed its Complaint against Defendants on April 26, 2024.[37]

### F. Plaintiff's Allegations

In its current posture, Plaintiff's Complaint alleges six counts, each of which requires proof of a valid common law trademark: (1) Trademark Infringement under 15 U.S.C. § 1125(a) (Count I); (2) violations of the Anti-Cybersquatting Consumer Protection Act (Count IV); (3) Trademark Infringement at common law (Count V); (4) Unfair Competition (Count VI); (5) violations of the

[33] SUF ¶ 42.
[34] *Id.*
[35] SUF ¶ 43.
[36] SUF ¶ 45.
[37] ECF No. 1.

Rhode Island Trademark Anti-Dilution Statute (Count VII); and (6) Cancellation of Defendants' Trademark (Count X). [38]

Notably, in this case, Plaintiff's litigation theory differs from most trademark infringement claims in which the plaintiff asserts that the defendant's infringement of the plaintiff's mark resulted in "forward confusion"—*i.e.*, consumers who mistakenly believed that Defendants' game was sponsored by Plaintiff. Instead, Plaintiff has claimed that the alleged infringement resulted in "reverse confusion"—*i.e.*, consumers who mistakenly believed that *Plaintiff's* game was sponsored by Defendants.[39]

As shown below, this distinction carries important implications for the issues in this case.

## III. LEGAL STANDARD

"Summary judgment is proper when the pleadings, discovery, and affidavits, show that 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"[40] To survive summary judgment, "a 'nonmovant [who] bears the ultimate burden of proof' must provide 'definite, competent evidence.'"[41] Thus, a nonmovant may not "rest on 'conclusory allegations, improbable inferences, [or] unsupported speculation' to defeat a motion for summary judgment."[42]

## IV. ARGUMENT

Summary judgment should be entered on Plaintiff's Complaint because Plaintiff fails to prove that it qualifies for common law trademark rights in any state or territory. Alternatively,

---

[38] ECF No. 1; Plaintiff previously withdrew Counts II, III, VIII and IX of its Complaint.

[39] SUF ¶ 46; ECF No. 1, ¶¶ 131-148; *see generally Am. Auto. Ass'n of N. Cal., Nev. & Utah v. Gen. Motors LLC*, 367 F. Supp. 3d 1072, 1102-03 (N.D. Cal. 2019).

[40] *Grossman v. Martin*, 566 F. Supp. 3d 136, 142 (D.R.I. 2021) (quoting Fed. R. Civ. P. 56).

[41] *Town of Westport v. Monsanto Co.*, 877 F.3d 58, 66 (1st Cir. 2017); *Ahern v. Shinseki*, 629 F.3d 49, 54 (1st Cir. 2010); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

[42] *Town of Westport*, 877 F.3d at 68.

even if Plaintiff could establish common law rights, summary judgment should still be entered on Plaintiff's claims for actual damages and disgorgement.

### A. Summary Judgment Should Be Entered on Plaintiff's Trademark Claims

The undisputed facts show that Plaintiff has failed to prove that it achieved sufficient market penetration in any state or territory, including the U.S. as a whole, to qualify for common law trademark rights.

#### 1. The Requirements for Common Law Trademark Rights

To establish common law trademark rights, a plaintiff bears the burden of proving that (1) the plaintiff is the senior user of the mark; and (2) the plaintiff has sufficient market penetration in a specific geographic area to preclude the defendant from using the mark in the same area.[43] These requirements reflect the courts' recognition that common law rights arise only when a party's mark is "sufficiently known" in a specific area to create a likelihood of confusion if another party enters the same area using the same mark.[44]

To meet these requirements, Plaintiff in this case relies almost entirely on unverified hearsay because Plaintiff did not maintain any state-by-state revenue records or any business records relating to its use of the Adopt Me name.[45] But as shown below, even if the hearsay is admitted, Plaintiff raises no material factual dispute as to two key requirements for common law rights—geographic scope and market penetration.

#### 2. Plaintiff Fails to Meet the "Geographic Scope" Requirement

Plaintiff presents no material evidence identifying the specific geographic area in which it purportedly acquired any real market presence. In its discovery responses, Plaintiff admits that it

---

[43] *Hanginout, Inc. v. Google, Inc.*, 54 F. Supp. 3d 1109, 1121 (S.D. Cal. 2014).
[44] *Thrifty Rent-A-Car Sys. v. Thrift Cars, Inc.*, 639 F. Supp. 750, 752 (D. Mass. 1986); *see also Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 416 (1916).
[45] SUF ¶¶ 14-15.

has no "state-by-state breakdown" of the revenue it allegedly received from its online use of the mark.[46] This admission alone demonstrates that Plaintiff cannot establish a factual basis for common law rights in any individual state, such as Rhode Island, Massachusetts, California or New York.[47]

Plaintiff nevertheless asserts that it acquired a *national* market because its online game could be accessed on the Internet.[48] This claim ignores the long line of authorities holding that the mere use of a mark on the Internet is not sufficient to establish a national market.[49] In each of these cases, the courts required the plaintiff to prove the specific states of residence of the consumers who actually purchased the relevant products on the Internet.

For example, in *God's Era*, the court rejected the plaintiff's claim that its Internet sales expanded the "geographic extent" of its common law rights.[50] The court explained that only the specific geographic "location of actual buyers indicates the extent of territorial penetration."[51] Similarly, in *Optimal Pets*, the court held that Internet sales did not prove a national market, but instead represented only sales in the specific "geographical area" in which the consumers are located.[52] Likewise, in *Hanginout*, the court squarely rejected the plaintiff's claim that Internet sales and marketing are "sufficient to find nationwide market penetration."[53] Instead, the court

---

[46] SUF ¶ 16.
[47] *See, e.g.*, *Move Press LLC v. Peloton Interactive, Inc.*, 2019 WL 4570018, at *9 (C.D. Cal. Sept. 5, 2019).
[48] ECF No. 1, ¶ 167.
[49] *See, e.g.*, J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 26:29-30 (5th ed. 2023); *UFirst Fed. Credit Union v. Univ. First Fed. Credit*, 2023 WL 6295615, at *4 (D. Utah Sept. 27, 2023); *God's Era v. New Era Cap, Co. Inc.*, 613 F. Supp. 3d 521, 526 n. 5 (D. Mass. 2020); *Hanginout*, 54 F. Supp. 3d at 1122; *Optimal Pets, Inc. v. Nutri-Vet, LLC*, 877 F. Supp. 2d 953, 962 (C.D. Cal. 2012).
[50] *God's Era*, 613 F. Supp. 3d at 526.
[51] *Id.* (emphasis added).
[52] *Optimal Pets*, 877 F. Supp. 2d at 962.
[53] *Hanginout*, 54 F. Supp. 3d at 1122.

required the plaintiff to prove the "actual location" of its registered users to establish the geographic scope of its mark.[54]

Finally, in *UFirst*, the court held that a plaintiff "may not rely on the fact that it operates a website and a mobile app to establish nationwide rights to its trademark."[55] Rather, the plaintiff must prove that it has "penetrated every market in the United States through use of its trademark *within each market*—either through use of the [plaintiff's] website or otherwise."[56] In reaching this result, the court cited a leading treatise stating that "[m]arket penetration by internet use of a mark should be determined primarily by evidence as to the place where buyers actually purchased the goods and services advertised on the internet site."[57]

The same logic applies here. By its own admission, Plaintiff cannot identify the location of registered users of its website or *any* advertiser who actually paid to post advertisements on Plaintiff's website or app.[58] Without this evidence, Plaintiff cannot identify *any* specific territory in which it established a market presence.[59]

For this reason alone, summary judgment should be entered on all of the counts set forth in Plaintiff's Complaint.

**3. Plaintiff Fails to Meet the "Market Penetration" Requirement**

Even if Plaintiff could prove a national market, it fails to present any evidence showing sufficient market penetration to "pose a real likelihood of confusion."[60]

---

[54] *Id.* at 1124; *see also D & D Greek Restaurant*, 2022 WL 4596548, at *4-5 (C.D. Cal. Aug. 26, 2022) (plaintiff's internet presence and television advertising failed to prove that it acquired "national senior common law rights").
[55] *UFirst*, 2023 WL 6295615, at *5.
[56] *Id.*
[57] *Id.* (*quoting McCarthy*, § 26:30.50).
[58] SUF ¶ 17.
[59] *God's Era*, 613 F. Supp. 3d at 526 n. 5; *Hanginout*, 54 F. Supp. 3d at 1122; *Optimal Pets, Inc. v. Nutri-Vet, LLC*, 877 F. Supp.2d 953, 962 (C.D. Cal. 2012).
[60] *Thrifty Rent-A-Car Sys.*, 639 F. Supp. at 754.

To determine the sufficiency of market penetration, the courts consider several factors, including (1) the plaintiff's volume of sales in the relevant geographic area; (2) the growth trends of the plaintiff's product (both positive and negative) in the relevant area; (3) the number of consumers in the relevant area who actually purchase or use the plaintiff's product in the relevant area; and (4) the plaintiff's advertising in the relevant area.[61]

**a. Volume of Sales**

Turning first to "volume of sales," the undisputed facts show that Plaintiff's mark generated only *de minimis* revenue in the period 2001-2025. In these years, according to Plaintiff, the sole source of the mark's online revenue was website advertising, nearly all of which came from Google AdSense.[62] However, Plaintiff admits that it has no records reflecting the actual sales it generated through the use of the mark on its website and app.[63]

As a result, instead of invoices, bank records or verifiable third-party data, Plaintiff provides only a vague and unverified narrative claiming that (1) from 2001 to 2003, Plaintiff received "hundreds of dollars a month" in revenue; (2) from 2006 to 2012, it received "thousands of dollars a month"; (3) in 2013 it "likely" received less than a thousand dollars a month; (4) from 2014 to 2020, it received a hundred dollars a month or less; and (5) from 2024 to the present, it received no more than a "few dollars" per month.[64]

Apart from this wholly uncorroborated narrative, Plaintiff cites a patchwork of fragmentary data based largely on emails containing inadmissible hearsay.[65] In the emails, Plaintiff purports to disclose advertising revenue for 36 days in 2006 and 13 days in 2009, but Plaintiff provides no

---

[61] *Hanginout,* 54 F. Supp. 3d at 1121.
[62] SUF ¶ 13.
[63] SUF ¶ 15.
[64] SUF ¶ 18.
[65] SUF ¶ 19.

third-party data for the period 2007-2008.[66] Plaintiff also provides other hearsay evidence indicating that Plaintiff earned less than $60 per year in 2016-2020 and less than $5 per year in 2024-25, but no evidence at all of any income between 2020 and 2023, when Plaintiff's game had no advertising.[67]

If this incomplete and unverified hearsay is deemed admissible, Plaintiff's *estimated* annual global sales volume for the years 2006-2024 can be extrapolated as follows (with the year of Defendants' 2017 game launch and each year after it highlighted in red):[68]

| YEAR | TOTAL ESTIMATED ANNUAL GLOBAL REVENUE |
|---|---|
| **2006** | **$ 26,602** |
| **2010** | **$ 18,148** |
| **2011** | **$ 18,817** |
| **2012** | **$ 15,097** |
| **2015** | **$ 763** |
| **2016** | **$ 60** |
| **2017** | **$ 60** |
| **2018** | **$ 60** |
| **2019** | **$ 60** |
| **2020** | **$ 0** |
| **2021** | **$ 0** |
| **2022** | **$ 0** |
| **2024** | **$ 5** |

[66] *See* **Ex. 12** to Ferguson Decl.
[67] *See* **Ex. 5** to Ferguson Decl. at Answer No. 3, p. 17.
[68] SUF ¶ 20.

Such "sporadic and inconsequential sales" cannot establish common law rights because they are far too small to create a *national* market presence—and hence far too small to create any "real likelihood of confusion" within that market.[69] This is particularly true since Defendants did not even launch their game until 2017 when Plaintiff's estimated *worldwide* revenue had already plummeted to less than $60 per year.

This rationale underlies cases like *Optimal Pets*, where the court found as matter of law that the plaintiff's sales volume was "beneath any reasonable threshold" for a finding of sufficient market penetration in any state or territory.[70] The court reached this conclusion based on evidence showing that at the time the defendant entered the market the plaintiff had (1) total sales in two states of $1,099 and $1,888; (2) total sales in four states of $117 to $569; (3) total sales in eight states of less than $80; and (4) no sales at all in the remaining states.

Similarly, in this case, Plaintiff's estimated (and unverified) sales revenue is far "beneath any reasonable threshold" for sufficient market penetration either in the nation as a whole or in any specific state or territory. Accordingly, even if Plaintiff's fragmentary and hearsay evidence is assumed to be admissible, Plaintiff's purported sales revenue is manifestly inadequate to establish sufficient market penetration in any specific state, much less in the U.S. as a whole.

**b. Growth Trends**

Plaintiff's emails not only reflect negligible sales but also document a 20-year decline in the sales generated by Plaintiff's mark. Beginning in 2006, Plaintiff's already low sales revenue began a steady decline to increasingly *de minimis* levels, which culminated in virtually non-

---

[69] *God's Era*, 613 F. Supp. 3d at 526; *Thrifty Rent-A-Car Sys.*, 639 F. Supp. at 754.

[70] *Optimal Pets*, 877 F.Supp.2d at 962-63; *see also Natural Footwear, Ltd. v. Hart, Schaffner & Marx*, 760 F.2d 1383, 1399 (3d Cir. 1985) (plaintiff's market penetration was *de minimis* in states where the plaintiff "achieved neither gross sales of over $5,000 nor a total of over 50 customers"); *Sweetarts v. Sunline, Inc.*, 436 F.2d 705, 709 (8th Cir. 1971) (plaintiff failed to prove sufficient market penetration where it had less than $1,059 worth of annual sales in any of the eight disputed states and there was no demonstration of upward sales).

existent sales by 2020.[71] This declining revenue trend corroborated Mr. Borgos's own comment that he decided in 2015 to let his online game "die a slow death" because its Flash technology would eventually be obsolete and too expensive to convert.[72]

The declining revenue also mirrored a sharp drop in the total monthly *organic* traffic (*i.e.*, individuals who merely visited the website)[73] in the period 2012-present.[74] During this period, the organic traffic fell from an already low 47,085 monthly visitors in January 2012 to 1,047 monthly visitors in 2016 (shortly before Defendants launched their game in 2017) with a continuing decline thereafter to virtually non-existent levels in 2024-25.[75]

**Total Monthly Organic Traffic to Adopt Me Website (2012-2025)**




These facts are remarkably similar to the facts of *Hanginout*, where the court found a "dramatic decline" in the number of website views of the relevant product.[76] In that case, the court

[71] SUF ¶ 20; *see* **Ex. 6** to Ferguson Decl. ¶ 135 ("In sum, these data indicate that Plaintiff earned only negligible revenue from its Adopt Me game in any geographic market. These revenues allegedly peaked in the mid- to late-2000s and declined to increasingly de minimis levels by the mid-2010s, where they have remained since.").
[72] SUF ¶ 25.
[73] *See* **Ex. 6** to Ferguson Decl. at ¶ 116 ("Organic traffic" thus measures the total number of visitors who navigated to the Adopt Me website, including visitors who do not log in to or otherwise play the game).
[74] SUF ¶ 23; *see* **Ex. 6** to Ferguson Decl., Fig. 6.
[75] SUF ¶ 23.
[76] *Hanginout*, 54 F. Supp. 3d at 1123.

stressed that the highest number of views occurred in October 2012 before "nearly flat-lining in or around October 2013," which represented an 82.17% decline.[77]

Similarly, in this case, Plaintiff's unverified sales revenue *and* its organic traffic both declined ***more than 99%*** between 2006 and 2025.[78] This dramatically negative growth trend further underscores Plaintiff's failure of proof on market penetration.

**c. The Number of Consumers Who Actually Played Plaintiff's Game Versus the Number of Potential Players**

The third factor—the number of actual versus potential consumers—provides even more support. On this issue, Plaintiff again maintains no relevant records or verifiable data, relying instead on emails and uncorroborated narratives to provide relevant data.[79] According to these unverified documents, Plaintiff's game peaked in 2007, when it purportedly averaged about 10,000 worldwide daily logins at its website, but then steadily declined, ultimately recording only 1,463 downloads on its app in 2024.[80]

These minimalist numbers contrast sharply with those of other companies that successfully marketed to many *millions* of consumers in the same "virtual pets" space. For example, in the last three years, Defendants averaged [redacted] with their Adopt Me! game, while NeoPets, a similar virtual pets website, reached over 25 million active users in the mid-2000s, and Webkinz, another virtual pets website, reported over 6 million unique visitors in November 2007 alone, and in 2009 had 3.2 million unique visitors *in a single day*.[81]

These undisputed facts show that the consumers who actually played Plaintiff's game constituted only a tiny fraction of the many millions of potential consumers in the same market—

---

[77] *Id.*
[78] This percentage reflects the global revenue decline from $26,602 in 2006 to $5 in 2025.
[79] SUF ¶ 17.
[80] SUF ¶ 24.
[81] *See* **Ex. 6** to Ferguson Decl. at ¶¶ 114, 120.

and therefore Plaintiff never achieved sufficient market penetration to qualify for common law trademark rights.

**d. Advertising by Plaintiff**

The final factor—advertising by Plaintiff—leads to the same conclusion. By its own admission, Plaintiff never developed a meaningful marketing strategy or advertising campaign, paid for marketing or attempted to measure brand recognition.[82]

> Q. Am I correct that you never developed a formal marketing strategy or marketing plan or brand building strategy for the Adopt Me game or website?
>
> A. Yes, that is correct.
>
> Q. And you never conducted an advertising campaign in connection with the Adopt Me game or the adoptme.com website?
>
> A. Right. That is correct.
>
> Q. Have you ever made any attempt to measure brand value or brand recognition or brand awareness for the Adopt Me brand?
>
> A. No.

As a result, Plaintiff never pursued any meaningful efforts to build customer awareness of its Adopt Me brand.[83] Consequently, Plaintiff's failure to advertise or promote its own brand further supports the conclusion of insufficient market penetration at any time to qualify for common law rights.

* * *

Thus, the undisputed facts show that Plaintiff never achieved either one of the two requirements for common law rights—a defined geographic scope and sufficient market

[82] SUF ¶ 26.
[83] SUF ¶ 27.

penetration to create a likelihood of confusion. For either one of these reasons, Plaintiff's trademark claims should all be dismissed.

Because Plaintiff cannot establish protectable common law trademark rights in the "Adopt Me" mark, every remaining count in Plaintiff's Complaint necessarily fails as well. Plaintiff's claims for common law trademark infringement, trademark dilution, cybersquatting, unfair competition and trademark cancellation all require proof of enforceable rights in the mark.[84] This includes Count X (Petition for Cancellation) which alleges that Defendants falsely represented to the U.S. Patent and Trademark Office that no other person had a right to use the Adopt Me name.[85] Without a threshold showing that Plaintiff had a valid right to use the same name, neither Count X nor any of the other claims can survive as a matter of law. For these reasons, summary judgment dismissing Plaintiff's Complaint in its entirety should be granted.

### B. Summary Judgment Should Be Entered on Plaintiff's Claim for Actual Damages

Section 35 of the Lanham Act provides that the award of monetary remedies in trademark infringement cases shall be subject to principles of equity.[86] To recover actual damages in a trademark case, a plaintiff must prove both "the fact and the amount of damage."[87] Damages are typically measured by any direct injury that a plaintiff can prove, as well as any lost profits that the plaintiff would have earned but for the infringement.[88] Compensatory damages must be established with "reasonable certainty" and cannot be based on speculation or conjecture.[89]

---

[84] ECF No. 1, ¶¶ 16, 190-194, 218-220, 224-225, 232-233, 271-272.
[85] ECF No. 1, ¶¶ 271-273.
[86] 15 U.S.C. § 1117(a).
[87] *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1405 (9th Cir. 1993); *see also Monahan Prod. LLC v. Sam's E., Inc.*, 463 F. Supp. 3d 128, 145-46 (D. Mass. 2020) (citing *Aktiebolaget Electrolux v. Armatron Int'l, Inc.*, 999 F.2d 1, 5 (1st Cir. 1993)) (a plaintiff must show actual harm to recover money damages).
[88] *Id.*
[89] *Nat'l Fire Prot. Ass'n, Inc. v. Int'l Code Council, Inc.*, 2006 WL 839501, at *25, *29 (D. Mass. Mar. 29, 2006) (compensatory damages for trademark infringement must be determined with reasonable certainty and "are intended

In this case, as noted above, Plaintiff's litigation theory proceeds on a reverse confusion claim, alleging that Defendants' infringement caused consumers mistakenly to believe that Plaintiff's products were affiliated with Defendants.[90] As a result, in this litigation, Plaintiff has no evidence that Defendants diverted Plaintiff's customers to their online game or otherwise sought to profit from Plaintiff's goodwill. Instead, Plaintiff claims that it suffered "lost opportunities" and "reputational damage" because consumers confused Plaintiff's online game with the "bad behavior" associated with Defendants' game.[91]

Yet, Plaintiff has not presented any documents or other evidence to quantify the precise nature and specific amounts of its actual damages. In its discovery responses, Plaintiff claimed that it could not provide "final separate computations" for its actual damages because the relevant documents have not been "fully produced" and "may require expert analysis."[92] With discovery now complete, Plaintiff has not produced any documents calculating its actual damages or presented any expert to quantify such damages. In addition, at his deposition, Mr. Borgos admitted that he could not identify any profits that Plaintiff lost as a result of Defendants' alleged infringement:[93]

Q. Can you identify any specific profits that you have lost as a result of my clients' alleged conduct?

A. Nothing specific. No.

Finally, Plaintiff also failed to produce any evidence supporting an award of a reasonable royalty.[94] Courts seldom grant royalty awards for trademark infringement, particularly if the

---

to make the injured plaintiff whole; they are not meant to provide a windfall."); *McClaran v. Plastic Indus., Inc.*, 97 F.3d 347, 361 (9th Cir. 1996).

[90] SUF ¶ 46; ECF No. 1, ¶ 125.

[91] ECF No. 1, ¶¶ 131-148.

[92] SUF ¶ 47.

[93] SUF ¶ 52.

[94] SUF ¶ 53.

parties do not have a prior licensing agreement, and when they do, it is only where "the evidence provides a sufficiently reliable basis from which to calculate [the award]."[95] In this case, Plaintiff produced no documents—and presented no experts—to establish a sufficiently reliable basis for a royalty award.[96]

Consequently, in the absence of any evidence supporting or quantifying Plaintiff's claim for actual damages, summary judgment should be granted on this issue.[97]

### C. Summary Judgment Should Be Entered on Plaintiff's Disgorgement Claim

In its primary claim for money damages, Plaintiff seeks disgorgement of many millions of dollars in profits purportedly earned by Defendants through their use of the Adopt Me! mark. Plaintiff bases this claim on Defendants' alleged "bad intent" in using the mark for their online game.[98] But even if Plaintiff could prove common law rights, summary judgment should still be entered on its disgorgement claim.

#### 1. General Principles of Disgorgement

It is well settled that disgorgement is a form of equitable relief that is committed to the sound discretion of the trial court and rarely granted.[99] Under the Lanham Act, a plaintiff seeking disgorgement must first present evidence of the defendant's total revenue, which then shifts the burden to the defendant to prove deductions for both expenses and any profits not resulting from the infringement.[100]

---

[95] *Gucci Am., Inc. v. Guess?, Inc.*, 858 F. Supp. 2d 250, 254 (S.D.N.Y. 2012); *see also The Apollo Theatre Found., Inc. v. W. Int'l. Syndication*, 2005 WL 1041141, at *13 (S.D.N.Y. May 5, 2005).
[96] SUF ¶ 54.
[97] *Comm. for Idaho's High Desert Inc. v. Yost*, 92 F.3d 814, 823 (9th Cir. 1996).
[98] *See* **Ex. 10** to Ferguson Decl. at ¶ 46.
[99] *Visible Systems Corp. v. Unisys Corp.*, 551 F.3d 65, 80 (1st Cir. 2008); 15 U.S.C. § 1117(a).
[100] 15 U.S.C. § 1117(a).

In the First Circuit, courts award disgorgement when necessary to: (1) compensate the plaintiff for the harm caused by the alleged infringement; (2) prevent the defendant from accruing an unjust enrichment; or (3) deter an infringer from further infringement.[101]

In making these determinations, courts consider several equitable factors, including (1) whether the defendant intended to deceive or confuse consumers; (2) whether the plaintiff suffered any harm; (3) whether the defendant obtained any benefit; (4) whether the plaintiff unreasonably delayed in pursuing its remedies; and (5) whether other remedies are available.[102]

In applying these factors, the courts view the defendant's intent as a "highly important consideration" in evaluating disgorgement claims.[103] The key issue is whether the defendant acted in bad faith by trading on the plaintiff's reputation or goodwill to deceive consumers.[104] In the absence of such a showing, the "intent" factor generally does not support a disgorgement award.[105]

### 2. Plaintiff Presents No Evidence that Defendants Intended to Deceive Consumers or Otherwise Acted in Bad Faith

As in all reverse confusion cases, Plaintiff in this case cannot prove that Defendants intended to exploit Plaintiff's mark, divert Plaintiff's sales, or otherwise deceive consumers.[106] Instead, Plaintiff merely claims that Defendants' use of the Adopt Me! mark caused consumers to believe (mistakenly) that Plaintiff's game was affiliated with Defendants.[107]

---

[101] *Visible Systems*, 551 F.3d at 79.
[102] *See, e.g.*, *Trojan Battery Co. v. Golf Carts of Cypress, LLC*, 175 F.4th 582, 599 (5th Cir. 2026); *Kars 4 Kids, Inc. v. Am. Can!*, 8 F.4th 209, 224 (3d Cir. 2021); *4 Pillar Dynasty LLC v. N.Y. & Co.*, 933 F.3d 202, 212 (2d Cir. 2019).
[103] *Romag Fasteners, Inc. v. Fossil, Inc.*, 590 U.S. 212, 219 (2020).
[104] *Visible Systems*, 551 F.3d at 75; *Am. Auto. Ass'n*, 367 F. Supp. 3d at 1102-03; *see also UFirst Fed. Credit Union v. Univ. First Fed. Credit*, 2023 WL 6295615, at *4 (D. Utah Sept. 27, 2023) (mere knowledge of first user of a mark is not enough to show bad faith; rather, the focus is on whether the second user had the intent to benefit from the first user's reputation or goodwill).
[105] *Id.*
[106] *See Am. Auto. Ass'n*, 367 F. Supp. 3d at 1102-03.
[107] ECF No. 1, ¶¶ 125-131.

Plaintiff nevertheless argues that Defendants acted with "bad intent" because Defendants knew of Plaintiff's use of the Adopt Me mark when Defendants applied for a federal registration.[108] However, this argument ignores the critical difference between "bad faith" and "willfulness."[109] As the First Circuit has explained, in trademark law, bad faith "refers to an attempt by a junior user to *exploit the goodwill and reputation of a senior user with the intent to sow confusion*," while willfulness refers to the use of the mark with knowledge of a prior user.[110] As a result, a showing of "bad faith" requires evidence that the defendant "*deliberately* intended to benefit from [the plaintiff's] reputation," rather than merely possessing knowledge of the plaintiff's mark.[111]

Consistent with this distinction, the courts have repeatedly held that disgorgement is most appropriate in cases where the defendant "deliberately intended" to deceive consumers by exploiting the plaintiff's reputation or goodwill.[112] Indeed, Defendants have not found a single case in which "a court has disgorged a defendant's profits based. . . only on mere knowledge [of the prior user]."[113]

For example, in *Visible Systems*—a reverse confusion case—the First Circuit upheld the district court's post-trial ruling that the plaintiff was not entitled to disgorgement of the defendant's profits.[114] In so doing, the First Circuit stressed that the plaintiff presented no evidence that the defendant made any "unjust profits," acted in bad faith, or otherwise used the mark "to take advantage of [the plaintiff's] goodwill and reputation in the market."[115]

---

[108] SUF ¶¶ 35-36.
[109] *Visible Systems*, 551 F.3d at 75 (quoting 4 *McCarthy* § 23:113, at 23-357) (emphasis added).
[110] *Id.*
[111] *Id.* (emphasis added).
[112] *See, e.g.*, *Am. Auto. Ass'n*, 367 F. Supp. 3d at 1102-03 (citing cases); *Medical Depot, Inc. v. Med Way US, Inc.*, 774 F. Supp. 3d 554, 573 (E.D.N.Y. 2025).
[113] *Am. Auto. Ass'n*, 367 F. Supp. 3d at 1103.
[114] *Visible Systems*, 551 F.3d at 75-76, 81.
[115] *Id.*

Thus, under these authorities, Plaintiff's failure to present any evidence showing a deliberate intent to deceive consumers weighs heavily—without more—against disgorgement.[116]

Furthermore, even if mere "knowledge of a prior user" were relevant to disgorgement, the undisputed evidence shows that before filing their U.S. application in February 2021, Defendants conducted a thorough investigation establishing the following facts:[117]

- While Mr. Borgos made millions of dollars through domain name sales, he had little if any real experience in video games or online gaming;
- Mr. Borgos's Adopt Me game bore a 2004 copyright and relied on soon-to-be discontinued Flash programming, as well as outmoded design and formatting characteristics;
- Mr. Borgos's game displayed no home page advertising or any other evidence of commercial use, and its website traffic had steadily declined in recent years;
- In May 2020, Mr. Borgos posted a notice stating that he was shutting down the adoptme.com website and directing visitors to an unrelated website having nothing to do with virtual pets;
- Mr. Borgos's mobile app (launched in late 2020) was also often dysfunctional, with no access fee or advertising, and no evidence of any commercial use; and
- Defendants' counsel (whose colleague ultimately filed the trademark application) informed Mr. Borgos that, in counsel's opinion, Mr. Borgos had no common law rights because he had not maintained a sufficient commercial use of the Adopt Me mark and then shut down the game.[118]

These undisputed facts establish that Defendants conducted a thorough investigation of Plaintiff's common law claims before filing their own federal trademark application.[119] Indeed, Plaintiff's own expert agreed at his deposition that Defendants' investigation "*seem[ed] like the*

---

[116] *Visible Systems*, 551 F.3d at 75.
[117] For cases in which the courts considered the defendant's affirmative evidence of good faith in weighing disgorgement claims, *see Am. Auto. Ass'n*, 367 F. Supp. 3d at 1102-03 (citing cases); *Medical Depot*, 774 F. Supp. 3d at 580-81.
[118] SUF ¶¶ 28, 31-33.
[119] *Id.*

*right things to do*," and he could not identify any additional steps, beyond consulting counsel, that Defendants should have taken:[120]

> Q. My question is: If you assume that [Defendants] conducted an investigation into what advertising, if any, existed on the website, they conducted an investigation into what promotional activities, if any, Mr. Borgos had conducted, they conducted an investigation into whether the app was even functional, if they did all that. . . . ***what else do you think they should have done to determine if Mr. Borgos or the Plaintiff had enforceable trademark rights?***
>
> A. Following your hypothetical, ***those seem like the right things to do***, and my only addition to that is they should have reported it to counsel, which they may have done.

Accordingly, Plaintiff not only fails to present any evidence showing that Defendants acted in bad faith by deceiving consumers but also fails to dispute any of the facts showing the thoroughness of Defendants' pre-filing investigation. For these reasons, the "intent" factor weighs against Plaintiff's disgorgement claim.

#### 3. Plaintiff Suffered No Harm—and Defendants Gained No Benefit—From the Alleged Reverse Confusion

Plaintiff also presents no evidence showing that Plaintiff suffered any harm or that Defendants gained any benefit from the alleged infringement.[121] As shown above, Plaintiff fails to quantify any lost profits or other harm that Plaintiff allegedly suffered as a result of Defendants' use of the Adopt Me! mark.[122] Nor does Plaintiff present any evidence that Defendants benefited in any way from the reverse confusion allegedly caused by their infringement. Most notably, Plaintiff presents no evidence of any "profits that accrued to [Defendants] as a result of [their alleged] infringement."[123]

---

[120] SUF ¶ 34 (emphasis added); *see Medical Depot*, 774 F. Supp 3d at 573.
[121] *Visible Systems*, 551 F.3d at 79.
[122] *See* Section IV.B.
[123] *Visible Systems*, 551 F.3d at 80.

Thus, the undisputed facts show that Defendants' alleged infringement caused no harm to Plaintiff *and* no benefit to Defendants, and these facts weigh heavily against disgorgement.

**4. By Unreasonably Delaying in Bringing Suit, Plaintiff was Able to Implement a Scheme Constituting Unclean Hands**

Another equitable factor weighing heavily against disgorgement is Plaintiff's unreasonable delay in bringing its infringement action.[124] At least as early as 2019—nearly five years before filing its Complaint—Mr. Borgos became aware of Defendants' use of the Adopt Me! mark and discussed the issue with a business associate who recommended filing a lawsuit against Defendants.[125] Yet notwithstanding this knowledge, Plaintiff delayed in filing the suit until April 2024.[126]

This delay enabled Mr. Borgos to execute a scheme constituting unclean hands.[127] In this scheme, Mr. Borgos launched a mobile app in late 2020 to "take advantage of the popularity of the [Defendants'] Adopt Me" so that Plaintiff could "***get free users from the confusion* with [Defendants' game**]."[128] As Mr. Borgos explained, "***everyone looking for [Defendants' game] will find me instead,"*** with the explicit goal to "piggyback" on Defendants' goodwill and reputation.[129]

Thus, the undisputed facts show that the party that deliberately sought to create and exploit consumer confusion and deceive consumers was Plaintiff and not Defendants. Indeed, by scheming to "piggyback" on Defendants' huge success, Plaintiff not only intentionally sowed consumer confusion, but also inflated the profits potentially subject to disgorgement by delaying

---

[124] *See McLean v. Fleming*, 96 U.S. 245, 251 (1878).
[125] SUF ¶¶ 36, 38.
[126] SUF ¶ 39.
[127] *Texaco Puerto Rico, Inc. v. Dep't of Consumer Affairs*, 60 F.3d 867, 881 (1st Cir. 1995) ("It is old hat that a court called upon to do equity should always consider whether the petitioning party has acted in bad faith or with unclean hands.").
[128] SUF ¶ 40 (emphasis added).
[129] SUF ¶¶ 41, 43-44 (emphasis added).

its lawsuit. These equitable considerations constitute "unclean hands" relating to the merits of the dispute and thus provide additional reasons to dismiss Plaintiff's disgorgement claim.[130]

### 5. The Undisputed Facts Show that Defendants' Profits Resulted from Factors Having Nothing to Do with the Name Adopt Me!

Finally, even if Plaintiff could establish some equitable basis for disgorgement, the undisputed facts show that Defendants' success resulted entirely from factors having nothing to do with the name "Adopt Me!"[131] The courts have long recognized that under the Lanham Act a disgorgement of profits should not include any profits "attributable to factors other than the infringement."[132]

These authorities apply here. When Defendants launched their game in 2017, Plaintiff was receiving less than $60 in estimated annual *global* revenue from its Adopt Me website and making no investments in marketing or developing its game.[133] These facts resulted from Plaintiff's decision to let the game "die a slow death" because its Flash programming would soon be obsolete and Plaintiff was unwilling to invest in a more modern format.[134] As a result, in 2017, Plaintiff's Adopt Me mark had no meaningful brand recognition, no market presence, and no reputation or goodwill that could benefit Defendants when they began using the same name.[135]

Instead, Defendants achieved their success by relying on other factors such as innovative game design, a robust marketing effort, continuous game updates, and sustained consumer engagement to build brand awareness and commercial recognition. Among other things, Defendants developed a constantly evolving game that featured a "sophisticated, multi-layered

---

[130] *Texaco*, 60 F.3d at 881.
[131] *See Avco Corp. v. Turn and Bank Holdings, LLC*, 659 F. Supp. 3d 483, 503-04 (M.D. Pa. 2023).
[132] *Lindy Pen*, 982 F.2d at 1408; *Avco Corp.*, 659 F. Supp. 3d at 503-04 (profits not subject to disgorgement where there is a "lack of connection between the infringing mark and the actual sales"); *see also D'Pergo Custom Guitars, Inc. v. Sweetwater Sound, Inc.*, 114 F.4th 125, 137 (1st Cir. 2024) (Copyright Act).
[133] SUF ¶ 20.
[134] SUF ¶¶ 22, 25.
[135] *See* **Ex. 6** to Ferguson Decl. at ¶ 12.

progression system built from multiple interlocking features centered on pet acquisition, care, aging, evolution, collection and trading," while Plaintiff relied on a "single player browser-based experience" which saw no real modernization for more than 20 years.[136]

In addition, unlike Mr. Borgos who made no investments in marketing and promotion, Defendants engaged in extensive efforts to generate brand awareness for Adopt Me! and sustained ongoing engagement with target customers over time.[137] For example, [redacted][138] [redacted][139]

Through these efforts, Defendants' game acquired a substantial user base, averaging more than [redacted] for several years, making it one of the most popular experiences on the Roblox platform since at least 2019.[140]

Accordingly, the unrebutted evidence shows that Defendants' commercial success stems from their investments in marketing and game development, and not from their use of the Adopt Me! name.[141] Indeed, Plaintiff's own expert conducted an analysis showing a "very strong correlation" (*i.e.*, a correlation coefficient greater than .9487) between Defendants' revenue and features of Defendants' game that increased so-called "player engagement metrics."[142] This

---

[136] SUF ¶¶ 50-51.
[137] SUF ¶¶ 26, 48-49.
[138] SUF ¶ 48.
[139] SUF ¶ 49.
[140] SUF ¶ 12.
[141] SUF ¶¶ 48-51.
[142] SUF ¶ 55.

documented correlation was so strong that it suggested a direct causal relationship between the game's ability to engage players and increases in Defendants' revenue:[143]

> Q. So would you say that the strong correlation supports the idea or is consistent with the idea that the player engagement metrics are causing the [revenue] earned?
>
> A. I would say so yes.

Thus, the undisputed facts show that Defendants owe their success to factors having nothing to do with the name "Adopt Me!" As a result, none of Defendants' profits should be attributed to the alleged infringement for purposes of disgorgement.

This factor provides a final reason for entering summary judgment on Plaintiff's disgorgement claim.

## V. CONCLUSION

For the above reasons, Defendants respectfully request that the Court grant their Motion for Summary Judgment and dismiss Plaintiff's Complaint with prejudice. Alternatively, Defendants request that the Court enter summary judgment on Plaintiff's claims for actual damages and disgorgement.

---

[143] SUF ¶ 56.

Dated: October 2, 2026

Respectfully submitted.

UPLIFT GAMES LLC
TREETOP GAMES LLC
LIONFIELD INVESTMENTS LTD
By and Through Their Attorneys,

*/s/ Jeffrey K. Techentin*
R. Bart Totten, Esq. (#5095)
Jeffrey K. Techentin, Esq. (#6651)
Adler Pollock & Sheehan P.C.
100 Westminster Street, 16th Floor
Providence, RI 02903

Michael D. Adams (pro hac vice)
James R. Ferguson (pro hac vice)
MAYER BROWN LLP
71 S. Wacker Dr.
Chicago, IL 60606

**CERTIFICATE OF SERVICE**

I hereby certify that on October 2, 2026, a true copy of the foregoing was filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the Court's CM/ECF system and the filing is available for viewing and downloading from the Court's CM/ECF system.

*/s/ Jeffrey K. Techentin*
Adler Pollock & Sheehan P.C.
Counsel for Defendants